## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

INDYMAC BANK, F.S.B.
155 North Lake Ave.
Pasadena, CA  91101

      v.

Case No.: _____

LEMARCOS A. IRVING
5755 Oak Forest Court
Indian Head, MD  20640

and

NINA Q. IRVING
5755 Oak Forest Court
Indian Head, MD  20640

and

SOUTHSHORE TITLE & ESCROW, INC.
7019 Backlick Court
Springfield, VA  22151

    Serve On:   Resident Agent:  Hofdahl, Inc.
                  3521 Barkley Dr.
                  Fairfax, VA  22031

and

TIMOTHY F. GEPPERT,
Individually and trading as GEPPERT REAL
ESTATE, an unincorporated entity
7 Ashky Court
Middleton, MD  21769

and

FAIRFAX REALTY, INC.
103 W. Broad St., Ste. 400
Falls Church, VA 22046

    Serve On:   Resident Agent: David P. Michalski
                  103 W. Broad St., Ste. 400

Case: 1:07-cv-01678
Assigned To : Roberts, Richard W.
Assign. Date : 9/21/2007
Description: General Civil

Falls Church, VA  22046

and

ALBERT SMITH
4140 Ferry Landing Rd.
Dunkirk, MD  20754


and

LEGACY FINANCIAL CORPORATION
9617 Eldwick Way
Potomac, MD  20854

   Serve On:  Resident Agent:  Gary M. Gertier
               9617 Eldwick Way
               Potomac, MD  20854

and

SAMUEL ADEBAYO
7811 Montrose Road, Ste. 501
Rockville, MD  20854

and

CORPORATE MANAGEMENT SERVICES, INC.
1400 Spring St., Ste. 415
Silver Spring, MD  20910

    Serve On:  Resident Agent:  Alan R. Davis
              1400 Spring St., Ste. 415
              Silver Spring, MD   20910

and

ALAN R. DAVIS
1400 Spring St., Ste. 415
Silver Spring, MD  20910

and

2

WILLIAM C. HARVEY & ASSOCIATES, INC.
1146-H Walker Road
Great Falls, VA 22066

    Serve On:  Resident Agent:  Larry E. Beeker
              5501 Backlick Rd., Ste. 220
              Springfield, VA 22151

    Defendants

---

## COMPLAINT

Plaintiff IndyMac Bank ("IndyMac") by Council, Baradel, Kosmerl & Nolan, P.A., Michael N. Russo, Jr. and Michael S. Steadman, Jr., its attorneys, brings suit against the Defendants identified in the above-captioned action and says:

### Parties

1.    Plaintiff IndyMac is a Federal Savings Bank organized in and with its principal place of business in the State of California.

2.    Defendants Lemarcos A. Irving and Nina Q. Irving (collectively "Irvings") are each individuals who are married to each other.  On information and belief, the Irvings are each citizens of and residents in the State of Maryland.

3.    Southshore Title & Escrow, Inc. ("Southshore") is a corporate entity incorporated in and with its principal place of business in the Commonwealth of Virginia. Southshore is engaged in the business of conducting real estate settlements and issuing title insurance.

4.       Timothy Geppert ("Geppert") is an individual who, upon information and belief, is a citizen of and resident in the State of Maryland.  Geppert trades as Geppert Real Estate, an unincorporated association.

5.       Defendant Albert Smith ("Smith") is an individual resident in and a citizen of the State of Maryland.  Smith was an acquaintance of the Irvings and assistant pastor of their church.  Smith was an employee and agent of Fairfax Realty, Inc.

6.       Fairfax Realty, Inc. is a corporate entity incorporated in and with its principal place of business in the Commonwealth of Virginia.

7.       Defendant Samuel Adebeyo ("Adebeyo") is an individual resident in and a citizen of the State of Maryland.

8.       Legacy Financial Corporation ("Legacy") is a corporate entity organized and with its principal place of business in the State of Maryland.  Upon information and belief, Defendant Samuel Adebayo is an employee of Legacy Financial Corporation; and for all of the matters relevant to this Complaint, Adebayo acted as an employee and agent of Legacy Financial Corporation.  Legacy Financial Corporation is engaged in the business of mortgage lending.

9.       Corporate Management Services, Inc. ("CMS") is a corporation with its principal place of business in the State of Maryland.  CMS is, upon information and belief, engaged in the business of acquiring, by purchase or lease, or owning, maintaining, selling and/or leasing real property.

10.      Alan R. Davis ("Davis") is the principal of CMS.  Davis is an individual resident and citizen of the State of Maryland.  Davis is an employee and agent of CMS.

## Jurisdiction and Venue

11. The amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

12. The action is between citizens of different states and, as such, jurisdiction by virtue of diversity of citizenship is appropriate pursuant to 28 U.S.C. § 1332.

## Facts Common to All Counts

13. By Deed dated February 11, 2005, and recorded with the Recorder of Deeds for the District of Columbia on March 4, 2005, at Instrument No. 2005031077 CMS obtained fee-simple ownership of the Subject Property from 7336, LLC. (Attached as Exhibit A.)

14. The "Subject Property" has a mailing address of 7336 14th Street, N.W., Washington, D.C. 20010 and is known and described as follows:

> All that certain lot or parcel of land situate in the District of Columbia and being more particularly described as follows:
>
> Lot numbered 19 in square numbered 2737 in the subdivision made by the Lynchburg Investment Corporation of part of the tract of land called "Girl's Portion" now known as "16th Street Heights" as per plat recorded in Liber 42 at folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.
>
> Note: the above-described land is designated on the records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

15. Smith approached the Irvings with a business proposition which involved the Irvings taking a role as the purchaser of the Subject Property.

16. By Regional Sales Contract dated September 12, 2006, CMS contracted to sell the Subject Property to the Irvings for a sales price of One Million One Hundred Fifty Thousand Dollars ($1,150,000.00). (Attached as Exhibit B.)

17.    CMS was represented in the transaction by its principal stockholder, employee and agent Alan Davis.

18.    The Irvings, at the instruction and advice of their agents, including Smith and Geppert, engaged the services of Legacy Financial Corporation and its employee and agent, Samuel Adebayo, to obtain purchase money financing for their purchase of the Subject Property. Adebayo and Legacy Financial arranged for the Irvings to finance their purchase of the Subject Property with a loan from IndyMac.

19.    Legacy and IndyMac had entered into a Seller Contract and e-MITS User Agreement ("Seller Contract") which provides the terms and conditions by which Legacy would originate and sell mortgage loans, such as the one ultimately provided to the Irvings, to IndyMac. Attached as Exhibit C. This Agreement provided, *inter alia,* that Legacy was to "diligently perform all duties incident to the sale…of all mortgage loans which may be sold by [Legacy]…[Legacy] shall comply with all of the applicable provisions of the [Lending] Guide… [Legacy] shall promptly notify IndyMac in writing of any activity or action, either internal or external, which could potentially affect adversely the terms of any mortgage loan serviced hereunder…." Seller Contract at Para. 2.

20.    The Seller Contract further provides that "[Legacy] acknowledges and agrees that it will be solely responsible for the data it inputs into the System and for the actions IndyMac takes based upon such data. Seller agrees that IndyMac will have no liability whatsoever arising out of or related to inaccurate or erroneous data." Seller Contact at Para. 6.4.

21.   Legacy specifically warranted that the representations made, including those representations made with respect to the Irvings, were "true and correct." Seller Contract at Para. 14. Further, Legacy agreed to "promptly indemnify, defend and hold IndyMac from and against all losses, claims, demands, actions or causes or action, liability, damages, penalties, fines, forfeitures, judgments, legal fees, including reasonable attorney's fees actually incurred, and any other costs and expenses heretofore or hereafter resulting from, arising out of, relating to or in connection with (i) any actual or alleged breach of any representation, warranty or obligation of [Legacy] contained in or made pursuant to this Contract or the [lending] guide, or (ii) any act or omission by Seller under this Contract or the [lending] guide... Seller Contract at Para. 16.

22.   Further, and in an Addendum to the Seller Contract dated July 13, 2005, ("Addendum") Legacy specifically warranted and covenanted that "[Legacy] will make all commercially reasonable efforts to insure the highest quality of integrity and accuracy with respect to loan quality and data verification." Attached as Exhibit D.

23.   William C. Harvey & Associates, Inc. ("Harvey & Associates") conducted an appraisal of the Subject Property at the request of and for the benefit of IndyMac in order that IndyMac might examine and underwrite this prospective loan to the Irvings.

24.   The Irvings, and/or their agents or representatives, retained the services of Southshore Title & Escrow, Inc. to serve as the settlement agent, escrow agent and title agent for the Irvings' purchase of the Subject Property from CMS.

25.   On or about September 15, 2006, IndyMac provided Southshore Title with its instructions by which Southshore was to conduct the settlement of the Subject Property. These

7

instructions included, in relevant part, a requirement that the Irvings, as the borrowers, deposit their own funds into a Southshore Escrow account as part of the purchase price for the Subject Property.

26.    On or about September 22, 2006, Southshore Title conducted a settlement of the sale of the Subject Property from CMS to the Irvings.  As part of the settlement, and as depicted on the HUD-1 settlement sheet, the Irvings were to provide cash in the amount of $220,240.98 towards their purchase of the Subject Property. (Attached as Exhibit E.)

27.    IndyMac provided its loan amount of $1,200,000.00 towards the transaction. The Irvings' initial earnest money deposit of $10,000.00 was credited towards the purchase price for the purchase of the property.

28.    After the conclusion of the settlement for the purchase of the property, IndyMac learned that despite its instruction, the Irvings failed to pay the monies called for them to pay under the settlement instructions for the HUD-1 settlement sheet.  Instead, the Irvings paid only their initial deposit of $10,000.00. Southshore Title received a wire in the amount of $220,347.00, which Southshore credited to the Irvings and noted on its records of settlement as coming from the Irvings.  The wired funds, however, were provided by Geppert.  Southshore never informed IndyMac that its instructions were not followed or received authorization that its instructions not be followed.

29.    By Deed dated September 22, 2006 and recorded with the Recorder of Deeds for the District of Columbia on November 20, 2006, CMS conveyed fee-simple title to the Subject Property to the Irvings. (Attached as Exhibit F.)

8

30.    By Deed of Trust also dated on September 22, 2006, and recorded on November 20, 2006 with the Recorder of Deeds for the District of Columbia at Instrument No. 2006156795, the Irvings conveyed a first position lien interest in the Subject Property to IndyMac. (Attached as Exhibit G.)

31.    At the settlement, and without the authority or knowledge of IndyMac, Southshore paid to Timothy F. Geppert a total of Seven Hundred Sixteen Thousand Thirty-Eight Dollars and Sixty-Two Cents ($716,038.62) out of the loan proceeds provided by IndyMac to the Irvings for their purchase of the Subject Property. (Disbursement Sheet attached as Exhibit H.)

32.    Harvey & Associates conducted an appraisal of the Subject Property and concluded that the fair market value of the Subject Property was One Million Six Hundred Five Thousand Five Hundred Seventy-Four Dollars ($1,605,574.00). However, at the time this appraisal was issued the actual fair market value of the property was much lower.

33.    The purchase of the Subject Property and the loan application to IndyMac was actually a scheme to defraud developed by and among the defendants to entice and encourage Indy Mac to loan money to the Irvings under false pretenses.

34.    CMS and its managing member Alan R. Davis, through the cooperation and in conjunction with the Irvings, Geppert; Smith, and Fairfax Realty, and Adebayo and Legacy Financial Corporation created a scheme or artifice which was intended for the Irvings to acquire title to the property by representing to IndyMac that the value of the property far exceeded its actual value and thus encouraging IndyMac to loan more than the value of the property to the Irvings. The increased proceeds were taken by or for the benefit of the Irvings,

Geppert, Albert Smith, Legacy Financial and Sam Adebayo, Corporate Management Services and Allan R. Davis for their personal or corporate benefit to the detriment of IndyMac Bank.

35.     IndyMac Bank's loan instructions, practices and procedures were put in place to permit it to properly and accurately underwrite its loan to the Irvings; however, Southshore Title failed to fulfill its responsibilities, as the settlement agent and escrow agent, to IndyMac for failing to comply with Indy Mac's lenders' instructions.

36.     The IndyMac loan to Irving is in payment default and IndyMac has initiated foreclosure proceedings.

### Count 1 – Negligence (Southshore Title)

37.     IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

38.     As its settlement agent, escrow agent and title agent, Southshore owed a duty to IndyMac, as the lender, to conduct the settlement of IndyMac's loan to the Irvings in a careful, prudent, professional and workmanlike manner, including careful and prudent compliance with IndyMac's instruction that the Irvings provide all down payment and earnest money deposits.

39.     Southshore breached its duty to IndyMac by failing to conduct the settlement with an adequate level of care and workmanship.

40.     As a result of Southshore's breach of its duty to IndyMac, IndyMac has in the past, and will continue to suffer financial damages.

41.     WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendant Southshore in the amount of $1,200,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

## Count 2 – Negligence (Harvey & Associates)

42.     IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

43.     Harvey & Associates was retained to conduct an appraisal of the Subject Property for the use and benefit of IndyMac as the lender.

44.     In performing its appraisal, Harvey & Associates was obligated to exercise reasonable care and prudence, conducting its appraisal consistent with accepted practices and principles in the appraisal industry.

45.     Harvey & Associates breached the applicable standard of care and failed to conduct an adequate and proper appraisal of the Subject Property.

46.     IndyMac relied upon Harvey & Associates' appraisal to its detriment and as a result of this reliance has suffered damage.

WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendant Harvey & Associates in the amount of $1,200,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

## Count 3 - Breach of Contract (Legacy)

47.     IndyMac adopts and incorporates herein all other paragraphs set forth in the Complaint.

48.     Pursuant to the terms and conditions of the Seller Contract and Addendum and subject to the terms and conditions of the Lending Guide adopted therein, Legacy submitted to IndyMac a loan to the Irvings in the principal amounts of $1,200,000.00.  This loan was secured by the Subject Property.

49.    In submitting the Irving loans to IndyMac, Legacy breached the representations of warranties contained in the Agreement, Addendum and the Lending Guide in that (1) the borrowers' occupancy was misrepresented and the transaction was misrepresented; the borrowers' employment and income were misrepresented; the loan was not an arms' length transaction; the borrowers' credit was misrepresented; the borrowers' assets were misrepresented; borrowers' verifications of deposit were not adequate. IndyMac may demand that Legacy repurchase the Irving loans or indemnify IndyMac for its losses based on its violations of the Seller Contract, Addendum and the Lending Guide.

50.    Legacy failed and refused to repurchase the loans and/or indemnify IndyMac for its losses. Legacy has breached the terms of the Seller Contract, Addendum and Lending Guide.

51.    As an approximate result of Legacy's breach of contract and including, but not limited to its failure to perform its obligations to IndyMac under the Seller Contract, Addendum and Lending Guide, IndyMac has been damaged in an amount to be proven at the time of trial but presently believed to be in excess of $1,200,000.00, plus interest, costs and attorney's fees.

WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendant Harvey & Associates in the amount of $1,300,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

### Count 4 – Negligence (Legacy and Adebayo)

52.    IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

12

53.    As a mortgage broker with a pecuniary interest in the transactions whereby IndyMac purchased the Irvings' loans, Legacy owed IndyMac a duty to act in accordance with the law and in accordance with the custom practice and standards of care of a mortgage broker. As part of this duty, Legacy owed IndyMac a duty that cannot be delegated to third parties or independent contractors. As a further part of this duty, Legacy owed IndyMac a duty to use reasonable care under the circumstance to refrain from supplying false or inaccurate information for the guidance of IndyMac in purchasing the Irving loans. Legacy knew or should have known that the information that they were providing to IndyMac was false or inaccurate and that this information would be used or relied upon by IndyMac in deciding to fund the loans.

54.    In breach of its duty to IndyMac, Legacy negligently provided false or inaccurate information to IndyMac concerning the transaction as well as the borrowers' income, employment, assets, down payment and occupancy.

55.    In breach of its duty to IndyMac, Legacy negligently failed to disclose material facts to IndyMac.

56.    IndyMac relied upon Legacy to conduct its business in accordance with the duty of care implied by law in the custom of the mortgage industry, causing IndyMac to believe that the information submitted by Legacy was true and had been reviewed in accordance with the Lending Guide and other standards prevalent in the mortgage industry.

57.    IndyMac has been damaged because it relied upon the proper performance by Legacy of its professional duties as a mortgage broker in making decisions to make the loans.

IndyMac's damages are presently believed to be in excess of $1,200,000.00, plus interest, costs and attorney's fees.

WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendant Harvey & Associates in the amount of $1,300,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

### Count 5 - Specific Performance (Legacy)

58.    IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

59.    The terms and provisions of the Seller Contract, Addendum and Lending Guide are just and reasonable as to IndyMac and Legacy in the respective obligations of IndyMac and Legacy thereunder as supported by fair and adequate consideration.  IndyMac alleges the specific performance causes of action as an alternate remedy to its cause of action at law, and, for the purpose of preserving its right to pursue alternate remedies alleges that it has no adequate remedy at law.

60.    IndyMac is entitled to a judicial decree of specific performance requiring Legacy to perform its indemnity obligations under the Seller Contract, Addendum and Guide to indemnify IndyMac for its losses incurred in connection with the Irving loans, the amount to be proven at the time of trial under the agreement, Legacy agreed to pay attorney's fees in the event that suit is commenced to enforce the agreement.  Therefore, IndyMac requests that the Court award IndyMac its attorney's fees in this matter as part of any award or judgment, plus pre-judgment interest as allowed by law.

WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendant Harvey & Associates in the amount of $1,300,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

### Count 6 – Fraud (All Defendants)

61.    IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

62.    Defendants Irvings, Geppert, Albert Smith, Fairfax Realty, Legacy Financial, Adebayo, Corporate Management, South Shore Title and Davis engaged in a scheme to make it appear as though the loan transactions was much more favorable to IndyMac including that the Subject Property had value in excess of its actual fair market value and to represent to IndyMac that proceeds from the IndyMac loan were to be used for the renovation of the Subject Property when instead it was their intention to keep most of the loan proceeds for their own use.

63.    It was the intent of the Defendants that IndyMac would rely upon their false representations to conclude that the Irvings' loan application and the transaction they had together formulated was accurate and legitimate.

64.    The Irvings misrepresented the following:

   a.  the value of the Subject Property on their loan application.

   b.  the amount they actually paid towards their purchase of the Subject Property on the HUD-1 settlement sheet.

   c.  Their monthly income.

   d.  Their intent to occupy the property as a primary residence.

   e.  The amount of the down payment they made.

    f. Their credit history to the extent of the absence of reference to an automobile loan from Bank Fund Staff FCU and a credit card debt to WFFNATLBNK.

65. Timothy Geppert actually made payments credited to the Irvings and, in support of these payments, made false representations as to the existence of and payoff amounts for false or non-existent loans which he represented that he previously made to the Irvings for which he received cash payments out of the settlement of the Subject Property;

66. CMS and Allan Davis misrepresented the value and condition of their property to facilitate perpetuation of this improper transaction.

67. Legacy Financial and its agent employee Adebayo gathered all improper documentation of the misrepresented loan and provided it to IndyMac representing it to be a sound and legitimate transaction which they knew was not the case.

68. All Defendants acted with the specific intent to defraud and deceive IndyMac.

69. IndyMac relied upon each of the Defendants' misrepresentations and as a result of this reliance has suffered damage.

WHEREFORE, for the reasons set forth above, Plaintiff respectfully demands a judgment against Defendants Irvings, Geppert, Albert Smith, Fairfax Realty, Legacy Financial, Adebayo, Corporate Management and Davis in the amount of $1,200,000.00 in compensatory damages and punitive damages in the amount of $2,000,000.00; plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

## Count 7 – Civil Conspiracy (All Defendants)

70.    IndyMac adopts and incorporates herein all other paragraphs set forth in this Complaint.

71.    All Defendants engaged in conduct described in this Complaint as part of a common scheme to defraud IndyMac.

72.    Each Defendant agreed, explicitly or tacitly, to commit the fraud described herein.

73.    Plaintiff was harmed as a result of this conspiracy.

74.    The Defendants committed unlawful overt acts in furtherance of their common scheme to commit fraud.

75.    Defendants' conduct was egregiously committed with malice and willful and wanton disregard of the Plaintiff's rights warranting imposition of punitive damages.

WHEREFORE, for the reasons set forth above, Plaintiff IndyMac demands judgment against Defendants in the amount of $1,300,000.00, punitive damages in the amount of $2,000,000.00, plus pre-judgment interest, post-judgment interest, costs and any further relief as the Court may deem appropriate.

Date: 9/21/07

COUNCIL, BARADEL,
KOSMERL & NOLAN, P.A.

By: _____
Michael N. Russo, Jr.
D.C. Bar No. 424712
Michael S. Steadman, Jr.
D.C. Bar No. 502347
125 West Street, 4th Floor
Post Office Box 2289
Annapolis, Maryland 21404-2289

17

Annapolis:  (410) 268-6600
Baltimore:  (410) 269-6190
Washington: (301) 261-2247

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT F
## OR THE DISTRICT OF COLUMBIA

|                          | * |              |
|--------------------------|---|--------------|
| INDYMAC BANK, F.S.B.     | * |              |
| v.                       | * | Case No.: _____ |
| LEMARCOS A. IRVING       | * |              |

### REQUEST FOR JURY DEMAND

Plaintiff respectfully requests a jury demand.

COUNCIL, BARADEL,
KOSMERL & NOLAN, P.A.

Date: 9/21/07

By: _____
Michael N. Russo, Jr.
D.C. Bar No. 424712
Michael S. Steadman, Jr.
D.C. Bar No. 502347
125 West Street, 4th Floor
Post Office Box 2289
Annapolis, Maryland 21404-2289

Annapolis: (410) 268-6600
Baltimore: (410) 269-6190
Washington: (301) 261-2247

Attorneys for Plaintiff

File No. **1193VA-DC**
DEED-SHORT FORM D.C.





LT2-0-0-2



**This Deed**, made this the 11th day of February, 2005, by and between **7336, LLC, a body corporate of the DISTRICT OF COLUMBIA**, party of the first part, and **CORPORATE MANAGEMENT SERVICES, LLC**, party of the second part.

**Witnesseth**, that in consideration of the sum of **SIX HUNDRED THIRTY FIVE THOUSAND AND 00/100 DOLLARS ($635,000.00)**, the party of the first part does hereby grant unto the party of the second part, in fee simple, as sole owner, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia which has a **Lot No. of in Square**, being more fully described as follows, to wit:

All that certain lot or parcel of land situate in the **District of Columbia** and being more particularly described as follows:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16TH STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above-described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

Which has a mailing address of:   **7336 14TH ST, NW**
                                  **WASHINGTON, DC  20010**

Title insurer: **First American Title Insurance Company**

**And** the said party of the first part covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.

**In Testimony Whereof,** 7336, LLC, has caused these presents to be signed by , its , and its corporate seal to be affixed hereto; and does hereby constitute and appoint , its , as its true and lawful attorney in fact for it and in its name to acknowledge and deliver these presents as its act and deed.

IN PRESENCE OF:                              7336, LLC

By:

State Of _Virginia_

County Of _Fairfax_                          , To Wit:

I, TAMMY L. MAGILL, a Notary Public in and for the aforesaid jurisdiction do hereby certify that , who is named as attorney-in-fact as aforesaid by virtue of the authority vested in him/her by said Corporation, and acknowledged said instrument to be the act and deed of said Corporation and the he/she executed the aforegoing and annexed deed, bearing the date of the 11th day of February, 2005, personally appeared before me in the said jurisdiction and acknowledged the same to be his act and deed.

**Witness** my hand and seal this the 11th day of February, 2005.

TAMMY L. MAGILL, Notary Public

My Commission Expires: 1/31/06

AFTER RECORDING RETURN TO:
Southshore Title & Escrow, Inc.
7019 Backlick Court
Springfield, VA 22151
File No. 1193VA-DC

TAMMY L MAGILL - NOTARY PUBLIC
County of Fairfax
My Commission Expires ... 2006

Doc# 2005031077 Fees:$13998.50
03/04/2005  2:47PM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

| RECORDING | $ | 20.00 |
| SURCHARGE | $ | 5.50 |
| RECORDATION TAX FEE | $ | 6,985.00 |
| TRANSFER TAX FEE | $ | 6,985.00 |

# Greater Capital Area Association of REALTORS®, Inc.



## REGIONAL SALES CONTRACT

This SALES CONTRACT ("Contract") is made on _____ September 12 _____ , 2006 , ("Contract Date") between _____ LeMarcos & Nina Irving, and/or its assigns _____ , ("Purchaser") and _____ Corporate Management Services, Inc. _____ , ("Seller") who hereby confirm and acknowledge by their initials and signatures below the prior disclosure that in this real estate transaction the Seller, and _____ Jubilee Realty & Associates, LLC _____ ("Listing Company") represents [x] the Purchaser OR ☐ the Seller. The Listing Company and Selling Company are collectively referred to as ("Broker"). (If the brokerage firm is acting as a dual representative for both the Seller and the Purchaser, then the appropriate disclosure form is attached to and made a part of this Contract)

1. **REAL PROPERTY.** The Purchaser will buy and the Seller will sell for the sales price ("Sales Price"), the Seller's entire interest in the land (with all improvements, rights and appurtenances) described as follows TAX Map/ID # _____ 2737//0019 _____ Legal Description: Lot(s) ___ 19 ___ , Block/Square ___ 2737 ___ , Section _____ Subdivision or Condominium ___ Shepherd Park ___ , Unit # _____ , Parking Space(s) # _____ County/City ___ Washington DC ___ Deed Book/Liber _____ , Page/Folio # _____ Street Address ___ 7336 14th Street, NW ___ , State ___ DC ___ , Zip Code ___ 20012 ___ , ("Property").

2. **PERSONAL PROPERTY, FIXTURES AND UTILITIES.** The Sales Price includes the following personal property and fixtures: A. Any existing built-in heating and central air conditioning equipment, plumbing and lighting fixtures, sump pump, attic fans, storm windows, storm doors, screens, installed wall-to-wall carpeting, window shades, blinds, smoke and heat detectors, tv antennas, exterior trees and shrubs and, B. The items marked YES below as currently installed or offered.

| YES | NO | | YES | NO | | YES | NO | | YES | NO | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | Stove or Range | ☐ | ☐ | Disposer | ☐ | ☐ | Ceiling Fan(s) # ____ | ☐ | ☐ | Alarm System |
| ☐ | ☐ | Cooktop | ☐ | ☐ | Freezer | ☐ | ☐ | Washer | ☐ | ☐ | Intercom |
| ☐ | ☐ | Wall Oven(s) # ___ | ☐ | ☐ | Window Fan(s) # ___ | ☐ | ☐ | Dryer | ☐ | ☐ | Storage Shed(s) # |
| ☐ | ☐ | Refrigerator(s) # __ | ☐ | ☐ | Window A/C Unit(s) # | ☐ | ☐ | Furnace Humidifier | ☐ | ☐ | Garage Opener(s)# ___ |
| ☐ | ☐ | w/ Ice maker(s) # __ | ☐ | ☐ | Pool, Equip. & Cover | ☐ | ☐ | Electronic Air Filter | ☐ | ☐ | w/remote(s) # |
| ☐ | ☐ | Dishwasher | ☐ | ☐ | Hot Tub, Equip. & Cover | ☐ | ☐ | Central Vacuum | ☐ | ☐ | Playground Equipment |
| ☐ | ☐ | Built-in Microwave | ☐ | ☐ | Satellite Dish and Equip. | ☐ | ☐ | Water Treatment System | ☐ | ☐ | Wood Stove |
| ☐ | ☐ | Trash Compactor | ☐ | ☐ | Window Treatments | ☐ | ☐ | Exhaust Fan(s) | ☐ | ☐ | Fireplace Screen/Doors |

Other. AS-IS _____

**WATER, SEWAGE, HEATING AND CENTRAL AIR CONDITIONING:** (Check all that apply)
Water Supply: ☒ Public ☐ Well _____ Hot Water: ☐ Oil ☒ Gas ☐ Elec. ☐ Other _____
Sewage Disposal: ☒ Public ☐ Septic # BR _____ Air Conditioning: ☐ Oil ☐ Gas ☒ Elec. ☐ Heat Pump ☐ Other _____
Heating: ☐ Oil ☒ Gas ☐ Elec. ☐ Heat Pump ☐ Other _____

3. **EQUIPMENT, MAINTENANCE AND CONDITION.** The Purchaser accepts the Property in the condition as of the Contract Date except as otherwise provided herein. The Seller warrants that the existing appliances, heating, cooling, plumbing, electrical systems and equipment, and smoke and heat detectors (as required), will be in normal working order as of the possession date. The Seller will deliver the Property in substantially the same condition as on the Contract Date and broom clean with all trash and debris removed. The Purchaser and the Seller will not hold the Broker liable for any breach of this paragraph.

4. **PRICE AND FINANCING**
   A. Down Payment                                                      $ _____ 1,150,000.00 _____

   B. Financing    1. First Trust                 $ _____

                  2. Second Trust          $ _____

                  3. Seller Held Trust - addendum attached          $ _____

       TOTAL FINANCING                             $ _____

       SALES PRICE                                 $ _____ 1,150,000.00 _____

GCAAR #1301 - Regional Sales Contract            Page 1 of 5          Please initial. Purchaser _____ / _____ Seller _____ / _____
(Previously form # 103)

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 794 - 9400     Fax. (301) 794 - 4420     Albert Smith                  Davis-Irving
Produced with Zip-form™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

5. **DEPOSIT.** A The Purchaser has made a deposit ("Deposit") with _____South Shore Title & Escrow_____ ("Escrow Agent") of ☐ $10,000.00 _____ by check and/or ☐ $ _____ by note due and payable on _____ receipt of which is hereby acknowledged. B The Deposit will be placed in an escrow account on the Escrow Agent after Date of Ratification to conform with the laws and regulations of the appropriate jurisdiction and/or, if VA financing applies, as required by Title 38 of the U.S. Code. This account may be interest bearing and all parties waive any claim to interest resulting from the Deposit. The Deposit will be held in escrow until: (i) Credited toward the Sales Price at Settlement. (ii) All parties have agreed in writing as to its disposition; (iii) A court of competent jurisdiction orders disbursement and all appeal periods have expired; or, (iv) Disposed of in any other manner authorized by the laws and regulations of the appropriate jurisdiction.

6. **DOWN PAYMENT.** The balance of the down payment will be paid at Settlement by certified or cashier's check or by bank wired funds.

7. **DEED(S) OF TRUST.**

A   **FIRST DEED OF TRUST. The Purchaser will** ☐ OBTAIN OR ☐ ASSUME. a ☐ Conventional ☐ FHA ☐ VA ☐ Other _____ First Deed of Trust loan amortized over __30__ years at a ☐ FIXED OR an ☐ ADJUSTABLE rate bearing (initial) interest of _____ % per year or market rate available. Special Terms (if any) _____

B   **SECOND DEED OF TRUST. The Purchaser will** ☐ OBTAIN, OR ☐ ASSUME a Second Deed of Trust loan amortized over _____ years at a ☐ FIXED OR an ☐ ADJUSTABLE rate bearing (initial) interest of _____ % per year or market rate available. Special Terms (if any) _____

C.   **ASSUMPTION ONLY:** Assumption fee, if any, and all charges related to the assumption will be paid by the Purchaser. If the Purchaser assumes the Seller's loan: (i) The Purchaser and the Seller ☐ will, OR ☐ will not obtain a release of the Seller's liability to the U.S Government for the repayment of the loan by Settlement (ii) The Purchaser and Seller ☐ will, OR ☐ will not obtain substitution of the Seller's VA entitlement by Settlement. (iii) Balances of any assumed loans, secondary financing and cash down payments are approximate

8. **ADDITIONAL FINANCING TERMS.**

A. ☒ **CONVENTIONAL FINANCING.** Based on the financing terms specified in this Contract, the Seller will pay $ _____ toward the Purchaser's charges, (including but not limited to loan origination fees, discount fees, buy down or subsidy fees, prepaids or other charges as allowed by the lender) The Purchaser will pay all remaining Purchaser's charges. If applicable, the Purchaser will pay at Settlement, or finance any initial private mortgage insurance

If the lender's appraisal is not equal to or greater than the Sales Price, the Purchaser will have the privilege and option of proceeding with consummation of this Contract without regard to the amount of the appraised valuation. The Purchaser's election to proceed with consummation of this Contract with regard to the amount of the appraised valuation will be made within 3 Days after the notification to the Purchaser of the appraised value. If the Purchaser does not make this election, it will be the Seller's option to lower the Sales Price to the appraised value and this Contract will remain in full force and effect at the lower Sales Price. If the Seller does not make this election, the parties may agree to mutually acceptable terms. Each election must be made by Notice within 3 Days after Notice from the other party. The parties will immediately sign any appropriate amendments If the parties fail to agree, this Contract will become void.

B   ☐ **VA OR** ☐ **FHA FINANCING**

The Purchaser will ☐ pay at Settlement, OR ☐ finance any VA Funding Fee or FHA initial Mortgage Insurance Premium. Based on the financing specified in this Contract, the Seller will pay _____ toward the Purchaser's charges (including but not limited to loan origination fees, discount fees, buydown or subsidy fees, prepaids or other charges as allowed by the lender) except that the total amount of any lender charges which cannot by law or regulation be charged to the Purchaser will be paid by the Seller. These charges, if any, will first be deducted from any Seller credit, and the remaining balance, if any, will then be applied to the Purchaser's other charges. The Purchaser will pay all remaining Purchaser's charges. If VA or FHA financing applies, it is expressly agreed that, notwithstanding any other provisions of this Contract, the Purchaser will not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner or Direct Endorsement Lender/Department of Veterans Affairs or the Lender Approval Processing Program (LAPP) underwriter setting forth the appraised value of the Property (excluding closing costs) of not less than $ _____ . The Purchaser will have the privilege and option of proceeding with consummation of this Contract without regard to the amount of the appraised valuation. THE APPRAISED VALUATION IS ARRIVED AT TO DETERMINE THE MAXIMUM MORTGAGE THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT/DEPARTMENT OF VETERANS AFFAIRS WILL INSURE/GUARANTEE. HUD/DEPARTMENT OF VETERANS AFFAIRS AND THE MORTGAGEE DOES NOT WARRANT THE VALUE NOR THE CONDITION OF THE PROPERTY THE PURCHASER SHOULD SATISFY HIMSELF/HERSELF THAT THE PRICE AND CONDITION OF THE PROPERTY ARE ACCEPTABLE.

If VA Financing applies, the Purchaser agrees that should the Purchaser elect to complete the purchase at an amount in excess of the reasonable value established by the Department of Veterans Affairs, the Purchaser shall pay such excess amount in cash from a source which the Purchaser agrees to disclose to the Department of Veterans Affairs, and which the Purchaser represents will not be borrowed funds except as approved by the Department of Veterans Affairs. The Purchaser's exercise of the option shall be made in writing within 3 Days of the notification to the Purchaser of the appraised value, or this Contract shall become void

If FHA financing applies, the Purchaser's exercise of the option of proceeding with consummation of the Contract without regard to the amount of the appraised valuation shall be made in writing within 3 Days of the notification to the Purchaser of the appraised value, or this Contract shall become void. The FHA loan amount may be approximate because the financed acquisition costs cannot be determined until the Settlement

9. **LOAN APPLICATION AND APPROVAL.**

A.   **FINANCING APPLICATION** The Purchaser will make written application for the financing or assumption called for in this Contract ("Specified Financing") within 7 days after Date of Ratification. The Purchaser grants permission for the Selling Company and the lender to disclose to the Listing Company and the Seller general information available about the progress of the loan application and loan approval process.

B.   **LENDER'S APPROVAL CONTINGENCY.** This Contract is contingent until 9 p.m. on _15_ Days after Date of Ratification ("Deadline") upon the Purchaser Delivering to the Seller a letter from the lender stating that the Purchaser is approved for the Specified Financing ("Lender's Letter"). Upon Seller's receipt of the Lender's Letter, this Contract is no longer contingent on the Purchaser being approved for the Specified Financing and this Contract will remain in full force and effect. TIME IS OF THE ESSENCE.

(i)   If the Purchaser does not Deliver the Lender's Letter by the Deadline, the lender's approval contingency will continue, unless the Seller at Seller's option gives Notice to the Purchaser that this Contract will become void If the Seller Delivers such Notice this Contract will become void at 9 p m on the third day following Delivery of Seller's Notice unless prior to that date and time,

a   Purchaser Delivers to Seller the Lender's Letter, OR

b   Purchaser removes this LENDER'S APPROVAL CONTINGENCY and provides Seller with evidence of sufficient funds available to complete Settlement without obtaining financing.

(ii)   The Purchaser may substitute alternative financing for Specified Financing provided:

a   There is no additional expense to the Seller; and

b   The Settlement Date is not delayed.

GCAAR #1301 - Regional Sales Contract          Page 2 of 5          Please initial: Purchaser _____ / _____   Seller _____ / _____
(Previously form # 103)

Davis-Irving

(iii) If prior to satisfaction or r( )al of the LENDER'S APPROVAL CONTINGENC Purchaser receives a written rejection for the Specified Financing and Delivers a copy of the written rejection to the Seller, this Contract will become void.

C. **DEFAULT.** The Purchaser will be in default if Settlement does not occur on the Settlement Date because the Purchaser:

(i) Fails to lock-in the interest rate(s) as specified above and the rate(s) increase so that the Purchaser no longer qualifies for such financing; OR

(ii) Applies for, and fails to obtain, alternative financing instead of the Specified Financing, unless the Seller consents in writing to the alternative financing terms, in which case the alternative financing becomes the Specified Financing; OR

(iii) Fails to comply with the lender's reasonable requirements in a timely manner; OR

(iv) Fails to immediately give Notice to the Seller or the Broker of any material adverse changes in the Purchaser's assets, liabilities, or income; OR

(v) Does not have the down payment, closing fees and any other funds to settle as provided in this Contract; OR

(vi) Does or fails to do any act following the Date of Ratification that prevents the Purchaser from obtaining the financing; OR

(vii) Makes any deliberate misrepresentations, material omissions or inaccuracies in financial information that results in the Purchaser's inability to secure the financing.

10. **PURCHASER'S REPRESENTATIONS.** The Purchaser ☒ will, OR ☐ will not occupy the Property as the Purchaser's principal residence. Unless specified in a written contingency, neither this Contract nor the financing is dependent or contingent on the sale and settlement or lease of other real property. The Selling Company ☐ is, OR ☒ is not authorized to disclose to the Listing Company any financial or credit information statement provided to the Selling Company by the Purchaser. The Purchaser acknowledges that the Seller the appropriate financial or credit information including without limitation the accuracy of financial or credit information given to the Seller, Broker or the lender by the Purchaser's representations including without limitation the accuracy of financial or credit information given to the Seller, Broker or the lender by the Purchaser

11. **ACCESS TO PROPERTY.** The Seller shall provide the Broker, the Purchaser, inspectors representing the Purchaser and representatives of lending institutions for appraisal purposes, reasonable access to the Property to comply with this Contract. The Purchaser and/or the Purchaser's representative will have the right to make an inspection prior to Settlement and/or occupancy, at which time the Seller will have all utilities in service.

12. **WELL AND SEPTIC.** If the Property is on well and/or septic systems, the ☒ Purchaser, at Purchaser's expense OR ☐ Seller, at Seller's expense, will furnish the Purchaser on or before Settlement with a certificate dated not more than 30 days prior to Settlement from the ☒ appropriate local government authority, or ☐ a private company, indicating that: A. The well water contains no more than the acceptable level of coliform bacteria and, B. The septic system appears to be functioning satisfactorily, and if known by public records, was installed pursuant to a valid health department permit. If either system is found defective or substandard according to the certificate, the Seller will take appropriate remedial action at the Seller's expense.

13. **TERMITE INSPECTION.** The ☒ Purchaser, at Purchaser's expense OR the ☐ Seller, at Seller's expense, will furnish a written report from a pest control firm dated not more than ☒ 30 OR ☐ 60 days prior to Settlement showing that all dwelling(s) and/or garage(s) within the Property (excluding fences or shrubs not abutting garage(s) or dwelling(s)) are free of visible evidence of active termites and other wood-destroying insects, and free from visible structural insect damage. Any extermination and structural repairs identified in the inspection report will be at the Seller's expense.

14. **REPAIRS.** If, as a condition of providing financing under this Contract, the lender requires repairs to be made to the Property, then the Purchaser will give Notice to the Seller of the lender's required repairs. Within 5 Days after Notice, the Seller will give Notice to the Purchaser whether the Seller will make the repairs. If the Seller will not make the repairs, the Purchaser will give Notice to the Seller within 5 Days after the Seller's Notice whether the Purchaser will make the repairs. If neither the Seller nor the Purchaser will make the repairs, then this Contract will become void. This clause will not release the Seller from any responsibilities set forth in the paragraphs titled PERSONAL PROPERTY, FIXTURES AND UTILITIES; EQUIPMENT, MAINTENANCE AND CONDITION; WELL AND SEPTIC; TERMITE INSPECTION; or OTHER TERMS, or any terms specifically set forth in this Contract and any addenda.

15. **DAMAGE OR LOSS.** The risk of damage or loss to the Property by fire, act of God, or other casualty remains with the Seller until the execution and delivery of the deed of conveyance.

16. **TITLE.** The title report and survey, if required, will be ordered promptly and, if not available on the Settlement Date, then Settlement may be delayed for up to 10 business days to obtain the title report and survey after which this Contract, at the option of the Seller, may be terminated and the Deposit will be refunded in full to the Purchaser according to the terms of the DEPOSIT paragraph. Fee simple title to the Property, and everything that conveys with it, will be sold free of liens except for any loans assumed by the Purchaser. The Seller will pay any special assessments and will comply with all orders, requirements, or notices of violations of any county or local authority, condominium unit owners' association, homeowners' or property owners' association or actions in any court on account thereof, against or affecting the Property on the Settlement Date. Title is to be good and marketable, and insurable by a licensed title insurance company with no additional risk premium. Title may be subject to commonly acceptable easements, covenants, conditions and restrictions of record, if any, otherwise, the Purchaser may declare this Contract void, unless the defects are of such character that they may be remedied within 30 Days beyond the Settlement Date. In case action is required to perfect the title, such action must be taken promptly by the Seller at the Seller's expense. The Broker is hereby expressly released from all liability for damages by reason of any defect in the title. The Seller will convey the Property by general warranty deed with English covenants of title (Virginia); general warranty deed (West Virginia); special warranty deed (D.C. and Maryland). The Seller will sign such affidavits, lien waivers, tax certifications, and other documents as may be required by the lender, title insurance company, Settlement Agent, or government authority, and authorizes the Settlement Agent to obtain pay-off or assumption information from any existing lenders.

17. **POSSESSION DATE.** Unless otherwise agreed to in writing between the Seller and the Purchaser, the Seller will give possession of the Property at the Settlement. If the Seller fails to do so and occupies the Property beyond the Settlement, the Seller will be a tenant by sufferance of the Purchaser and hereby expressly waives all notice to quit as provided by law. The Purchaser will have the right to proceed by any legal means available to obtain possession of the Property. The Seller will pay any damages and costs incurred by the Purchaser including reasonable attorney fees.

18. **SETTLEMENT.** The Seller and the Purchaser will make full settlement in accordance with the terms of this Contract ("Settlement") on, or with mutual consent before, _September 15, 2006_, ("Settlement Date") except as otherwise provided in this Contract

19. **SETTLEMENT AGENT.** (Not for use in Virginia, see the Virginia Jurisdictional Addendum) The Purchaser selects _South Shore Title & Escrow_ ("Settlement Agent") to conduct the Settlement. Either party may retain their own counsel. The Purchaser agrees to contact the Settlement Agent within 10 Days after the Date of Ratification to schedule Settlement. The Settlement Agent will order the title exam and survey if required

GCAAR #1301 - Regional Sales Contract
(Previously form # 103)

Page 3 of 5

Please initial: Purchaser _____ / _____    Seller _____ / _____

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

**20. FEES.** Fees for the preparation ... e Deed, that portion of the Settlement Agent's ... billed to the Seller, costs of releasing existing encumbrances, appropriate legal fees and any other proper charges assessed to the Seller will be paid by the Seller. Fees for the title exam (except as otherwise provided) survey, recording (including those for any purchase money trusts) and that portion of the Settlement Agent's fee billed to the Purchaser, appropriate legal fees and any other proper charges assessed to the Purchaser will be paid by the Purchaser. Fees to be charged will be reasonable and customary for the jurisdiction in which the Property is located (Recording, Transfer and Grantor's Taxes are covered in the appropriate jurisdictional addenda).

**21. BROKER'S FEE.** The Seller irrevocably instructs the Settlement Agent to pay the Broker compensation ("Broker's Fee") as set forth in the listing agreement and to disburse the compensation offered by the Listing Company to the Selling Company in writing as of the Contract Date, and the remaining amount of Broker's compensation to the Listing Company.

**22. ADJUSTMENTS.** Rents, taxes, water and sewer charges, front foot benefit and house connection charges, condominium unit owners' association, homeowners' and/or property owners' association regular periodic assessments (if any) and any other operating charges, are to be adjusted to the day of Settlement. Any heating or cooking fuels remaining in supply tank(s) at Settlement will become the property of the Purchaser. Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the collector of taxes, if any, except that recorded assessments for improvements completed prior to Settlement, whether assessments have been levied or not, will be paid by the Seller or allowance made at Settlement. If a Deed of Trust is assumed, interest will be adjusted to the Settlement Date and the Purchaser shall reimburse the Seller for existing escrow accounts, if any.

**23. ATTORNEY'S FEES.** In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court or arbitrator(s). In the event a dispute arises resulting in the Broker being made a party to any litigation or if the Broker is required to bring litigation to collect the Broker's Fee, the Purchaser and Seller agree to indemnify the Broker, its employees, and/or licensees for all attorney fees and costs of litigation, unless the litigation results in a judgment against the Broker, its employees and/or licensees

**24. PERFORMANCE.** Delivery of the required funds and executed documents to the Settlement Agent will constitute sufficient tender of performance. Funds from this transaction at Settlement may be used to pay off any existing liens and encumbrances, including interest, as required by lender(s) or lienholders

**25. DEFAULT.** If the Purchaser fails to complete Settlement, at the option of the Seller, the Deposit may be forfeited as liquidated damages and not as a penalty, in which event the Purchaser will be relieved from further liability to the Seller. If the Seller does not elect to accept the Deposit as liquidated damages, the Deposit may not be the limit of the Purchaser's liability in the event of a default. If the Deposit is forfeited, or if there is an award of damages by a court or a compromise between the Seller and Purchaser, the Broker accept and the Seller agrees to pay the Broker one-half of the Deposit in lieu of the Broker's Fee, (provided Broker's share of any forfeited Deposit will not exceed the amount due under the listing agreement). If the Seller fails to complete Settlement, the Purchaser will have all legal or equitable remedies, including specific performance and/or damages. If either the Seller or Purchaser refuses a release of Deposit when requested to do so in writing and a court finds that they should have executed the agreement, the party who so refused to execute a release of Deposit will pay the expenses, including, without limitation, reasonable attorney's fees, incurred by the other party in the litigation The Seller and Purchaser agree that no Escrow Agent will have any liability to any party on account of disbursement of the Deposit or on account of failure to disburse the Deposit, except only in the event of the Escrow Agent's gross negligence or wilful misconduct. The parties further agree that the Escrow Agent will not be liable for the failure of any depository in which the Deposit is placed and that the Seller and Purchaser each will indemnify, defend and save harmless the Escrow Agent from any loss or expense arising out of the holding, disbursement or failure to disburse the Deposit, except in the case of the Escrow Agent's gross negligence or wilful misconduct. If either the Purchaser or the Seller is in default, then in addition to all other damages, the defaulting party will immediately pay the costs incurred for the title examination, appraisal, survey and the Broker's Fee in full

**26. OTHER DISCLOSURES.** The Purchaser and Seller are advised to seek professional advice concerning the condition of the Property or other legal and tax matters. The following subparagraphs disclose some matters which the parties may investigate further. These disclosures are not intended to create a contingency. Any contingency must be specified by adding appropriate terms to this Contract. The parties acknowledge the following disclosures

A.  **PROPERTY CONDITION.** See EQUIPMENT, MAINTENANCE AND CONDITION Paragraph Various inspection services and home warranty insurance programs are available. The Broker is not advising the parties as to certain other issues, including without limitation; water, sewer or septic; soil condition; flood hazard areas; possible restrictions of the use of the Property due to restrictive covenants, zoning, subdivision, or environmental laws; easements or other documents; airport or aircraft noise; planned land use, roads or highways; and construction materials and/or hazardous materials, including without limitation flame retardant treated plywood (FRT), radon, urea formaldehyde foam insulation (UFFI), polybutylene pipes, synthetic stucco (EIFS), underground storage tanks, asbestos and lead-based paint. Information relating to these issues may be available from appropriate government authorities

B.  **LEGAL REQUIREMENTS** All contracts for the sale of real property must be in writing to be enforceable. Upon ratification and delivery, this Contract becomes a legally binding agreement. Any changes must be made in writing.

C   **FINANCING.** Mortgage rates and associated charges vary with financial institutions and the marketplace. The Purchaser has the opportunity to select the lender and the right to negotiate terms and conditions of the financing subject to the terms of this Contract The financing may require substantial lump sum (balloon) payments on the due dates. The Purchaser has not relied upon any representations regarding the future availability of mortgage money or interest rates for the refinancing of any such lump sum payments.

D   **BROKER.** The Broker may from time to time engage in the general insurance, title insurance, mortgage loan, real estate settlement, home warranty and other real estate-related businesses and services. Therefore, in addition to the Broker's Fee specified herein, the Broker may receive compensation related to other services provided in the course of this transaction The Purchaser and Seller acknowledge that the Broker is being retained solely as a real estate agent and not as an attorney, tax advisor, lender, appraiser, surveyor, structural engineer, home inspector or other professional service provider.

**27. ASSIGNABILITY.** This Contract may not be assigned without the written consent of the Purchaser and the Seller. If the Purchaser and the Seller agree in writing to an assignment of this Contract, the original parties to this Contract remain obligated hereunder until Settlement.

**28. DEFINITIONS.** "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery and the time period will end at 9 p.m. on the Day specified. If the Settlement Date falls on a Saturday, Sunday, or legal holiday, then the Settlement will be on the prior business day. "Date of Ratification" means the date of final acceptance in writing of all the terms of this Contract (not the date of expiration or removal of any contingencies). "Delivery" means hand-carried, sent by overnight delivery service, by facsimile transmission as provided for in the NOTICES Paragraph, or when receipt is acknowledged in writing. In the event of overnight delivery service, Delivery will be deemed to have been made on the Day following the sending. The masculine includes the feminine and the singular includes the plural.

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com                Davis-Irving

29. **NOTICES.** All notices ("Notice") required to be given by this Contract will be in writing and will be effective as of the date on which such Notice is Delivered:

    A. Addressed to the Seller at: _____ _____ _____ _____ _____ **OR** transmitted by facsimile to _____.

    B. Addressed to the Purchaser at: _____ _____ _____ _____ _____ **OR** transmitted by facsimile to _____.

30. **MISCELLANEOUS.** This Contract may be signed in one or more counterparts, each of which is deemed to be an original, and all of which together constitute one and the same instrument. Documents obtained via facsimile machines will also be considered as originals. Typewritten or handwritten provisions included in this Contract will control all pre-printed provisions that are in conflict.

31. **VOID CONTRACT.** If this Contract becomes void, both parties will immediately execute a release directing that the Deposit be refunded in full to the Purchaser according to the terms of the DEPOSIT paragraph.

32. **ADDITIONS.** The appropriate **JURISDICTIONAL ADDENDUM** and **LEAD BASED PAINT ADDENDA (if applicable)** must be attached and made a part of this Contract. The following are made a part of this Contract

| | | |
|---|---|---|
| ☒ Yes ☐ No | STATE JURISDICTIONAL ADDENDUM ☒ DC ☐ VA ☐ MD ☐ WVA ☐ Other _____ | |
| ☐ Yes ☒ No | HOME INSPECTION CONTINGENCY | ☐ Yes ☒ No  LEAD - BASED PAINT DISCLOSURE FORM |
| ☐ Yes ☒ No | RADON TESTING CONTINGENCY | ☐ Yes ☒ No  LEAD - BASED PAINT INSPECTION CONTINGENCY |
| ☐ Yes ☒ No | SALE OF HOME CONTINGENCY | ☐ Yes ☒ No  FHA HOME INSPECTION NOTICE |
| ☐ Yes ☒ No | CONDO/COOP ADDENDUM (DC and MD) | |
| ☐ Yes ☒ No | HOME WARRANTY POLICY paid for by: ☐ Purchaser or ☐ Seller. | |
| | Cost not to exceed $ _____. Warranty provider to be _____ | |
| ☐ Yes ☒ No | OTHER (specify). _____ _____ _____ | |

33. **OTHER TERMS.** _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____

34. **ENTIRE AGREEMENT.** This Contract will be binding upon the parties, and each of their respective heirs, executors, administrators, successors and permitted assigns. The provisions hereof will survive the delivery of the deed and will not be merged therein. This Contract, unless amended in writing, contains the final and entire agreement of the parties and the parties will not be bound by any terms, conditions, oral statements, warranties or representations not herein contained. The interpretation of this Contract will be governed by the laws of the appropriate jurisdiction.

**SELLER:**                                         **PURCHASER:**

_____/_____ _____ (SEAL)       _____/_____ _____ (SEAL)
Date     Signature Corporate Management Services,   Date     Signature LeMarcos & Nina Irving

_____/_____ _____ (SEAL)       _____/_____ _____ (SEAL)
Date     Signature                              Date     Signature and/or its assigns

Date of Ratification (see DEFINITIONS PARAGRAPH) _____ _____

**For information purposes only:**

Listing Company's Name and Address:              Selling Company's Name and Address:
                                                 Jubilee Realty & Associates, LLC

Office # _____ Fax # _____                   Office # _____ Fax # _____
MRIS Broker Code _____ MRIS Office ID# _____  MRIS Broker Code: _____ MRIS Office ID# _____
Agent Name _____                       Agent Name Albert Smith
Agent MRIS ID# _____                   Agent MRIS ID# _____
Agent Email Address _____              Agent Email Address _____

©1999. This is a suggested form owned by certain REALTOR® Associations ("Associations") This form has been created and printed exclusively for the use of REALTORS® and members of the Associations, who may copy or otherwise reproduce this form in identical form with the addition of their company logo and with any other changes being set forth in a clearly marked separate addendum. Any other use of this form by REALTORS® or members of Associations, or any use of this form whatsoever by non-members of Associations, is prohibited without prior written authorized consent of the Associations

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving





## Addendum of Clauses

**FOR USE WITH EITHER THE MARYLAND ASSOCIATION OF REALTORS® (MAR) RESIDENTIAL CONTRACT OF SALE OR THE REGIONAL SALES CONTRACT**

The Contract of Sale dated ___**September 12, 2006**___ , Address _____ **7336 14th Street, NW**
City _____ , State ____ **DC** ___ Zip _____ **20012** ___ between
Seller _____ **Corporate Management Services, Inc.** _____ and
Buyer _____ **LeMarcos & Nina Irving, and/or its assigns** _____
is hereby amended by the incorporation of this Addendum, which shall supersede any provisions to the contrary in the Contract.

It is expressly provided that only the numbered paragraphs which are checked and initialed by all Parties shall be made a part of said contract. **TIME IS OF THE ESSENCE WITH REGARD TO EACH PROVISION OF THIS ADDENDUM WHICH CONTAINS TIMEFRAMES.**

☐ **1. HOME INSPECTION CONTINGENCY.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") for inspections of the property, not including radon or lead-based paint inspections, which require separate contingencies, by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. The Seller will have all utilities in service at the time of inspection(s). This contingency will terminate at the Deadline unless by the Deadline the Buyer Delivers to the Seller either A or B:

**A.** A copy of the report(s) from the inspection(s) of the property together with a Home Inspection Notice (see GCAAR Home Inspection Notice) listing home inspection conditions or items that the Buyer requires the Seller to repair, and/or stipulating a dollar credit, as allowed by the lender, to be paid at settlement by the Seller toward the Buyer's charges to buy the property.

If the Seller elects not to perform in accordance with the Home Inspection Notice or makes another offer, the Seller will Deliver notice to the Buyer of such decision within 3 Days after Delivery of the Home Inspection Notice.

Within 3 Days after Delivery of a notice from the other party, the other party may:

(i)   Deliver notice accepting the terms contained in the other party's notice; or
(ii)  Deliver notice continuing negotiations by making another offer; or
(iii) Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of Notice from the other party will result in acceptance by both parties of the terms of the most recent Notice.

**B.** Notice declaring this Contract void.

☐ **2. GENERAL INSPECTION CONTINGENCY.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") for satisfactory inspections of the property by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. The Seller will have all utilities in service at the time of inspection(s). In the event of an unsatisfactory inspection, as determined by Buyer in his sole discretion, Buyer may, by Notice to Seller, declare this contract null and void in which case Buyer's deposit shall be refunded in full. In the event such Notice is not given by the Deadline, this contract will remain in full force and effect.

☒ **3. "AS IS" PROPERTY CONDITION.** The Property, including but not limited to electrical, plumbing, heating, air conditioning, equipment and fixtures ("the Property"), is sold and shall be delivered in "As Is" physical condition, to be determined as of the _____ Date of Ratification, **09/12/2006** the Date of the Home Inspection or _____ (other)

The Seller makes no representation or warranty, express or implied, as to the condition of the Property or any equipment or System contained therein. All clauses in this Contract pertaining to Property condition, termites or compliance with city, state or county regulations are hereby deleted from this Contract. Smoke detectors will be installed as required by the laws or regulations of the appropriate jurisdiction. The property shall be delivered free and clear of trash and debris and broom clean.

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 794 - 9480        Fax: (301) 794 - 4420        Albert Smith

Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

**4.  RADON INSPECTION C      INGENCY.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") to allow the Buyer, at the Buyer's discretion and expense, to have the property inspected for the presence of radon by a Testing Firm listed with the U.S. Environmental Protection Agency ("EPA"), National Radon Safety Board ("NRSB"), or the National Environmental Health Association ("NEHA") using an EPA approved testing method. **Testing device to be placed and retrieved by an EPA, NRSB or NEHA listed technician or their authorized subcontractor.** This contingency will terminate at the Deadline unless by the Deadline, Buyer Delivers to the Seller a copy of the radon testing report which confirms the presence of radon that equals or exceeds the action level established by the EPA together with either A or B:

**A.**  Radon Testing Notice requiring the Seller at Seller's expense prior to settlement to remediate the radon condition by contracting with an **EPA, NRSB or NEHA listed remediation firm** to reduce the presence of lead paint below the action level established by the EPA and to provide Buyer written verification that the required remediation has been performed.

If the Seller elects not to perform in accordance with the Radon Testing Notice or makes another offer, the Seller will Deliver notice to the Buyer of such decision within 3 Days after Delivery of the Radon Testing Notice.

Within 3 Days after Delivery of a notice from one party, the other party may:
    (i)   Deliver notice accepting the terms contained in the other party's notice; or
    (ii)  Deliver notice continuing negotiations by making another offer; or
    (iii) Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient delivers
        to the other party notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract
        will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent notice.

**B.**  Notice declaring this Contract void.

**5.  LEAD-BASED PAINT INSPECTION CONTINGENCY** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification (**must be 10 days or such other period as shall be mutually agreeable to the Buyer and Seller**) ("Deadline") to allow Buyer, at Buyer's discretion and expense, to have a risk assessment or inspection of the interior and exterior of the subject property for the presence of lead paint and/or lead-based paint hazards ("Inspection"). Such Inspection shall be performed by an individual certified by the Maryland Department of the Environment ("MDE"), for Maryland properties, or the DC Department of Health Lead Based Paint Program, for DC Properties, to conduct such assessment or inspection ("Certified Inspector"). This contingency will terminate at the Deadline unless by the Deadline, Buyer Delivers to Seller a copy of the risk assessment report or inspection report which reveals conditions for which the Certified Inspector recommends corrective action together with either A or B.

**A.**  Lead-Based Paint Testing Notice identifying specific lead based paint hazards and requiring Seller at Seller's expense prior to settlement to perform requisite corrective action to abate such lead based paint hazards. In the event Seller agrees to have the corrective action performed, Seller shall furnish, not later than the date of settlement, a written certification by a Certified Inspector demonstrating that the specified conditions have been remedied.

If Seller elects not to perform in accordance with the Lead Based Paint Notice or makes another offer, Seller will Deliver notice to Buyer of such decision within 3 Days after Delivery of the Lead Based Paint Notice.

Within 3 Days after Delivery of a notice from one party, the other party may:
    (i)   Deliver notice accepting the terms contained in the other party's notice; or
    (ii)  Deliver notice continuing negotiations by making another offer; or
    (iii) Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient delivers
        to the other party notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract
        will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent notice.

**B.**  Notice declaring this Contract void.

**6.  POST SETTLEMENT AIR CONDITIONING AND/OR SWIMMING POOL INSPECTION CONTINGENCY**
These provisions shall apply to the following system(s) (the "System") (check appropriate system(s)):
☐ the Air Conditioning System; and/or ☐ the Swimming Pool System (defined as the swimming pool and related equipment, including the structural integrity of the swimming pool).

Due to weather conditions, the System located at the Property cannot be adequately tested to ensure that it is in compliance with the Equipment, Maintenance and Condition paragraph or the Condition of Property and Possession paragraph, as applicable, of the Sales Contract and this Addendum (the "Required Condition"). Buyer and Seller agree that Buyer shall, at his expense, make an inspection of the System at the earliest practicable date, consistent with the weather conditions, but in no event later than the May 31 following ratification (the "Final Inspection Date"). Seller's agreement that the System will be in the Required Condition at the time of settlement or occupancy, whichever occurs first, is hereby extended through the date of the inspection of the System, but in no event later than the Final Inspection Date.

Buyer shall give Notice to Seller of the date and time on which the inspection is to be made, and Seller shall have the option of being present or represented at said inspection. The inspection shall be conducted by a heating and air conditioning technician, or pool service company, as appropriate, licensed in the jurisdiction in which the Property is located. Buyer agrees not to attempt to operate the System prior to the scheduled date for the inspection. **In the event Buyer attempts to operate the System prior to said inspection, then any warranty hereunder, express or implied, by Seller, shall be deemed to be null and void.**

©2005 The Greater Capital Area Association of REALTORS®, Inc
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

2 of 6

GCAAR Form # 1332 - MC & DC
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035  www.zipform.com
10/2005
Davis-Irving

In the event that the aforesaid insp...on shows the System to be in the Required Conditio..., then Seller's obligations hereunder with respect to the System shall be deemed fulfilled. In the event that the aforesaid inspection shows the System not to be in the Required Condition, Buyer shall provide Notice of same to Seller no later than the Final Inspection Date, in which event Seller shall be responsible for the actual cost necessary to place the System in the Required Condition. All remedial action taken hereunder shall be performed in a good and workmanlike manner by a heating and air conditioning contractor or pool service company, as appropriate, selected by Seller who is licensed in the jurisdiction in which the Property is located, and shall be completed within 10 days after Buyer's Notice to Seller ("Seller's Timeframe"). Buyer shall make the Property available at reasonable times for the completion of such work. In the event that the System is not in the Required Condition by the expiration of Seller's Timeframe, Buyer shall be irrevocably authorized to have the required remedial action performed by a contractor meeting the aforesaid qualifications. Upon completion of the remedial action, but no later than 10 days following the expiration of Seller's Timeframe ("Buyer's Timeframe"), Buyer shall provide a Notice to Seller including a copy of the contractor's invoice and instructions as to whether the amount shown in said invoice shall be paid directly to said contractor or to Buyer as a reimbursement for covered expenses. Upon receipt of said Notice, Seller shall immediately make payment as instructed in the Notice.

In the event that any Notice required to be given in this Addendum is not given within the timeframe specified, then Seller's obligations hereunder with respect to the System shall be deemed fulfilled.

[X]   **7.   SELLER'S CREDIT(S) TO BUYER (For use with the MAR contract).** In addition to any other amount(s) the Seller has agreed to pay under other provisions of this Contract, the Seller shall credit the Buyer at time of settlement with the sum of $ 45,045.00 towards Buyer's settlement costs. It is the Buyer's responsibility to confirm with his lender, if applicable, that the entire credit provided for herein may be utilized. **If lender prohibits the Seller from payment of any portion of this credit, then said credit shall be reduced to the amount allowed by the lender.**

[ ]   **8.   HOLDING DEPOSIT CHECK.** It is understood and agreed by all Parties that the Buyer has instructed the Escrow Agent to hold and not deposit the above described deposit check until _____ Days after Ratification at which time said check shall be deposited by the Broker.

[ ]   **9.   INTEREST-BEARING ACCOUNT DEPOSIT.** The Parties hereto agree and authorize _____ Escrow Agent, to place the deposit in an interest-bearing escrow account. Interest shall accrue and be payable to the Buyer at time of settlement. In order to establish an Interest Bearing Account, the Buyer understands that a completed W-9 form and a copy of a government issued photo ID must be given to the Escrow Agent. A Processing fee of $ _____ shall be charged to the party receiving the interest by the above Escrow Agent for this service. In the event of a forfeiture of deposit, interest accrued shall be payable to the Seller.

[ ]   **10.  APPRAISAL CONTINGENCY.** This Contract IS CONTINGENT until 9 p.m. on the _____ day after the Date of Ratification ("Deadline") for Buyer to obtain a written appraisal valuation of the property (hereinafter "Appraisal") certifying the value of the property to be no less than the sales price (Check with your lender to confirm that the Appraisal will be completed by the Deadline). If Buyer is obtaining financing, the Lender shall select the Appraiser. If this is a cash sale, the Buyer shall select the Appraiser. The Appraiser shall be licensed to perform appraisals in the jurisdiction in which the property is located. Seller shall make the property available for inspection by such Appraiser.

In the event that the Appraisal is lower then the Sales Price, the Buyer has the option of proceeding with this Contract at the stated Sales Price without regard to the Appraisal. However, should the Buyer decline to proceed with this Contract at the state Sales Price (due to the Appraisal being lower than the stated Sales Price), Buyer shall deliver to Seller, by the Deadline, a Notice (See GCAAR Buyer's Appraisal Notice), requesting that the sales price be reduced to a specified lower amount of not less than the appraised value, together with a copy of the written Appraisal ("Buyer's Appraisal Notice").

Should Buyer fail to deliver Buyer's Appraisal Notice by the Deadline, Buyer's Appraisal Contingency will continue, unless Seller at Seller's option, prior to Seller's receipt of the Buyer's Appraisal Notice, gives Notice to Buyer that the Deadline has passed and the Contingency will EXPIRE. If Seller Delivers such Notice this Contingency will EXPIRE at 9 p.m. on the third day following Delivery of Seller's Notice, unless prior to that date and time Buyer delivers Buyer's Appraisal Notice. If this Contingency expires pursuant to the terms of this paragraph, this contract will remain in full force and effect.

All Notices (under this Appraisal Contingency) delivered subsequent to the delivery of the Buyer's Appraisal Notice shall be treated as follows

WITHIN 3 DAYS AFTER NOTICE DELIVERY FROM ONE PARTY, THE OTHER PARTY MAY:

1.   Deliver notice accepting the terms contained in the other party's notice; OR
2.   Deliver notice continuing negotiations by making another offer; OR
3.   Deliver notice that this Contract will become void at 9:00 p.m. on the 3rd Day following Delivery, unless the recipient delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case, this Contract will remain in full force and effect.

FAILURE OF EITHER PARTY TO RESPOND WITHIN 3 DAYS AFTER NOTICE DELIVERY WILL RESULT IN THE <u>CONTRACT BECOMING VOID.</u>

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only
Previous editions of this Form should be destroyed.

Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035   www.zipform.com

**11. PREQUALIFICATION LETTER CONTINGENCY.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the Buyer Delivering to the Seller a prequalification letter from an institutional lender stating that the financing described in this Contract is available to the Buyer and, based upon written loan application, a preliminary credit report, and the information provided by the Buyer, the financing should be committed subject to appropriate verification, approval and commitment. At anytime after the Deadline, but prior to Delivery to the Seller of the prequalification letter, the Seller may give notice to the Buyer declaring this Contract void.

**12. GIFT LETTER.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the Buyer providing to the Seller a Gift Letter and necessary documentation satisfactory to the lender ("Gift Letter") in the amount of $ _____ from _____. At any time after the Deadline, but prior to Delivery to the Seller of the Gift Letter, the Seller may give notice to the Buyer declaring this Contract void. Once the Gift Letter has been Delivered, if the Buyer does not have the gift funds to settle as provided in this Contract, the Buyer will be in default.

**13. SALE OF THE BUYER'S PROPERTY AND KICK-OUT.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the sale of the Buyer's property located at _____ _____ ("Buyer's Property"). If the Buyer does not satisfy or remove this contingency by the Deadline pursuant to paragraph 13C below, then at any time after the Deadline, but prior to the Buyer satisfying or removing this contingency, either the Seller or the Buyer may declare this Contract void by providing notice to the other party.

   **A.**  The Seller may continue to offer the Property for sale and accept bona fide back-up offers to this Contract. If during the term of this contingency, a back-up offer is accepted, the Seller will Deliver notice to the Buyer requiring that this contingency be satisfied or removed pursuant to paragraph 13C below not later than 9 p.m. on the _____ Day after Delivery of the notice; or this Contract will become void.

   **B.**  The Buyer's Property will be listed exclusively and actively marketed by a licensed real estate broker and entered into a multiple listing service within 3 Days after the Date of Ratification at a price not to exceed $ _____.

   **C.**  The Buyer may:

      (i)  satisfy this contingency by Delivering to the Seller a copy of the ratified contract for the sale of the Buyer's Property with evidence that all contingencies, other than financing, have been removed or waived, together with a prequalification letter as described in the Prequalification Letter Contingency paragraph of this addendum for the Buyer of the Buyer's Property, **or**

      (ii)  remove this contingency by Delivering to the Seller (a) the lender's letter stating that the financing is not contingent in any manner upon the sale and settlement of any real estate or obtaining a lease of any real estate and that the Buyer has sufficient funds available for the down payment and closing costs necessary to complete settlement; or (b) evidence of sufficient funds available to complete settlement without obtaining financing.

   **D.**  If the Buyer satisfies the requirements of Paragraph 13C (i) above, this Contract will remain contingent upon the settlement of the sale of the Buyer's Property. Settlement under this Contract may not be delayed more than _____ Days after the settlement date (specified in this contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver notice to the Seller together with evidence of such voiding, at which time either the Seller or the Buyer may declare this Contract void by Delivering notice to the other party. This paragraph will survive the satisfaction of the contingency for the sale of the Buyer's Property.

**14. BACK-UP CONTRACT OR OFFER.** This Contract is first back-up to another contract or offer dated _____ between the Seller and _____ as the Buyer. This Contract shall become the primary contract immediately upon Delivery of notice from the Seller that the other contract or offer is void along with a copy of the fully executed release. The Buyer may void this back-up contract at any time prior to its becoming primary by Delivering notice to the Seller. If the contract dated _____ settles, this back-up contract will become void. The rights and obligations of the parties under the primary contract are superior to the rights and obligations of the parties to this back-up contract. All timeframes contained in this contract shall not commence until the date this contract becomes primary. Additionally, the date for Settlement will be _____ days after the date this contract becomes primary.

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc and is for use by members only.
Previous editions of this Form should be destroyed

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

10/2005

Davis-Irving

☐ **15. COINCIDING SETTLEMENTS.** Settlement on this Contract is contingent upon the settlement on the contract for the sale of the Buyer's Property located at _____ ("Buyer's Property".) A copy of said contract is attached evidencing that all contingencies, other than financing, have been removed or waived, along with a prequalification letter us described in the Prequalification Letter Contingency paragraph of this addendum for the Buyer of the Buyer's Property. Settlement under this Contract may not be delayed more than _____ Days after the settlement date (specified in this Contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver notice to the Seller together with evidence of such voiding, at which time either the Seller or the Buyer may declare this Contract void by Delivering notice to the other party

☐ **16. OPTION TO KEEP HOUSE ON MARKET.** The Seller may continue to offer this property for sale and accept bona fide back-up offers to this Contract. If during the contingency period(s) as set forth in paragraph #'s _____ #'s _____ of form # _____ . a back-up offer is accepted, the Seller will Deliver notice to the Buyer together with a copy of the back-up Contract requiring that said contingency(ies) be satisfied or removed no later than 9 p.m. on the _____ Day after Delivery of the notice, or this Contract will become void.

☐ **17. CONTINGENT ON THE SELLER PURCHASING ANOTHER HOME.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") to allow the Seller to obtain a ratified contract to purchase another home. This provision will terminate at the Deadline and this Contract will remain in full force and effect unless the Seller declares this Contract void by Delivering notice to the Buyer by the Deadline.

☐ **18. THIRD PARTY APPROVAL.** This Contract is contingent upon the approval of _____ by 9 p.m. on the _____ Day after the Date of Ratification ("Deadline"). If notice of disapproval is not Delivered to the other party by the Deadline, this contingency will terminate and this Contract will remain in full force and effect. No notice of approval is required. If notice of disapproval is Delivered by the Deadline, this Contract will become void.

☐ **19. ITEMS TO BE REMOVED.** Notwithstanding the provisions of this Contract, the following fixtures and/or items of personal property shall not convey and shall be removed from the subject property by the Seller prior to settlement and will not be replaced: _____ _____

☐ **20. POST-SETTLEMENT OCCUPANCY AGREEMENT.** The Parties agree that the Seller shall occupy the property for a period of _____ days following settlement at the rate of $ _____ $ _____ at the time of settlement. The Seller and the Buyer acknowledge that they have read and executed, or will execute at settlement, the GCAAR Post-Settlement Occupancy Agreement and agree to be bound by its terms and provisions.

☐ **21. PRE-SETTLEMENT OCCUPANCY AGREEMENT.** The Parties agree that Buyer shall occupy the property prior to settlement commencing on the _____ day of _____ at the rate of $ _____ per day. The Seller and the Buyer acknowledge that they have read and executed, or will execute prior to occupancy, the GCAAR Pre-Settlement Occupancy Agreement and agree to be bound by its terms and provisions.

☐ **22. LICENSED SELLER/BUYER AGENT.** (NOTE: This clause should be used when Buyer or Seller is a licensed real estate agent or is related to one of the Parties. Failure to include could result in violation of the law.) The Parties acknowledge that _____ is a licensed real estate agent in _____ (DC, MD, VA) associated with _____ and may share in the brokerage fee to be paid and is the Buyer, Seller or is related to one of the Parties hereto.

☐ **23. BROKERAGE FEE PAID BY THE BUYER.** It is understood and agreed by all parties that (company name) _____ _____ , (agent's name) _____ . is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker"). The Seller has no obligation to the Buyer's Broker, and does not owe a brokerage fee or other consideration of any nature to said Buyer's Broker. The settlement office is directed to collect from the Buyer funds, at settlement, and to disburse said fee, as per the separate Buyer's Broker Agreement between the Buyer's Broker and the Buyer. This Buyer's Broker's fee is separate and apart from any brokerage fee owed to the Seller's Listing Broker pursuant to the agency paragraph of the contract. The parties acknowledge that the said Buyer's Broker relationship was disclosed to the Seller and/or the Seller's agent prior to showing the property to the Buyer.

☒ **24. AGREEMENT BETWEEN SELLER (FSBO/BUILDER) AND BUYER'S BROKER.** It is understood and agreed by all Parties that (agent's name) _____Albert Smith_____ , of (company name) _____Jubilee Realty & Associates, LLC_____ is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker"). The Seller agrees to pay to the Buyer's Broker a cash payment of $ __60,600.00__ . The settlement office is hereby irrevocably directed to deduct from the proceeds of the sale at settlement and pay the said Buyer's Broker fee. This fee is separate and apart from, and is in addition to, any brokerage fee owed to any Listing Broker pursuant to the agency paragraph of this Contract. The Parties acknowledge that said Buyer's Broker relationship was disclosed to the Seller and/or the Seller's agent prior to showing the property to the Buyer.

©2005 The Greater Capital Area Association of REALTORS®, Inc
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

☐ **25. MASTER PLAN REVIEW FOR MONTGOMERY COUNTY PROPERTIES.** (except City of Rockville.) Notwithstanding any provisions to the contrary, this Contract is contingent until 9:00 P.M. on the _____ Day after the Date of Ratification ("Deadline"), to allow the Buyer the opportunity to review the applicable County Master Plan and the municipal land use plan for the area in which the property is located as well as any amendment to either plan and any approved official map showing planned uses, roads and highways, parks and other public facilities affecting the property ("Master Plan"). In the event the Buyer is dissatisfied with anything contained in the applicable Master Plan or municipal land use plan, in the Buyer's sole discretion, the Buyer shall Deliver notice of disapproval to the Seller on or before the Deadline specified in this paragraph, in which event this Contract shall be null and void and the Buyer's deposit shall be returned. If no such notice is received by said Deadline, this contingency shall automatically expire and be of no force and effect. (This clause may not be used for property within the corporate limits of the City of Rockville.)

☐ **26. ADDITIONAL PROVISIONS:** _____
_____
_____
_____
_____

**THE FOLLOWING GENERAL PROVISIONS PARAGRAPH SHALL APPLY TO THIS ENTIRE CONTRACT AND THE NOTICES PARAGRAPH SHALL SUPERSEDE ANY OTHER NOTICE PROVISION IN THIS ENTIRE CONTRACT.**

**GENERAL PROVISIONS.** This Contract shall be deemed ratified when the contract, all addenda and any modifications thereto have been signed and initialed, where required by all parties, and Delivered to the other party pursuant to the Notices paragraph.

**NOTICES.** All notices under the contract shall be in writing. Notices to the Seller shall be effective when delivered to the Seller or an Agent of the Seller named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Seller, as applicable, or alternatively, to the Agent's Supervising Manager.) Notices to the Buyer shall be effective when delivered to the Buyer or an Agent of the Buyer named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Buyer, as applicable, or alternatively, to the Agent's Supervising Manager), "Purchaser" means "Buyer" and vice versa. "Delivery" means hand carried, sent by overnight delivery service, sent by wired or electronic medium which produces a tangible record of the transmission (such as telegram, mailgram, telecopier or "Fax", email which includes an attachment with an actual copy of the executed instruments being transmitted, or U.S. Postal mailing.) In the event of overnight delivery service, Delivery shall be deemed to have been made on the next business Day (Monday through Friday excluding federal holidays) following the sending, unless earlier receipt is acknowledged in writing. In the event of U.S. Postal mailing, Delivery shall be deemed to have been made on the third business Day (Monday through Saturday, excluding federal holidays) following the mailing, unless earlier receipt is acknowledged in writing. "Day" or "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery, and the time period will end at 9 p.m. on the Day specified. The provisions of this paragraph regarding delivery of notices shall also be applicable to delivery of resale packages for condominiums, cooperatives and/or homeowners associations as may be required in a separate addendum.

Except as modified by this Addendum, all of the terms and provisions of this Contract are hereby expressly ratified and confirmed and will remain in full force and effect. The captions and headings are for convenience of reference only.

SELLER **Corporate Management Services,** DATE _____

SELLER _____ DATE _____

HOME TELEPHONE NUMBER _____

OFFICE TELEPHONE NUMBER _____

FAX NUMBER _____

LISTING AGENT: _____

Name _____

Real Estate License Number and Jurisdiction

BUYER **LeMarcos & Nina Irving** DATE _____

BUYER **and/or its assigns** DATE _____

HOME TELEPHONE NUMBER _____

OFFICE TELEPHONE NUMBER _____

FAX NUMBER _____

SELLING AGENT/BUYER'S AGENT: _____

Name **Albert Smith** _____

Real Estate License Number and Jurisdiction

©2005 The Greater Capital Area Association of REALTORS®, Inc
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

GCAAR Form # 1332 - MC & DC                  6 of 6                              10/2005
                                                                                 Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

SEP-12-2006 17:44 From:                    To:7035565393                    P.12/17

   

# Washington, DC Jurisdictional Addendum
### (REQUIRED NOTICE AND DISCLOSURE ADDENDUM
### FOR USE WITH THE REGIONAL CONTRACT)

The Contract of Sale between _____ **Corporate Management Services, Inc.** _____ , Seller, and
_____ **LeMarcos & Nina Irving, and/or its assigns** _____ , Buyer, dated
**September 12, 2006** for the sale of Lot **19**    Square **2737**    Parking Space _____
Subdivision/Condominium Project _____ **Shepherd Park** _____ also known as
_____ **7336 14th Street, NW** _____    Washington, DC, **20012**
    (Address)                                               (Zip)
is hereby amended by the incorporation of the following paragraphs, which shall supersede any provisions to the contrary in the Contract.

**1.  LEAD - BASED PAINT HAZARD.** A Seller who fails to give the required Lead-Based Paint Disclosure Form and Pamphlet may be liable under the Act for three times the amount of damages. The Seller represents that residential Property [X] was built prior to 1978 OR [ ] was not built prior to 1978 OR [ ] building date is uncertain. If the dwelling(s) was built prior to 1978 or if the building date is uncertain, this Contract is not complete and not ratified unless it includes, and the Seller and Buyer both accept the Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards, whereby the Buyer acknowledges receipt of required Lead Paint Information and has either taken the opportunity to incorporate a Lead-Based Paint Inspection contingency or waived such a right. The Seller and any agent involved in the transaction are required to retain a copy of the completed Lead-Based Paint Disclosure form for a period of 3 years following the date of settlement. The Seller and Buyer acknowledge by their respective initials below that they have read and understand the provisions of this paragraph.

_____ / _____   Seller's Initials           _____ / _____   Buyer's Initials

**2.  SELLER DISCLOSURE.** Buyer acknowledges receipt of the Seller's Disclosure Statement pursuant to D.C. Code 45-951 prior to the submission of the offer [X] Yes [ ] No.

_____ / _____   Buyer's Initials

**3.  RECORDATION AND TRANSFER TAXES.** The D.C. Recordation Tax will be paid by the Buyer and the D.C. Transfer Tax will be paid by the Seller.

**4.  D.C. SOIL DISCLOSURE REQUIREMENTS.** The characteristic of the soil on the subject Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976 and as shown on the Soil Maps of the District of Columbia at the back of that publication is _____

For further information, the Buyer can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the Department of Agriculture.

**5.  TENANCY.** Seller represents that property [ ] is [X] is not subject to an existing residential lease or tenancy.
    a.  If the Property is tenant occupied, Buyer hereby certifies that Buyer [ ] will [ ] will not occupy the Property.
    b.  The Property is sold and shall be conveyed free of existing tenancy except as follows:

(hereinafter the "Tenant(s)"). Without the prior written consent of Buyer (which shall not be unreasonably withheld) Seller shall not modify the terms of or terminate such tenancy, except for non-payment of rent or enter into any new leases or tenancies with respect to the Property. Seller represents to Buyer and Agents that on _____ (date), Seller has provided to the Tenant(s) a written notice of the intended sale of the Property and a bona fide offer of sale or will provide same pursuant to the following paragraph. Seller and Buyer further acknowledge that, in addition to the rights under the bona fide offer of sale, the Tenant(s) has an additional fifteen (15) day right of first refusal to purchase the Property during the period specified by District of Columbia law and regulations.

© 2005, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed

GCAAR # 1313  Washington DC Jurisdictional Addendum          Page 1 of 2                                 10/2005
(Previously Form # 114)

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton MD 20735         Phone (301) 794-0400    Fax (301) 794 - 4420     Davis-Irving
Albert Smith            Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035  www.zipform.com

Seller further represents and agrees that within two (2) days after final ratification of this Contract Seller will hand-deliver to the Tenant(s) and send by first-class mail the notice of right of first refusal required by District of Columbia law and regulations and a copy of this Contract. In the event that prior to the date of this Contract Seller has not provided to the Tenant(s) a written notice of the intended sale of the Property and a bona fide offer of sale, Seller represents and agrees that within two (2) days after final ratification of this Contract Seller will hand-deliver and send by first class mail to the Tenant(s) a written notice of the intended sale of the Property, a bona fide offer of sale, the required notice of right of first refusal and a copy of this Contract. Upon or after execution of a Contract of sale of the Property between Seller and the Tenant(s), at the option of Buyer (exercisable by written notice to Seller) this Contract shall be void and the deposit hereunder shall be returned to Buyer. If, however, the Tenant(s) shall fail to exercise the foregoing rights to purchase the Property or shall execute and deliver a valid rejection of said rights, then this Contract shall remain in full force and effect. The Seller shall keep Buyer and the Agents apprised of all negotiations, correspondence, Contracts and other developments with respect to negotiations with the Tenant(s). All actions required hereunder to be taken by Seller shall be taken in accordance with District of Columbia law and regulations.

**6.  UNDERGROUND STORAGE TANK DISCLOSURE. (Applicable to single family sales only.)**
In accordance with the requirements of Section 3(g) of the District of Columbia Underground Storage Tank Management Act of 1990 (D.C. Code Section 6-995.2), as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (the "Act") and the regulations adopted thereunder by the District of Columbia (the "Regulations"), Seller hereby informs Buyer that Seller has no knowledge of the existence or removal during Seller's ownership of the Property of any underground storage tanks as that term is defined in the Act and the Regulations, except as follows: _____

_____  _____  _____  _____  _____

I hereby certify that I have received and read a copy of the disclosure notice in this paragraph prior to signing this Contract.
Buyer: _____

| LeMarcos & Nina Irving | and/or its assigns |
|---|---|

**7.  FOREIGN INVESTMENT TAXES-FIRPTA:** Section 1445 of the United States Internal Revenue Code of 1986 provides that a buyer of a residential real property located in the United States must withhold federal income taxes from the payment of the purchase price if (a) the purchase price exceeds $300,000.00 or the purchase price is less than or equal to $300,000.00 and the property will not be owner occupied and (b) Seller is a foreign person for purposes of U.S. income taxation (foreign person). A foreign person includes, but is not limited to, a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined by the Internal Revenue Code and applicable regulations). Seller represents that Seller is not a foreign person and agrees to execute an affidavit to this effect at the time of settlement.

**8.  CONDOMINIUM/COOPERATIVE/HOMEOWNERS ASSOCIATION:** Seller represents that this property ☐ is ☐ is not subject to a condominium, cooperative or homeowners association that is entitled to assess a mandatory fee. The current fee is _____ per _____.

**9.  NOTICES.** All notices under the contract shall be in writing. Notices to the Seller shall be effective when delivered to the Seller or an Agent of the Seller named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Seller, as applicable, or alternatively, to the Agent's Supervising Manager.) Notices to the Buyer shall be effective when delivered to the Buyer or an Agent of the Buyer named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Buyer, as applicable, or alternatively, to the Agent's Supervising Manager). "Purchaser" means "Buyer" and vice versa. "Delivery" means hand carried, sent by overnight delivery service, sent by wired or electronic medium which produces a tangible record of the transmission (such as telegram, mailgram, telecopier or "Fax", email which includes an attachment with an actual copy of the executed instruments being transmitted, or U.S. Postal mailing.) In the event of overnight delivery service, Delivery will be deemed to have been made on the next business Day (Monday through Friday excluding federal holidays) following the sending, unless earlier receipt is acknowledged in writing. In the event of U.S. Postal mailing, Delivery will be deemed to have been made on the third business Day (Monday through Saturday, excluding federal holidays) following the mailing, unless earlier receipt is acknowledged in writing. "Day" or "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery, and the time period will end at 9 p.m. on the Day specified. The provisions of this paragraph regarding delivery of notices shall also be applicable to delivery of resale packages for condominiums, cooperatives and/or homeowners associations as may be required in a separate addendum.

| Seller | Date | Buyer | Date |
|---|---|---|---|
| Corporate Management Services, | | LeMarcos & Nina Irving | |

| Seller | Date | Buyer | Date |
|---|---|---|---|
| | | and/or its assigns | |

© 2005, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035  www.zipform.com      Albert Smith

SEP-12-2006 17:45 From:                    To:7023565393                    P.14/17



## Prince George's County Association of REALTORS®, Inc.

### ADDENDUM

Agreement Between Seller & Buyer's Broker

(FSBO/Builder)

Special Provisions attached to and hereby made a part of the Contract, dated __September 12, 2006__, for the purchase and sale of Lot _____ Block _____ Subdivision _____ _____ located at __7336 14th Street, NW, , DC 20012__ _____, Prince George's County between __Corporate Management Services, Inc.__ _____ (Sellers) and __LeMarcos & Nina Irving, and/or its assigns__ _____ (Buyers).

It is understood and agreed by all parties that (agent's name) _____ __Albert Smith__ of (Company Name) __Jubilee Realty & Associates, LLC__ _____, is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker").

The Seller agrees to pay to the Buyer's Broker a cash payment of $ __60,600.00__ _____. The Settlement Office is hereby irrevocably directed to deduct and pay said Buyer's Broker's fee from the proceeds of the sale. This fee is separate and apart from, and is in addition to, any brokerage fee owed to any Listing Broker pursuant to the agency paragraph of the above-referenced Contract.

The parties acknowledge that said Buyer's Broker relationship was disclosed to Seller and/or Seller's agent prior to showing the property to the Buyer.

_____
Seller __Corporate Management Services,__

__Jubilee Realty & Associates, LLC__
Buyer's Broker

_____
Seller

By: _____
Authorized Agent
__Albert Smith__

_____
Date

Date _____

This Recommended Form is property of the Prince George's County Association of REALTORS®, Inc. and is for use by members only. Previous editions of this Form should be destroyed.

PGCAR Form #600 FSBO - Agreement between Seller & Buyer's Broker - Authorization to Show

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 794 - 9400    Fax: (301) 794 - 4420    Albert Smith

Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

  

# GENERAL ADDENDUM

Special provisions attached to and hereby made a part thereof, the Contract dated _____ September 12, 2006 _____

on Lot _____ 19 _____ , Block _____ 2737 _____ , Subdivision _____ Shepherd Park _____,

_____ 7336 14th Street, NW, , DC 20012 _____,

located in _____ Washington DC _____ Maryland between

(Purchasers) _____ LeMarcos & Nina Irving, and/or its assigns _____

and (Sellers) _____ Corporate Management Services, Inc. _____

Seller Corporate Management Services,                    Purchaser LeMarcos & Nina Irving

Seller _____                                  Purchaser and/or its assigns

Date _____                                    Date _____

© 1989, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only
Previous editions of this Form should be destroyed.

GCAAR #1320 - General Addendum                    Page 1 of 1                                    10/89
Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 794 - 9400        Fax: (301) 794 - 4420        Albert Smith                        Davis-Irving

Produced with ZipForm™ by RF FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035   www.zipform.com



SELLER CONTRACT AND e-MITS® USER AGREEMENT

**Lender Application**


**IndyMac Bank.**
Correspondent Services

### Seller Contract and e-MITS® User Agreement

This Seller Contract and e-MITS® User Agreement (as amended, supplemented or otherwise modified from time to time, the "Contract") is entered into this _____ day of _____, 20____, by and between INDYMAC BANK, F.S.B. ("IndyMac"), and Legacy Fianncial Corp , a Corporation ("Seller").

Subject to all applicable federal, state and local laws and regulations, Seller desires to do one or more of the following: (1) sell mortgage loans to IndyMac and (2) service mortgage loans for IndyMac; and IndyMac desires to do one or more of the following: (1) purchase mortgage loans from Seller and (2) have Seller service mortgage loans for IndyMac, in each case pursuant to the terms of this Contract, the IndyMac Lending Guide, as amended, supplemented or otherwise modified from time to time (the "Lending Guide"), and the e-MITS® User Guide (the "e-MITS® Guide" and, together with the Lending Guide are collectively referred to as the "Guide") and any Master Commitments entered into between Seller and IndyMac. Seller desires to undertake the aforementioned tasks using the System (as defined herein) as more fully described herein and subject to the terms and conditions herein.

NOW, THEREFORE, in consideration of the premises set forth above and the terms, conditions and agreements set forth below, IndyMac and Seller hereby agree as follows:

1. **Definitions.** Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Section 1 unless defined elsewhere herein. All other capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Guide.

   1.1 "Consumer" means a natural person who seeks credit or other financial services for personal, family or household purposes, including a User (as defined below).

   1.2 "Consumer Privacy Laws" means any and all federal, state and local statutes, regulations and rules applicable to the protection and privacy of consumer information, including but not limited to the privacy provisions of the Gramm-Leach-Bliley Act (15 U.S.C. Section 6801 et seq.).

   1.3 "Consumer Information" means any and all information relating to a Consumer forwarded to IndyMac by or through Seller except to the extent that any such information is thereafter submitted directly to IndyMac by such Consumer(s) in connection with a request for or inquiry regarding credit or other services offered by IndyMac.

   1.4 "IndyMac Consumer Information" means any and all information relating to a Consumer submitted directly to IndyMac without going through Seller and any and all information relating to a Consumer received by Seller after IndyMac has established with such Consumer a "customer" or "consumer" relationship as those terms are defined pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. Section 6801 et seq.).

   1.5 "IndyMac Data" means any data or information of IndyMac that is provided to or obtained by Seller in the performance of its obligations under this Contract, including data and information with respect to the businesses, customers, customer accounts, customer transactions, operations, facilities, products, customer markets, assets, and/or finances of IndyMac and its customers. IndyMac Data also shall mean any data or information created, generated, collected or processed for IndyMac by Seller in the performance of its obligations under this Contract, including IndyMac Consumer Information.

   1.6 "OTS" means Office of Thrift Supervision.

   1.7 "Seller Consumer Information" means any and all information relating to a Consumer forwarded to IndyMac by or through Seller, except to the extent that any such information is thereafter (i) submitted directly to IndyMac by such Consumer or by other third parties or (ii) submitted to IndyMac by or through Seller after IndyMac establishes with such Consumer a "customer" or "consumer" relationship, as those terms are defined pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. Section 6801 et seq.).

   1.8 "User" means a person who submits a loan inquiry or application for credit to or through Seller.

2. **Seller's Duties.** Seller shall diligently perform all duties incident to the sale and/or servicing, as applicable, of all mortgage loans which may be sold by Seller to and/or serviced by Seller for IndyMac from time to time and such other mortgage loans as IndyMac and Seller may mutually agree upon. In the performance of such duties, Seller shall comply with all of the applicable provisions of the Guide and with all other reasonable requirements and instructions of IndyMac. Seller shall perform all such duties at its sole expense except as otherwise expressly provided in the Guide. Seller agrees to service (if servicing is retained) each of such mortgage loans continuously beginning with the purchase date for such mortgage loans, or the date of designation of Seller as replacement servicer for mortgage loans previously purchased by IndyMac from another Seller, until all interest and principal on each mortgage loan has been paid in full, the mortgage loan has been liquidated as provided in the Guide, or such servicing duties are terminated by Seller or IndyMac. Seller shall create, maintain and transmit all mortgage loan papers and documents including permanent mortgage loan account records in accordance with the Guide. Seller shall promptly notify IndyMac in writing of any activity or action, either internal or external, which could potentially affect adversely the terms of any mortgage loan serviced hereunder or the ability of Seller to service any mortgage loan for any investor, including IndyMac.

3. **Incorporation of Guide by Reference.** SELLER ACKNOWLEDGES THAT IT HAS RECEIVED ACCESS TO AND HAS READ THE GUIDE PRIOR TO ENTERING INTO THIS CONTRACT and has the ability to sell, service and/or facilitate (as the case may be) the funding of mortgage loans in accordance with the Guide. Seller hereby agrees to perform all of the obligations of a seller of mortgage loans, and to comply with the terms, conditions, procedures and requirements set forth in the Guide, all of the terms and conditions of which are incorporated herein by reference and made a part of this Contract. SELLER FURTHER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THE GUIDE AS WELL AS OF THIS CONTRACT SHALL GOVERN THE RELATIONSHIP BETWEEN SELLER AND INDYMAC HEREUNDER, including without limitation, representations and warranties made by Seller under the Guide with respect to itself and the mortgage loans, and Seller's obligations to provide the remedies set forth in the Guide in the event of a default on the part of Seller (i.e., a defect in the mortgage loan documents, a breach of representations and warranties made by Seller or failure to perform its obligations as required).

4. **Term of Contract; Termination.**

   4.1 **Term.** The term of this Contract will commence on the date first set forth above. Each party reserves the right to terminate this Contract at any time for any reason in its sole discretion upon ninety (90) days written notice to the other party. In addition to the foregoing, IndyMac will have the right to terminate this Contract effective immediately upon notice to Seller in the event of any breach by Seller of this Contract, any other agreement between IndyMac and Seller related to the System (as defined herein) or Seller's relationship with IndyMac.

   4.2 **Obligations of Seller upon Termination.** Upon termination of this Contract, including termination for any alleged breach, Seller shall (i) cease using the System and Software immediately, and (ii) deliver to IndyMac or, if so directed by IndyMac, destroy any copies of the Software in Seller's possession and any other materials provided by IndyMac to Seller pursuant hereto in Seller's possession, custody or control (including the Guide). If IndyMac shall so direct, Seller shall furnish to IndyMac an affidavit signed by an officer of Seller certifying that, to the best of his or her knowledge, the

V# 0904

Downloaded indymach2h.com

11/21



SELLER CONTRACT AND e-MITS® USER AGREEMENT

Lender Application


IndyMac Bank
Correspondent Services

delivery or destruction referenced in clause (ii) above has been fully effected. The parties' rights and obligations under Sections 2, 3, 6.2, 7, 12-16, 18, 19, 21-26 shall survive any termination of any license or rights under this Contract.

**5.   Non-Exclusivity.** IndyMac agrees that this Agreement is non-exclusive and that Seller is not obligated to submit all mortgage loans to IndyMac for purchase. Seller agrees that IndyMac is not obligated to purchase any mortgage loans submitted by Seller and that IndyMac's decision to purchase a mortgage loan should not be construed as its agreement to purchase future mortgage loans submitted by Seller. IndyMac reserves the right to reject any mortgage loans submitted by Seller hereunder for any reason whatsoever.

**6.   Use of IndyMac e-MITS®.**

**6.1  System and Software.** Subject to the terms and conditions of this Contract, IndyMac grants to Seller the non-exclusive, non-assignable right to use, during the term of this Contract (i) the electronic mortgage information transaction system owned by IndyMac and known as IndyMac e-MITS® (the "System"), and (ii) the System software, any updates and enhancements of such software which are made available by IndyMac to Seller, and all code and controls contained in the e-MITS® Web Site (the "Web Site"), as well as any subsequent code which may be written in any programming language (collectively, the "Software"), without change, along with any reports or other printouts generated by the Software in the course of its normal operation, any documentation related to the Software, and any copies of the foregoing which Seller is permitted to make pursuant to the terms of this Contract and the Guide. Seller may only access the System using the Software via the internet through the Web Site, and will cause to be entered into the System only data regarding existing mortgage loans sold to IndyMac, potential mortgage loans for which an application or an inquiry has been made to Seller by a potential borrower, and mortgage loans presented to Seller by a third party originator ("TPO"), subject to any limitations set forth in the Guide. Seller's use of the System is subject to all provisions of this Contract and all instructions as may be communicated by IndyMac from time to time in writing, including, without limitation, restrictions on the use of the System. Seller shall not: (a) decompile, disassemble, reverse engineer, or otherwise determine or attempt to determine source code for the executable code of the Software or any information, products or services obtained from the Web Site (collectively, the "Products"); (b) rent, lease, transfer, sell, publish, license, distribute or otherwise transfer any rights to the Products, except to the extent permitted under Section 15; (c) modify, translate, enhance, maintain, or create derivative works based on the Products; (d) except to the extent necessary to use the System for the sole purpose set forth in this Section 6.1, modify, copy, distribute, transmit, display, perform or reproduce the Software; (e) except to the extent otherwise provided in this Contract or consented to by IndyMac in writing, permit any third parties to use the System, either directly or through Seller; (f) use the System for any purpose other than to perform Seller's obligations hereunder; or (g) copy, download, or otherwise access the System Software except as such operations are performed by the Software in the course of its normal operation. Any unauthorized use, misappropriation or infringement of the System, the Products or the Software shall be deemed a material breach of this Contract. The remedies for any breach of this Section 6 shall include, but are not limited to, the remedies provided in Section 7.4 below.

**6.2  System Ownership.** Seller acknowledges that it has no ownership or other interest in or license to the System or Software, except to the extent of the rights expressly granted herein and subject to the terms of this Contract. Title, ownership rights, and intellectual property rights (including all applicable rights to copyrights, trade secrets, patents, and trademarks) in and to the System and Software and any modifications or enhancements made to the System or Software belong to and shall remain with the exclusive property of IndyMac.

**6.3  Procedures for Seller's Use.** Seller hereby agrees that the Web Site shall be used by Seller's authorized employees only. IndyMac shall provide Seller access to the System as set forth in Section 1000 of the e-MITS® Guide. IndyMac shall be solely responsible for (i) preventing unauthorized use of the identification numbers and passwords, (ii) unauthorized use of the System in connection with Seller's identification numbers and passwords, (iii) controlling access to the System and (iv) implementing effective security measures to protect the integrity of the System. IndyMac shall have no liability with respect to any such unauthorized use. Seller shall list Seller's authorized users as set forth in Section 1000 of the e-MITS® Guide, and ensure that each individual identification number and password is used only by the person identified in the System. Seller will permit IndyMac to audit or review Seller's controls and procedures relating to the access and security of the System.

**6.4  Seller's Obligation for System Input and Data Integrity.** Seller acknowledges and agrees that it will be solely responsible for the data it inputs into the System and for the actions IndyMac takes based upon such data. Seller agrees that IndyMac will have no liability whatsoever arising out of or related to inaccurate or erroneous data.

**6.5  Seller's Obligation to Submit Loans Through the System.** Seller acknowledges and agrees that Seller must submit all mortgage loans intended for sale to IndyMac through the System to the extent the System supports the applicable mortgage loan program and/or product. The mortgage loan programs and/or products supported by the System may be expanded or reduced from time to time at IndyMac's sole discretion, and IndyMac will notify Seller of the new mortgage loan programs and/or products supported by the System as they change. All rate locks shall have the same force and effect as a rate lock received by IndyMac's Rate Lock Desk via telephone or facsimile in accordance with the applicable terms set forth in this Contract and the Guide. Any Master Commitment price enhancement granted to Seller by IndyMac will apply to rate locks issued through the System, but may not be reflected in the pricing obtained through e-MITS®. Seller acknowledges that all rate locks are subject to change if, upon review of the Data (as defined below), IndyMac determines, in its sole and absolute discretion, that the Data is incomplete or is not supported by the mortgage loan documents, or any other documents that IndyMac receives from Seller or otherwise obtains in connection with the Data verification process.

**6.6  Provisions Concerning TPO's.** IndyMac agrees that Seller may use the Software to input data into the System regarding mortgage loans presented to Seller by TPOs, subject to each of the terms and provisions set forth in Section 3000 of the e-MITS® User Guide and to the terms of any addendum or amendment to this Contract.

**6.7  Fees.** Seller will not be assessed a fee for the use of the System; provided, however, that IndyMac, in its sole and absolute discretion, reserves the right to charge a fee for use of the System at a future date. In the event that IndyMac commences charging a fee for use of the System, IndyMac shall provide Seller thirty (30) days prior written notice of such fee. Seller shall have the right to terminate this Contract upon receipt of IndyMac's notice regarding the charging of such fee.

**6.8  Data.** Seller agrees that IndyMac will have the right to use and disclose the data entered by Seller onto the System and any other data obtained by IndyMac as provided in Section 1013 of the Lending Guide (collectively, the "Data").

**7.   Confidentiality.**

**7.1  Confidentiality; Confidential and Derivative Information; Breach.** Seller reaffirms and acknowledges Seller's obligations to maintain the confidentiality of the Confidential Information and Derivative Information, each as defined in the Guide, under the terms and provisions set forth in the Guide. Seller and IndyMac agree that the confidentiality conditions contained in the Guide and this Contract are material terms of this Contract and the Guide, and that any disclosure of any Confidential Information or Derivative Information by Seller or any other person bound by these confidentiality conditions shall constitute a breach by Seller of this Contract and the Guide.

**7.2  Protection of Consumer Information.** Each party agrees to use and disclose Consumer Information only in accordance with Consumer Privacy Laws. Unless and until the User forms a "customer" or "consumer" relationship with IndyMac, as those terms are defined under the Consumer Privacy Laws, or provides IndyMac separate authorization, IndyMac agrees not to use or disclose Consumer Information for any purpose other than

V# 0904

Downloaded from indymech2h.com



SELLER CONTRACT AND e-MITS® USER AGREEMENT

Lender Application



**IndyMac Bank.**
Correspondent Services

(i) to effect, administer, or enforce a transaction that User requests through Seller or (ii) pursuant to an enumerated exception to the opt-out and notice requirement under the regulations implementing the Gramm-Leach-Bliley Act provided in 12 CFR Sections 573.14 and 573.15. Before Seller forwards Consumer Information to IndyMac, Seller will obtain the User's authorization to forward Consumer Information to unspecified third parties that may be able to extend credit to the User, on the terms and conditions that User requests, which authorization shall apply to IndyMac. Absent express authorization provided directly by a Consumer to IndyMac or obtained by Seller for the benefit of IndyMac as provided in the foregoing sentence, IndyMac will not use or share Consumer Information with any affiliated or unaffiliated third party for any purpose other than to evaluate the Consumer's credit inquiry on the terms and conditions selected by Seller. Seller may inform Consumers of IndyMac's privacy policy and provide to Consumers notices and disclosures required under such privacy policy on behalf of IndyMac; *provided, however*, that Seller is not obligated to exercise its independent judgment as to the legal sufficiency or advisability of any such information, notices or disclosures or the delivery or timing of such delivery of such information, notices or disclosures. Each of IndyMac and Seller shall have in place an information security program, which program shall be designed to (i) ensure the security, integrity, and confidentiality of all Consumer Information and IndyMac Consumer Information; (ii) protect against hazards to the security, integrity, and confidentiality of Consumer Information and IndyMac Consumer Information; and (iii) protect against unauthorized access to or use of Consumer Information or IndyMac Consumer Information. IndyMac and Seller shall provide the other a copy of its information security program upon reasonable request made by the other party in writing.

7.3   Protection of IndyMac Consumer Information. Seller acknowledges that pursuant to this Contract, Seller may receive IndyMac Consumer Information. Seller hereby agrees not to (i) use or share any IndyMac Consumer Information with any affiliated or unaffiliated third party for any purpose other than in connection with the enforcement of it rights and the performance of its duties under this Contract or (ii) copy such IndyMac Consumer Information except as may be necessary to perform its duties under the Contract. If Seller proposes to disclose IndyMac Consumer Information to a third party in order to perform under this Contract, Seller shall remain responsible for any breach by third parties of confidentiality covenants made by Seller hereunder. Seller must enter into a confidentiality agreement with such third party pursuant to which such third party would be restricted from disclosing, using or duplicating such IndyMac Consumer Information, except as consistent with this Section 7.3. Seller shall notify IndyMac in writing immediately upon becoming aware of any unauthorized use or disclosure of IndyMac Consumer Information. In such event, Seller shall cooperate with IndyMac in mitigating any potential damages by, at Seller's expense: (i) immediately recovering all IndyMac Consumer Information from the unauthorized recipient and instructing the unauthorized recipient to cease and desist from any use of such IndyMac Consumer Information, (ii) at the request of IndyMac, deleting from Seller's electronic systems and physical records within five (5) business days all IndyMac Consumer Information and providing written certification that such deletion has occurred; (iii) promptly responding with assistance and cooperation, to any demand forwarded by IndyMac to Seller as a result of a court order imposed on IndyMac or from a governmental authority having jurisdiction over IndyMac; and (iv) taking any other remedial steps reasonably required by IndyMac. The restrictions on use and disclosure set forth above shall not apply when, and to the extent that, the IndyMac Consumer Information or IndyMac Data is required to be disclosed by Seller as a matter of law, provided that Seller uses all reasonable efforts to provide IndyMac with at least ten (10) business days' prior notice of such disclosure and Seller discloses only that portion of the IndyMac Consumer Information and IndyMac Data that is legally required to be furnished pursuant to the opinion of legal counsel of Seller. The provisions of this Section 7.3 shall survive the termination of this Contract.

7.4   Remedies. Seller agrees that a breach of the confidentiality obligations contained in this Section 7 as they relate to IndyMac Consumer Information or IndyMac Data may cause IndyMac to suffer irreparable harm in an amount not easily ascertained. Seller agrees that any breach of this Section 7, or of Section 6, above, or Section 8, below, whether threatened or actual, will give IndyMac the right to terminate this Contract immediately and without penalty, obtain equitable relief, including an injunction to restrain any disclosure or use of any and all IndyMac Trademarks, IndyMac Consumer Information or IndyMac Data, and pursue all other remedies IndyMac may have at law or in equity. In addition, Seller agrees that its failure to provide IndyMac, from time to time, commercially reasonable assurances that Seller has taken adequate steps to protect the security of all IndyMac Consumer Information and IndyMac Data in its possession shall give IndyMac the right to terminate this Contract immediately and without penalty.

7.5   Unauthorized Copying Prohibited. Except to the extent necessary to perform its servicing obligation or other obligations to IndyMac, Seller shall not copy or permit copies to be made of the Confidential Information, Derivative Information, or any portion thereof, without the prior written consent of IndyMac, which consent may be granted or denied in IndyMac's sole and absolute discretion. Seller shall return or turn over to IndyMac any Confidential Information, Derivative Information and copies thereof, including without limitation, hard copies and word processing and other computer files, within three (3) business days of Seller's receipt of written demand by IndyMac or immediately upon termination of Seller's eligibility, whichever is earlier.

7.6   Ownership and Safeguarding of IndyMac Data and IndyMac Consumer Information. IndyMac Data is and shall remain the exclusive property of IndyMac. Seller shall promptly deliver to IndyMac a copy of, or at IndyMac's request return, all IndyMac Data and IndyMac Consumer Information (or such portion thereof as shall be specified by IndyMac) in the format and on the media prescribed by IndyMac (i) at any time (ii) upon IndyMac's request, IndyMac Data or IndyMac Consumer Information is no longer required by Seller to perform under this Contract, or (iii) with respect to particular IndyMac Data or IndyMac Consumer Information, at such earlier date that such Seller shall destroy or securely erase all copies of IndyMac Data or IndyMac Consumer Information in Seller's possession or under Seller's control. Seller shall not withhold any IndyMac Data or IndyMac Consumer Information as a means of resolving any dispute, but may make and retain archival copies solely for record-keeping purpose. IndyMac Data and IndyMac Consumer Information shall not be utilized by Seller for any purpose other than the performance of Seller's obligations under this Contract and shall not be disclosed, sold, assigned, leased, or otherwise provided to third parties by Seller or commercially exploited by or on behalf of Seller or it affiliates, employees, agents or contractors.

Seller shall establish and maintain environmental, safety and facility procedures, data security procedures and other safeguards against the destruction, loss, or alteration of IndyMac Data and IndyMac Consumer Information in the possession of Seller which are (i) no less rigorous than those maintained by IndyMac; (ii) no less rigorous than those maintained by Seller for its own information of a similar nature or that of other Seller customers; and (iii) no less rigorous than those mandated by the federal banking agencies Interagency Guidelines Establishing Standards for Safeguarding Customer Information (Feb. 1, 2001)

8.   IndyMac's Trademarks. IndyMac hereby grants Seller a nonexclusive, royalty-free, and nontransferable right to display the IndyMac trademarks for which Seller has been approved in writing (the "Marks") during the term of the Contract, provided that Seller shall use such Marks strictly in accordance with the Guide and solely for the purpose of and to the extent necessary for Seller's performance of its obligations under the Contract. The Marks are and shall remain the exclusive property of IndyMac. All authorized use of IndyMac's intellectual property shall inure to the benefit of IndyMac. Any unauthorized use, misappropriation, or infringement of IndyMac's intellectual property by Seller shall be deemed a material breach of the Contract, and the remedies for such breach shall include, but are not limited to, the remedies provided in Section 7.4, above.

9.   IndyMac's Audit Rights.

9.1   Operational Audits. Seller shall provide to IndyMac (and internal and external auditors, inspectors and regulators that IndyMac may designate from time to time) access at reasonable hours to Seller personnel, to the facilities at or from which services are or have been provided, and to Seller records, all to the extent relevant to Seller's obligations under the Contract. Such access shall be provided for the purpose of performing audits and inspections of Seller and its businesses, to (i) verify the integrity of IndyMac Data, (ii) examine the systems that process, store, support and transmit that data, (iii) examine the controls (e.g., organizational controls, input/output controls, system modification controls, processing controls, system design controls, and access controls) and the security, disaster recovery and back-up practices and procedures, and (iv) examine Seller's performance

V# 0904

Downloaded indymach2h.com

SELLER CONTRACT AND e-MITS® USER AGREEMENT

**Lender Application**



**IndyMac Bank.**
Correspondent Services

of its obligations under the Contract.

**9.2    Regulatory Audits.**  By entering into this Contract, Seller agrees that the OTS will have the authority and responsibility pursuant to the Bank Service Corporation Act (12 U.S.C. §1867(c)) to examine Seller's records, and systems and facilities used to perform its obligations hereunder and Seller may be subject to examination by government examiners, auditors, inspectors and regulators and any other agency having jurisdiction over IndyMac's business to the same extent as such records, systems and facilities would be subject to examination if IndyMac were providing such servic-es on its own premises.  If a governmental body exercises its right to examine or audit Seller's records, systems or facilities, Seller shall provide all assistance requested by IndyMac or the governmental body in responding to such audits or government requests for information.

**9.3    Annual SAS 70 Audit.**  If Seller is servicing mortgage loans for IndyMac, Seller shall, at the discretion and upon request of IndyMac, cause an annual SAS 70 audit to be completed for any facility at or from which Seller performs its obligations, and shall promptly deliver two copies of the resulting audit report to IndyMac at no additional charge and shall address the finding of such an audit in accordance with prudent business practices. Seller shall also provide a copy of such audit to the appropriate regulatory agencies, if any, having jurisdiction over Seller's provision of services as required hereunder.

**10.    Seller's Status as Independent Contractor.**  IndyMac and Seller are, and operate as, independent parties.  Nothing contained herein shall constitute an agency, partnership or joint venture between IndyMac and Seller.  Seller is not, nor may Seller hold itself out to be, IndyMac's agent (except that to the extent that Seller is acting as the servicer of mortgage loans on behalf and for the benefit of IndyMac pursuant to the terms of this Contract and the Guide), employee or independent contractor.

**11.    Assignment.**  This Contract, the Guide, the Software, any rights Seller has to use the System and any related Master Commitments may not be assigned or transferred (whether voluntarily, involuntarily, by merger, by operation of law or otherwise), in whole or in part, by Seller without the prior written consent of IndyMac; it being expressly understood, however, that any transfer or assignment of Seller's rights hereunder to a successor by operation of Section 25 shall not be considered a violation of this Section 11.  IndyMac may sell, assign, pledge or in any other way transfer, in whole or in part, its rights and obligations under this Contract, the Guide and any related Master Commitment to any of IndyMac's affiliates without notice to or the consent of Seller.  Any other transfer by IndyMac is permitted and effective upon written notice by IndyMac to Seller.

**12.    No Warranty by IndyMac.**  IndyMac makes no representation or warranty with respect to the System, the Software or any of the data obtained, provided or transmitted by or through the System.  EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREE-MENT, THE SYSTEM, THE SOFTWARE AND ALL DATA ARE BEING PROVIDED TO SELLER "AS IS" AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), ARE EXPRESSLY EXCLUDED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF ACCURACY, NON-INFRINGEMENT, AVAILABILITY, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Seller shall be solely responsible for, and Seller acknowledges that IndyMac shall have no obligation to assist Seller in, (i) setting up the Software on its computer system, (ii) accessing the System via the Web Site or otherwise, or (iii) maintaining connectivity to the System in accordance with instruc-tions provided by IndyMac from time to time.  Seller agrees that, notwithstanding any telephone assistance provided by IndyMac under Section 6500 of the e-MITS® Guide, IndyMac will have no liability whatsoever arising out of or related to Seller's set-up of the Software, Seller's access to the System, the maintenance of Seller's connectivity to the System, or any such telephone assistance.  Seller also acknowledges that Seller's access to the System via the Web Site will be through a third party internet service provider ("ISP"), and that IndyMac will have no liability whatsoever arising out of or related to any service provided to Seller by an ISP.

**13.    Liability Limitation.**  IndyMac will have no liability under this Contract, or related in any respect to the System or Software (including, without limitation, under any other agreement with Seller related to the System) for special, consequential, exemplary, indirect or incidental damages, or for any lost revenues, lost profits or lost data, even if IndyMac has been advised of the possibility of such damages.  In no event shall IndyMac's total lia-bility to Seller, whether arising out of tort, contract, or other legal theory, exceed $10,000.

**14.    Warranties, Representations and Obligation.**  Seller reaffirms that the representations and warranties stated in the Guide are true and correct and agrees to undertake all of the obligations stated in the Guide upon the execution of this Contract and upon the sale of each mortgage loan to IndyMac, unless expressly waived in writing by IndyMac.  All representations and warranties made, and obligations undertaken, by Seller shall survive (i) any investigation made by or on behalf of IndyMac, its assignees or designees, (ii) any liquidation of the mortgage loans, (iii) any purchase or fund-ing of the mortgage loans by IndyMac, its assignees or designees, (iv) the subsequent transfer of the mortgage loans and/or the servicing rights inci-dent to the mortgage loans to any third party, (v) any suspension or termination of Seller's privileges under this Contract, and (vi) the bankruptcy or insolvency of either party, and all such representations and warranties that inure to the benefit of IndyMac, its assignees or designees, and any trans-feree of any mortgage loan.  Upon specific written request from IndyMac, Seller shall supply evidence that is satisfactory to IndyMac of its compliance with any provision of this Contract and the Guide.

**15.    Repurchase Obligations.**  Seller shall promptly effectuate any repurchase of a mortgage loan required by IndyMac in accordance with the terms and conditions of the Guide.

**16.    Indemnification by Seller.**  Seller shall promptly indemnify, defend and hold IndyMac from and against all losses, claims, demands, actions or causes of action, liabilities, damages, penalties, fines, forfeitures, judgments, legal fees, including reasonable attorneys' fees actually incurred, and any other costs and expenses heretofore or hereafter resulting from, arising out of, relating to, or in connection with (i) any actual or alleged breach of any representation, warranty or obligation of Seller contained in or made pursuant to this Contract or the Guide, or (ii) any act or omission by Seller under this Contract or the Guide, or (iii) any claim, demand, defense or assertion against or involving IndyMac, including without limitation, from any IndyMac assignee or transferee, with respect to any mortgage loan based on or grounded upon, or resulting from any alleged action or inaction that would con-stitute (a) a breach by Seller, or (b) a breach of any representation, warranty or obligation made by IndyMac in reliance upon any representation, war-ranty or obligation made or undertaken by Seller pursuant to this Contract or the Guide, or (iv) any claims based upon Seller's use of the System or Software, including without limitation, claims arising out of Seller's input into the System of inaccurate or erroneous data and any actions taken by IndyMac or Seller based on such data, or (v) Seller's actual or alleged failure to comply with applicable laws and regulations, or (vi) unauthorized use of any identification numbers or passwords with respect to the System, or (vii) actions of TPOs associated with Seller, or (viii) disclosure by Seller or a TPO associated with Seller of the Confidential Information or Derivative Information to a third party.  The obligations of Seller under this paragraph shall survive delivery and payment for the mortgage loans and termination of this Contract or the expiration hereof.  Attorneys' fees and disbursements incurred in enforcing a judgment pursuant hereto or any appeal thereof shall be recoverable separately from and in addition to any other amount included in such judgment, and this clause is intended to be severable from the other provisions of this Contract and to survive and not be merged into such judgment.

**17.    Early Payment Defaults.**  Notwithstanding the provisions in the Guide concerning responsibility for early payment defaults, Seller will not be liable for an early payment default on any mortgage loan, provided that the information supplied at any time by Seller to IndyMac regarding such mort-gage loan is true and correct in all respects.  However, IndyMac, may in its sole and absolute discretion, upon ten days' written notice to Seller, elect to enforce the early payment default provisions contained in the Guide for any mortgage loan delivered after the date of such notice.

**18.    Right of Offset.**  IndyMac has the right to offset any amounts owed to IndyMac by Seller, including but not limited to amounts resulting from

Downloaded indymac2b.com

SELLER CONTRACT AND e-MITS® USER AGREEMENT

Lender Application




**IndyMac Bank.**
Correspondent Services

Seller's indemnification and repurchase obligations pursuant to the Contract, against any amounts owed by IndyMac to Seller.

19. Integrated Agreement. This Contract, including all documents incorporated by reference herein, constitutes the entire understanding between the parties hereto and supersedes all other agreements, covenants, representations, warranties, understanding and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Contract.

20. Amendments. This Contract may not be amended or modified orally, and no provision of this Contract may be waived or amended, except in writing signed by the party against whom enforcement is sought. Such a written waiver or amendment must expressly reference this Contract. However, by its terms the Guide may be amended or supplemented by IndyMac from time to time. Seller agrees to comply with any such amendment(s) to the Guide, effective upon (i) posting of such amendment on the Web Site or (ii) the effective date specified therein.

21. Notices. All notices, requests, demands or other communications that are to be given under this Contract shall be in writing, addressed to the appropriate parties and either sent by overnight delivery or by U.S. mail, to the addresses below, or by facsimile to the facsimile numbers below. Any such notice, request, demand or other communications shall be deemed effective upon receipt.

If to IndyMac, notice must be sent to the appropriate address or facsimile number specified in the Guide.

If to Seller, notice must be sent to:

**Legacy Financial Corporation**
**9617 Eldwick Way**
**Potomac, Maryland 20854**

22. Headings. All section headings contained herein are for convenience only and shall not be construed as part of this Contract.

23. Enforceability. Any provision of this Contract that is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and to this end, the provisions hereof are severable. In the event any of the terms or provisions contained in this Contract conflict with those contained in the Guide, the terms and provisions of this Contract shall govern.

24. Governing Law; Waiver of Jury Trial. This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of California, without reference to conflict of laws principles, and the Seller hereby agrees that any court action arising out of this Contract shall be brought in any court of competent jurisdiction within the State of California, County of Los Angeles. EACH PARTY VOLUNTARILY AND KNOWINGLY WAIVES ANY RIGHT IT HAS TO A JURY TRIAL PURSUANT TO ANY COURT ACTION BROUGHT BY ANY PARTY TO THIS CONTRACT.

25. Agreement Binding upon Seller's Successors. Any person or entity into which the Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Seller shall be a party, or any person purchasing substantially all of the assets of the Seller or otherwise succeeding to the business of the Seller shall be the successor of the Seller under the Seller Contract, any Master Commitment and the Guide without the execution or filing of any paper or any further act on the part of any of the parties to the Seller Contract. The successor to the Seller shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Seller, including, without limitation, the continuing representation and warranty obligations of the Seller with respect to each mortgage loan delivered to IndyMac by the Seller and any corresponding repurchase or indemnification obligations of the Seller, with like effect as if originally named as party to this Contract.

26. Counterparts. This Contract may be executed in one or more counterparts, each of which shall constitute an original and all of which shall constitute the same Contract.

IN WITNESS WHEREOF, the duly authorized officers of Seller and IndyMac have executed this Contract as of the date first above written.

NAME OF SELLER

By: _____

Name: Gary M. Gertler

Title: President

INDYMAC BANK, F.S.B.

By: _____

Name: **Lalin De Soyza**
**Vice President**

Title: _____

Date: _____

Downloaded indymacb2b.com

**Addendum to Seller Contract For e-MITS™ Preferred Delegated Underwriting (Servicing Released)**

This Addendum to Seller Contract for e-MITS™ Preferred Delegated Underwriting ("Addendum") is entered into this 13th day of __July_____, 200 5 by and between IndyMac Bank, F.S.B., its successors and assigns (hereafter collectively referred to as "IndyMac"), on the one hand, and __Legacy Financial Corporation_____ (hereafter referred to as "Seller"), on the other hand, with reference to that certain Seller Contract and e-MITS™ User Agreement (the "Contract"), entered into on _____, 200_ by and between IndyMac and Seller.

**WHEREAS,** IndyMac and Seller previously entered into the Contract to govern, among other things, the proper use and protection of IndyMac's proprietary electronic Loan transmission system, e-MITS™ ("e-MITS™");

**WHEREAS,** IndyMac and Seller desire to supplement the Contract to enable Seller to participate in IndyMac's e-MITS™ Preferred Delegated Underwriting Program (the "e-MITS™ PDU Program"), the terms and conditions of which are more fully set forth in the IndyMac Lending Guide (the "Guide"), under which IndyMac will purchase Loans from Seller without advanced underwriting approval by IndyMac, provided that such Loans are underwritten in accordance with the Guide and through the use of e-MITS™.

**NOW, THEREFORE,** in consideration of the premises set forth above and the terms, conditions and agreements set forth below, the parties hereto hereby agree as follows:

Defined Terms. All capitalized terms used herein in but not otherwise defined herein shall have the meanings assigned to them in the Guide.

IndyMac's Purchase of Mortgage Loans from Seller. IndyMac hereby agrees to purchase Loans from Seller without prior underwriting approval by IndyMac provided that such Loans are underwritten and validated through the use of e-MITS™. Furthermore, Seller's authority as provided in the foregoing sentence is subject to any and all restrictions or limitations related to the e-MITS™ PDU Program and is limited to Loans that are eligible for purchase by IndyMac as provided in this Addendum.

Eligible Mortgage Loans. Seller hereby acknowledges and agrees that under the e-MITS™ PDU Program, IndyMac will purchase only Loans which meet the criteria for eligible Loans as established in the Guide, or any amendment thereto, and for which the Seller may be deemed eligible based on, among other things, its financial, operational and regulatory status, as IndyMac may determine in the sole and absolute discretion.

Other Conditions for Seller Eligibility. In addition to meeting the requirements of Sections 1100, 1500, 2500, and all other applicable sections of the Guide, or any successor provisions thereof, Seller must satisfy each of the following conditions to be eligible for the e-MITS™ PDU Program:

Seller must resolve all Loan repurchase requests within 60 days of notice provided by IndyMac to Seller;

Seller must pay all fees within 60 days of the invoice date

(excluding overdue document fees);

Seller shall provide proper written notification of any non-investment quality findings to IndyMac within 60 days of Seller's discovery thereof.

(d) Seller must attend a Seller Implementation Group training class for the e-MITS™ PDU program before delivering Loans.

Representations and Warranties. In addition to all other representations and warranties contained herein and made by Seller to IndyMac pursuant to the terms and conditions of the Contract and the Guide, Seller hereby represents and warrants to, and covenants with, IndyMac that:

Seller will make all commercially reasonable efforts to ensure the highest quality of integrity and accuracy with respect to Loan quality and data verification.

All Loans delivered to IndyMac pursuant to the e-MITS™ PDU Program are investment quality Loans and conform in all respects to the requirements set forth in the Guide. For purpose of this clause (b), "investment quality Loans" refer to Loans that are (i) made to a borrower from whom timely repayment of the debt can be expected, (ii) secured by real property with an Acceptable Appraised Value to ensure full recovery of the lender's investment if the borrowers default on such Loans and (iii) not subject to any circumstance that would cause private institutional investors to regard such Loans as unacceptable investments or otherwise adversely affect the value or marketability of such Loans.

Seller will validate the file in accordance with IndyMac's guidelines and feedback received from e-MITS™.

Seller will rate lock and close each Loan prior to shipping to IndyMac Bank for funding review and purchase.

Remedies of IndyMac. Seller hereby acknowledges and agrees that nothing contained herein shall be deemed to restrict IndyMac's remedies with respect to any failure of Seller to comply with the terms and conditions contained herein, and/or the terms and conditions contained in the Guide and the Contract. Accordingly, IndyMac reserves the right to exercise any and all remedies it may possess under the Guide and the Contract or under applicable law with respect to any failure of Seller to comply with the terms and conditions contained herein, and/or the terms and conditions contained in the Guide and the Contract. IndyMac reserves the right to terminate Seller's eligibility to participate in the e-MITS™ PDU Program at any time, with or without cause.

7. Legal Effect. This Addendum shall serve to supplement and amend the terms and conditions of the Contract and the Guide between IndyMac and Seller. All terms, conditions and Seller obligations set forth in the Contract and the Guide between IndyMac and Seller shall

remain in full force and effect, as supplemented and amended by the terms hereof. To the extent that the terms, conditions and Seller obligations set forth in this Addendum conflict with the terms, conditions and Seller obligations set forth in the Contract, the Guide or any Master Commitment between IndyMac and Seller, the terms, conditions and Seller obligations set forth in this Addendum shall govern.

8. <u>Modification</u>. This Addendum shall not be modified orally, and no provision of this Addendum may be waived or modified except in writing signed by the parties hereto.

9. <u>Governing Law</u>. This Addendum shall be governed by and construed in accordance with the laws of the State of California, without reference to conflict of laws principles.

10. <u>Counterparts</u>. This Addendum may be executed in separate counterparts, each of which shall be considered one and the same Addendum.

**IN WITNESS WHEREOF**, the duly authorized officers of IndyMac and Seller have executed this Addendum as of the date first above written.

INDYMAC BANK, F.S.B.

By: _____
        Jorge Mena Jr.
        First Vice President

Name: _____ Date: 9/13/05 _____

Title: _____


[SELLER NAME] LEGACY FINANCIAL CORPORATION

By: _____

Name: Gary M. Gertler

Title: President

Previous editions are obsolete                                                                                     form HUD-1 (3/86) ref Handbook 4305.2

| A. | Settlement Statement | FINAL |
|---|---|---|

U.S. Department of Housing and Urban Development
OMB No. 2502-0265 (expires 9/30/2006)

**B. TYPE OF LOAN**

1. ☐FHA   2. ☐FmHA   3. ☒Conv. Unins.
4. ☐VA    5. ☐Conv. Ins.

| 6. FILE NUMBER | 7. LOAN NUMBER |
|---|---|
| 1510VA-DC | 124039788-PERM |

8. MORTGAGE INSURANCE CASE NUMBER

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U. S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 09/22/2006 at 15:52 PAM

| D. NAME OF BORROWER: | LEMARCOS A. IRVING and NINA Q. IRVING |
|---|---|
| ADDRESS: | 5755 OAK FOREST COURT, INDIAN HEAD, MD 20640 |
| E. NAME OF SELLER: | CORPORATE MANAGEMENT SERVICES, INC |
| ADDRESS: | |
| F. NAME OF LENDER: | INDYMAC BANK FSB |
| ADDRESS: | 3465 Foothill Blvd, Pasadena, CA 91107 |
| G. PROPERTY ADDRESS: | 7336 14TH STREET, NW, WASHINGTON, DC 20010 |
| | SQUARE 2737, LOT 0019 |
| H. SETTLEMENT AGENT: | Southshore Title & Escrow, inc., P) 703-256-5880 F)703-256-5393 |
| PLACE OF SETTLEMENT: | 7019 Backlick Court, Springfield, VA 22151 |
| I. SETTLEMENT DATE: | 09/22/2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 1,081,000.00 | 401. Contract sales price | 1,081,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 349,105.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 109. 2nd Half 2006 Property Taxes | 2,780.00 | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 1,432,885.50 | **420. GROSS AMOUNT DUE TO SELLER** | 1,081,000.00 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 10,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 1,200,000.00 | 502. Settlement charges to seller (line 1400) | 12,596.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of First Mortgage Loan | 326,266.12 |
| | | AMERICAN INDUSTRY GROUP, LLC | |
| 205. | | 505. Payoff of Second Mortgage Loan | 333,032.60 |
| | | TIMOTHY F. GEPPERT | |
| 206. | | 506. Payoff of Third Mortgage Loan | 55,900.00 |
| | | TIMOTHY F. GEPPERT | |
| 207. | | 507. Current Water Bill | 63.43 |
| | | DC Water & Sewer | |
| 208. | | 508. Water Escrow | 150.00 |
| 209. | | 509. Tax Certificate Escrow | 10,000.00 |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    04/01/06 to 09/22/06 | 2,644.52 | 510. City/town taxes    04/01/06 to 09/22/06 | 2,644.52 |
| 213. | | 513. Special Assessment | 6,347.33 |
| 214. | | 514. Contractor | 7,000.00 |
| 215. | | 515. | |
| 216. | | 516. Payment towards 1st trust | 327,000.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 1,212,644.52 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 1,081,000.00 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 1,432,885.50 | 601. Gross amount due to seller (line 420) | 1,081,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | 1,212,644.52 | 602. Less reduction amount due seller (line 520) | 1,081,000.00 |
| **303. CASH FROM BORROWER** | 220,240.98 | **603. CASH TO SELLER** | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No: 11-3663741) with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: ___-___-___  ___-___-___   SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

Previous editions are obsolete

form HUD-1 (3/86) ref Handbook 4305.2

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

File Number: 1510VA-D

**SETTLEMENT STATEMENT**

TitleExpre...   ...llement System  Printed 09/22/2006 at 15:52 PAM

FINAL  PAGE 2

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $1,081,000.00 @ 0.000 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $          to | | | |
| 702. $          to | | | |
| 703. Commission paid at Settlement | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee    0.000 % Legacy Financial Corporation | | 20,295.00 | |
| 802. Loan Discount          % | | | |
| 803. Appraisal Fee        to Harvey and Associates        (P.O.C.) 750.00 Buyer | | | |
| 804. Credit Report        to MCR        (P.O.C.) 13.00 Buyer | | | |
| 805. Flood Certification Fee    to LSI | | 12.00 | |
| 806. Tax Service Fee      to INDYMAC BANK FSB | | 75.00 | |
| 807. Underwriting Fee      to INDYMAC BANK FSB | | 200.00 | |
| 808. Processing Fee        to Legacy Financial Corporation | | 380.00 | |
| 809. Funding Fee        to INDYMAC BANK FSB | | 700.00 | |
| 810. YSP Pd by Lender    to Legacy Financial Corporation    $4,500.00 POC by Lender | | | |
| 811. Indymac Admin Fee    to INDYMAC BANK FSB | | 995.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From      to      @$      /day | | | |
| 902. Mortgage Insurance Premium for    to | | | |
| 903. Hazard Insurance Premium for    1 yr    to M.A. CHENAULT INSURANCE SERVICES | | 3,680.00 | |
| 904. | | | |
| 905. Construction Reserves    to INDYMAC BANK FSB | | 301,950.00 | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance        mo. @ $      /mo | | | |
| 1002. Mortgage Insurance      mo. @ $      /mo | | | |
| 1003. City Property Taxes      mo. @ $      /mo | | | |
| 1004. County Property Taxes    mo. @ $      /mo | | | |
| 1005. Annual Assessments      mo. @ $      /mo | | | |
| 1009. Aggregate Analysis Adjustment | | 0.00 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee    to Southshore Title & Escrow, Inc. | | 250.00 | 250.00 |
| 1102. Abstract or title search    to POTOMAC TITLE CORPORATION | | 464.75 | |
| 1103. Title examination      to Southshore Title & Escrow, Inc. | | 125.00 | |
| 1104. Title insurance binder    to Southshore Title & Escrow, Inc. | | 50.00 | |
| 1105. Document Preparation    to Southshore Title & Escrow, Inc. | | | 275.00 |
| 1106. Notary Fees | | | |
| 1107. Attorney's fees | | | |
| (includes above items No:                    ) | | | |
| 1108. Title Insurance      to First American Title Insurance Company | | 7,192.75 | |
| (includes above items No:                    ) | | | |
| 1109. Lender's Policy    1,200,000.00  - 3,575.00 | | | |
| 1110. Owner's Policy    1,081,000.00  - 3,617.75 | | | |
| 1111. Delivery Fees      to Southshore Title & Escrow, Inc. | | 50.00 | |
| 1112. Release Procurement Fee    to Southshore Title & Escrow, Inc. | | | 180.00 |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees Deed $26.50    ; Mortgage $ 208.50    ; Release $ | | 235.00 | |
| 1202. City Transfer Tax      Deed $11,891.00    ; Mortgage $ | | | 11,891.00 |
| 1203. City Recordation Tax    Deed $11,891.00    ; Mortgage $ | | 11,891.00 | |
| 1204. Construction Tax      Deed $          ; Mortgage $ | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Date Down Endorsement    to Fidelity | | 500.00 | |
| 1302. Builders Evaluation      to INDYMAC BANK FSB | | 60.00 | |
| **1400. TOTAL SETTLEMENT CHARGES**    (enter on lines 103, Section J and 502, Section K) | | 349,105.50 | 12,596.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

CORPORATE MANAGEMENT SERVICES, INC

LEMARCUS A. IRVING

NINA C. IRVING

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent

Date    9/27/06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18, U.S. Code Section 1001 and Section 1010.

File No. **1510VA-DC**
DEED-SHORT FORM D.C.

**This Deed**, made this the 22nd day of September, 2006, by and between **CORPORATE MANAGEMENT SERVICES, INC, a body corporate of the State of Maryland**, erroneously known of record as CORPORATE MANAGEMENT SERVICES, LLC, party of the first part, and **LEMARCOS A. IRVING and NINA Q. IRVING**, parties of the second part.

**Witnesseth**, that in consideration of the sum of **ONE MILLION EIGHTY ONE THOUSAND AND 00/100 DOLLARS ($1,081,000.00)**, the party of the first part does hereby grant unto the parties of the second part, in fee simple, as tenants by the entirety, their assigns and unto the survivor of them, and the survivor's personal representatives and assigns, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, being more fully described as follows, to wit:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16th STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

BEING the same lot of ground which by Deed dated 02/11/2005 and recorded 03/04/2005 among the Land Records of District of Columbia in Instrument No. 31077 was granted and conveyed by 7336, LLC, a body corporate of the DISTRICT OF COLUMBIA unto CORPORATE MANAGEMENT SERVICES, LLC the Grantors (or Borrowers) herein.

Which has a mailing address of:    **7336 14TH STREET, NW**
**WASHINGTON, DC 20010**

Title Insurer: **First American Title Insurance Company**

**And** the said party of the first part covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.

**In Testimony Whereof**, **CORPORATE MANAGEMENT SERVICES, INC**, has caused these presents to be signed by , its , and its corporate seal to be affixed hereto; and does hereby constitute and appoint , its , as its true and lawful attorney in fact for it and in its name to acknowledge and deliver these presents as its act and deed.

IN PRESENCE OF:

_____

**CORPORATE MANAGEMENT SERVICES, INC**

_____
By: Alan R. Davis, President

## State Of VIRGINIA
## County Of FAIRFAX, To Wit:

I, EKATERINA ANANIEVA, a Notary Public in and for the aforesaid jurisdiction do hereby certify that ALAN R. DAVIS, President, who is named as attorney-in-fact as aforesaid by virtue of the authority vested in him/her by said Corporation, and acknowledged said instrument to be the act and deed of said Corporation and the he executed the aforegoing and annexed deed, bearing the date of the 22nd day of September, 2006, personally appeared before me in the said jurisdiction and acknowledged the same to be his act and deed.

**Witness** my hand and seal this the 22nd day of September, 2006.

_____
EKATERINA ANANIEVA,  Notary Public

**My Commission Expires**:

**AFTER RECORDING RETURN TO:**
**Southshore Title & Escrow, Inc.**
**7019 Backlick Court**
**Springfield, VA 22151**
File No.  1510VA-DC



Ekaterina Ananieva
NOTARY PUBLIC
*Commonwealth of Virginia*
My Commission Expires
April 30, 2009

Return To:

INDYMAC BANK, F.S.B.
3465 EAST FOOTHILL BLVD./ATTN: DOCUMENT MANAGEMENT
PASADENA, CA 91107

*Return to:*
SOUTHSHORE TITLE & ESCROW, INC.
~~7019 BACKLICK COURT~~
SPRINGFIELD, VA 22151
*1570 VA = DC*

—————————— [Space Above This Line For Recording Data] ——————————

# DEED OF TRUST

Loan Number: 124039788-PERM

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated          September 22, 2006          , together with all Riders to this document.

**(B) "Borrower"** is
LEMARCOS A IRVING AND NINA Q IRVING, HUSBAND AND WIFE

Borrower's address is  5755 Oak Forest Court

Indian Head, MD  20640                                    . Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is
INDYMAC BANK, F.S.B.

Lender is a  a federally chartered savings bank
organized and existing under the laws of          THE UNITED STATES OF AMERICA
Lender's address is  155 NORTH LAKE AVENUE
PASADENA, CA  91101

Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is
Southshore Title & Escrow, Inc.
Trustee's address is    7019 Backlick Ct
Springfield, VA  22151

**DISTRICT OF COLUMBIA** -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3009

**VMP** -6(DC) (0205).02                     1/01 (rev. 5/02)
Page 1 of 15                              Initials: _____
                 VMP Mortgage Solutions, Inc.

DDS-DCJ

**(E) "Note"** means the promissory note signed by Borrower and dated                September 22, 2006
The Note states that Borrower owes Lender
One Million Two Hundred Thousand and 00/100                                                                            Dollars
(U.S. $ 1,200,000.00                      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than                April 1, 2037
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note,
and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be
executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Construction Rider |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are
imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar
paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to
order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-
sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated
clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party
(other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the
Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any
amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor
legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all
requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify
as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Parcel ID Number:                                                              which currently has the address of
                                                                                              {Street}
7336 14th Street Northwest
Washington, District of Columbia          20010          {Zip Code} ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency.

However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.

Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.

Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.

Initials

If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of          N/A  % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
                                                                    -Borrower

Lemarcos A Irving
5755 Oak Forest Court
Indian Head, MD  20640

_____

                                                                    (Address)

_____ (Seal)
                                                                    -Borrower

Nina Q Irving
5755 Oak Forest Court
Indian Head, MD  20640

                                                                    (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower


                        (Address)                                   (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower


                        (Address)                                   (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower


                        (Address)                                   (Address)

*State of Maryland*

**DISTRICT OF COLUMBIA, ss:**

*State of Maryland*

I, _____ a Notary Public in and for the District

of Columbia, do hereby certify that _____

*he Marcos A. Irving and Nina Q. Irving*

personally known to me as the person(s) who executed the foregoing instrument bearing date of   *22nd*

day of   *September, 2006*                          , personally appeared before me in said District and acknowledged said instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes therein contained .

Witness my hand and official seal this   *22nd*   day of   *September , 2006 .*

_____ (Seal)

Notary Public, D.C.

*MD*

Initials: _____

**TO BE RECORDED WITH THE SECURITY INSTRUMENT**

Loan #: 124039788-PERM                              Date: September 22, 2006

## RESIDENTIAL CONSTRUCTION LOAN RIDER WITH
## SECURITY AGREEMENT AND FINANCING STATEMENT
### (Multistate)

Words used in this Rider are defined below. Words in the singular mean and include the plural and vice versa.

"Agreement" means the Residential Construction Loan Agreement.

"Borrower" is  Lemarcos A Irving, Nina Q Irving

"Borrower's Funds Account" means any and all construction loan accounts established pursuant to the Agreement and held by Lender and used to deposit additional funds provided by Borrower.

"Contractor" is  DP CUSTOM HOUSE
and its successors or assigns.

"Improvements" are the improvements made to a single family residence *or* new construction of a single family residence.

"Lender" is  INDYMAC BANK, F.S.B.,
a federally chartered savings bank
and its successors or assigns.

"Note" means the promissory note of even date signed by Borrower in favor of Lender.

"Property" means the property commonly known as
7336 14th Street Northwest
Washington, DC  20010

"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument of even date signed by Borrower in favor of Lender.

THIS RESIDENTIAL CONSTRUCTION LOAN RIDER shall be deemed to amend and supplement the Security Instrument of the same date given by the Borrower to secure Borrower's Note to Lender of the same date and covering the Property described in the Security Instrument.

IndyMac Bank, F.S.B.
Residential Construction Loan Rider to Security Instrument - Multistate

**HCL 911**

8480334 (0311)                VMP Mortgage Solutions, Inc. (800)521-7291                    12/03
DDS-CR2

**AMENDED AND ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**1. Residential Construction Loan Agreement.** Borrower agrees to comply with the covenants and conditions of the Agreement between Borrower, Lender and Contractor, which is incorporated herein by this reference and made a part of this Security Instrument. The Agreement provides for the construction of certain Improvements on the Property. All advances made by Lender pursuant to the Agreement shall be an indebtedness of Borrower secured by this Security Instrument as amended, and such advances may be obligatory under the terms of the Agreement. The Security Instrument secures the payment of all sums and the performance of all covenants required by Lender in the Agreement. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Agreement, the principal sum and all interest and other charges provided for in the loan documents and secured hereby shall, at the option of the Lender, become due and payable.

**2. Security Instrument.** This Security Instrument is a "construction mortgage" securing an obligation incurred for the construction of Improvements on the Property including the acquisition cost of the Property, if any, and any notes issued in extension, renewal, or substitution thereof. Borrower affirms, acknowledges and warrants that prior to the recordation of this Security Instrument, as amended, in the appropriate Real Property Records of the State of                    District of Columbia                    , no Improvements contemplated by the Loan Agreement have been constructed, no work has been performed, and no materials have been ordered or delivered.

**3. Future Advances.** This Security Instrument shall secure in addition to the sum evidenced by the Note all funds hereafter advanced by Lender to or for the benefit of Borrower, as contained in the Contract and/or the Agreement for the construction of Improvements on the mortgaged property or for any other purpose. All future advances shall be made within the time limit authorized by the laws of this state. To the extent that moneys advanced by Lender are used to pay for the costs of acquiring the Property, this mortgage shall be a purchase money security interest.

**4. Disbursements to Protect Security.** All sums disbursed by Lender prior to completion of the Improvements to protect the security of this Security Instrument, up to the principal amount of the Note and any future advances, shall be treated as disbursements pursuant to the Agreement. All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless the collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefore.

**5. Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

**6.    Breach by Borrower.** In case of breach by Borrower of the covenants and conditions of the Agreement, Lender, at Lender's option, with or without entry upon the Property, (a) may invoke any of the rights or remedies provided in the Agreement, or (b) may accelerate the sums secured by this Security Instrument.

**7.    Termination of Agreement upon Amortization.** After the commencement of amortization of the Note, the terms of the Agreement (except to the extent Lender is indemnified therein) shall be null and void, and there shall be no claim or defense arising out of or in connection with the Agreement against the obligations of the Note and this Security Instrument.

**8.    Property.** The property covered by this Security Instrument includes the property described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property described below which constitutes real property is sometimes referred to as the "Real Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal Property," listed as follows:

Any and all buildings, improvements (provided in the Agreement or otherwise), and tenements now or hereafter erected on the Property; any and all heretofore and hereafter vacated alleys and streets abutting the Property, easements, rights, appurtenances, rents (subject however to any assignment of rents to Lender), leases, royalties, mineral, oil and gas rights and profits, water, water rights and water stock appurtenant to the Property (to the extent they are included in Borrower's fee simple title); any and all fixtures, machinery, equipment, building materials, appliances, and goods of every nature whatsoever now or hereafter located in, or on, or used, or intended to be used in connection with the Property and all replacements and accessions of them, including, but not limited to those for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air and light; security and access control apparatus; plumbing and plumbing fixtures; refrigerating, cooking and laundry equipment; carpet, floor coverings and interior and exterior window treatments; furniture and cabinets; interior and exterior sprinkler plant and lawn maintenance equipment; fire prevention and extinguishing apparatus and equipment, water tanks, swimming pool, compressor, vacuum cleaning system, disposal, dishwasher, range, and oven, any shrubbery and landscaping; any and all plans and specifications for development of or construction of Improvements upon the Property; any and all contracts and subcontracts relating to the Property; any and all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions related to the Property; any and all permits, licenses, franchises, certifications, and other rights and privileges obtained in connection with the Property; any and all products and proceeds arising from or by virtue of the sale, lease, or other disposition of any of the Property; any and all proceeds payable or to be payable under each policy of insurance relating to the Property; any and all proceeds arising from the taking of all or part of the Property for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof; all building permits, certificates of occupancy, certificates of compliance, any right to use utilities of any kind including water, sewage, drainage and any other utility rights, however arising whether private or public,

present or future, including any reservation, permit, letter, certificate, license, order, contract or otherwise and any other permit, letter, certificate, license, order, contract or other document or approval received from or issued by any governmental entity, quasi-governmental entity common carrier, or public utility in any way relating to any part of the Property or the Improvements, fixtures and equipment thereon; all other interests of every kind and character which Borrower now has or at any time hereafter acquires in and to the Property, including all other items of property and rights described elsewhere in this Security Instrument.

The Personal Property also includes the Borrower's Funds Account, together with any interest accruing thereon and proceeds thereof.

9. **Security Agreement and Financing Statement.** This Security Instrument shall be a security agreement granting Lender a first and prior security interest in all of Borrower's right, title and interest in, to and under the Personal Property, under and within the meaning of applicable statutes of this state, as well as a Mortgage and/or a Deed of Trust granting a lien upon and against the Real Property. In the event of any foreclosure sale all of the Real and Personal Property may, at the option of Lender, be sold as a whole or in any part. It shall not be necessary to have present at the place of such sale the Personal Property or any part thereof. Lender shall have all the rights, remedies and recourses with respect to the Personal Property afforded to a "Secured Party" by the applicable statutes of this state in addition to and not in limitation of the other rights and recourse afforded Lender under this Security Instrument. Borrower shall, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon any property, real and/or personal, described in this Security Instrument, (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; or (iv) the failure by Borrower to perform or observe any of the provisions or covenants in this Security Instrument; or (v) any actions taken by Lender for any reason whatsoever in any case or proceeding under Chapter 7, 11, or 13 of the Bankruptcy Code or any successor statute thereto, including, but not limited to, action taken with respect to issues particular to federal bankruptcy law.

Lender may, at its election, at any time after the delivery of this Security Instrument, sign one or more copies of this Security Instrument in order that such copies may be used as a financing statement under the statutes of this state. Lender's signature need not be acknowledged, and is not necessary to the effectiveness hereof as a mortgage, a security agreement, or (unless otherwise required by applicable law) a financing statement.

10. **Completion.** Lender shall not be responsible for the completion of the Improvements, and shall not in any way be considered a guarantor or surety of performance by Borrower. In the event the Improvements are not completed according to the plans and specifications approved by Lender, and it is determined for whatever reason the Lender does not have a lien arising by or through Borrower, then Lender shall have a valid lien for its loan amount, less the amount reasonably necessary to complete the Improvements, or in such event Lender, at its option, shall have the right to complete the Improvements, and the lien shall be valid for the loan amount.

**11. Invalid Provisions.** If any provision of this Security Instrument is declared invalid, illegal, or unenforceable by a court of competent jurisdiction, then such invalid, illegal or unenforceable provision shall be severed from this Security Instrument and the remainder enforced as if such invalid, illegal or unenforceable provision is not a part of this Security Instrument.

**12. Address.**

The name and address of the Borrower/Debtor during construction of the Improvements is:

Lemarcos A Irving, Nina Q Irving

5755 Oak Forest-Court
Indian Head, MD  20640

The name and address of the Lender/Secured Party is:

INDYMAC BANK, F.S.B.,
a federally chartered savings bank
155 NORTH LAKE AVENUE
PASADENA, CA  91101

**13. Other Provisions.** The following notice is required by law:

IMPORTANT NOTICE: YOU ARE HEREBY NOTIFIED THAT ANY PERSON PERFORMING LABOR ON YOUR PROPERTY OR FURNISHING MATERIALS FOR THE CONSTRUCTION, REPAIR, OR IMPROVEMENT OF YOUR PROPERTY WILL BE ENTITLED TO A LIEN AGAINST YOUR PROPERTY IF HE IS NOT PAID IN FULL, EVEN THOUGH YOU MAY HAVE PAID THE FULL CONTRACT PRICE TO YOUR CONTRACTOR. THIS COULD RESULT IN YOUR PAYING FOR LABOR AND MATERIALS TWICE. THIS LIEN CAN BE ENFORCED BY THE SALE OF YOUR PROPERTY. TO AVOID THIS RESULT, YOU MAY DEMAND FROM YOUR CONTRACTOR LIEN WAIVERS FROM ALL PERSONS PERFORMING LABOR OR FURNISHING MATERIALS FOR THE WORK ON YOUR PROPERTY. YOU MAY WITHHOLD PAYMENT TO THE CONTRACTOR IN THE AMOUNT OF ANY UNPAID CLAIMS FOR LABOR OR MATERIALS. YOU ALSO HAVE THE RIGHT TO DEMAND FROM YOUR CONTRACTOR A COMPLETE LIST OF ALL LABORERS AND MATERIAL SUPPLIERS UNDER YOUR CONTRACT, AND THE RIGHT TO DETERMINE FROM THEM IF THEY HAVE BEEN PAID FOR LABOR PERFORMED AND MATERIALS FURNISHED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Residential Construction Loan Rider.

_____ (Seal)
-Borrower

Lemarcos A Irving

_____ (Seal)
-Borrower

Nina Q Irving

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

**ATTENTION OFFICIAL RECORDER OF INSTRUMENTS:** This instrument covers goods that are or are to become fixtures on the described Property herein and is to be filed for record in the District Recorder's records where mortgages on real estate are recorded. Additionally, this instrument should be appropriately indexed, not only as a mortgage but as a financing statement covering goods that are or are to become fixtures on the described Property herein. The mailing address of the Borrower (Debtor) and Lender (Secured Party) are set forth in this instrument.

_____ **[Please See Attached Acknowledgment(s)]** _____

8480334 (0311)                    Page 6 of 6                    **HCL 911**
DDS-CR2                                                          **12/03**

# FIXED/ADJUSTABLE RATE RIDER
## (1 Year Libor Index - Rate Caps)

Loan #: 124039788-PERM

THIS ADJUSTABLE RATE RIDER is made this     22nd    day of          September, 2006          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust,
or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
INDYMAC BANK, F.S.B.,
a federally chartered savings bank
(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

7336 14th Street Northwest
Washington, DC 20010

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note contains the following provisions: This Note, as amended by the attached Residential
Construction Loan Addendum Amending Note (the "Addendum"), represents both a
construction/home improvement loan and a permanent mortgage loan. During the Construction
Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction
Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note
and ending on the first day of the month preceding the due date of the first monthly payment of
principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as
defined in the Residential Construction Loan Agreement) has occurred before that date in accordance
with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will
be in default under the Addendum and under this Note. If Completion has occurred prior to the
Permanent Loan Commencement Date, then the loan evidenced by this Note will automatically
become a permanent mortgage loan on the Permanent Loan Commencement Date, and the
provisions of the Addendum will cease to be in effect and all terms and conditions of the loan will be as
set forth in this Note on the Permanent Loan Commencement Date.

**IndyMac Bank**
**Construction-to-Perm Adjustable Rate Rider**
**Intermediate Libor ARMs - Multistate**
8480827 (0506)                          Page 1 of 5                                    **HCL 1013**
VMP Mortgage Solutions, Inc. (800)521-7291                              **06/05**

DDS-9FI

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    8.250    %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the    1st    day of    April, 2012    , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("Libor"), as published in The Wall Street Journal.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three and One-Quarter    percentage points ( 3.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    13.250 % or less than    3.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than    Two    percentage points (    2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than  13.250 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
                        -Borrower

Lemarcos A Irving

_____ (Seal)
                        -Borrower

Nina Q Irving

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

8480827 (0506)                Page 5 of 5                    **HCL 1013**
                                                              **06/05**

DDS-9FI

# Exhibit A

All that certain lot or parcel of land situate in the **District of Columbia** and being more particularly described as follows:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16th STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

BEING the same lot of ground which by Deed dated 02/11/2005 and recorded 03/04/2005 among the Land Records of District of Columbia in Instrument No. 31077 was granted and conveyed by 7336, LLC, a body corporate of the DISTRICT OF COLUMBIA unto CORPORATE MANAGEMENT SERVICES, LLC the Grantors (or Borrowers) herein.

# SECURITY AFFIDAVIT

## CLASS 1 AND CLASS 2

File No. 1510VA-DC

We, LEMARCOS A. IRVING and NINA Q. IRVING, the owners of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to Section 412a of district of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-813), with 5 or fewer units.

LEMARCOS A. IRVING

NINA Q. IRVING

Subscribed and sworn to before me this 22nd day of September, 2006.

Notary Public

My commission expires: 9/1/09

# Disbursement Statement

Page: 1

Account No: 20079680

Bank: MD/DC Escrow Account
Order #: 1510VA-DC

Southshore Title & Escrow, Inc.
P) 703-256-5880  F)703-256-5393
7019 Backlick Court

Springfield, VA 22151

| | | |
|---|---|---|
| OPENED: | 12/13/2005 |
| SETTLED: | 09/22/2006 |
| DISBURSED: | 09/22/2006 |
| CLOSER: | |

| | |
|---|---|
| LENDER: | INDYMAC BANK FSB |
| LOAN NO: | 124039788-PERM |
| BUYER(S)/BORROWER(S) | LEMARCOS A. IRVING |
| | NINA Q. IRVING |
| SELLER(S): | CORPORATE MANAGEMENT SERVICES, INC |
| PROPERTY LOCATION: | 7336 14TH STREET, NW     SQUARE 2737, LOT 0019 |
| | WASHINGTON, DC  20010 |

## FUNDS RECEIVED

| FROM | METHOD | STATUS | ITEM DATE | POST DATE | DEPOSIT # | DUE | RECEIVED |
|---|---|---|---|---|---|---|---|
| Joined | Check | Joined | 08/19/06 | 07/31/06 | | | 10,000.00 |
| LEMARCOS A. IRVING and NINA Q. | Check | Received | 09/22/06 | 09/25/06 | | | 220,347.00 |
| INDYMAC BANK FSB | Check | Received | 09/22/06 | 09/25/06 | | | 900,008.00 |
| | Check | Voided | 05/03/06 | 07/31/06 | | | |
| Void Reason: joined from EMD | | | | | | | |
| | Check | Voided | 05/03/06 | 07/11/06 | | | |
| Void Reason: duplicate | | | | | | | |
| | Check | Voided | 05/03/06 | 07/11/06 | | | |
| Void Reason: duplicate | | | | | | | |
| LEMARCOS A. IRVING and NINA Q. | Check | Voided | 09/22/06 | 09/25/06 | | | |

| | | |
|---|---|---|
| TOTAL FUNDS DUE: | 0.00 |
| TOTAL FUNDS RECEIVED: | 1,130,355.00 |

## FUNDS DISBURSED

| TO | STATUS | ITEM DATE | POST DATE | CHECK # | HELD | DISBURSED |
|---|---|---|---|---|---|---|
| | Held | 09/22/06 | 09/25/06 | | 150.00 | |
| | Held | 09/22/06 | 10/16/06 | | 8,691.00 | |
| Rolando Moreno | Printed | 09/25/06 | 09/25/06 | 5270 | | 7,000.00 |
| TIMOTHY F. GEPPERT | Printed | 09/25/06 | 09/25/06 | 5271 | | 106.02 |
| AMERICAN INDUSTRY GROUP, LLC | Printed | 09/25/06 | 09/25/06 | 5272 | | 326,266.12 |
| D.C. Office of Tax and Revenue | Printed | 09/25/06 | 09/25/06 | 5273 | | 2,780.00 |
| D.C. Treasurer | Printed | 09/25/06 | 09/25/06 | 5274 | | 24,017.00 |
| DC Water & Sewer | Printed | 09/25/06 | 09/25/06 | 5275 | | 63.43 |
| First American Title Insurance Company | Printed | 09/25/06 | 09/25/06 | 5276 | | 1,798.19 |
| Legacy Financial Corporation | Printed | 09/25/06 | 09/25/06 | 5277 | | 25,175.00 |
| M.A. CHENAULT INSURANCE SERVICES | Printed | 09/25/06 | 09/25/06 | 5278 | | 3,680.00 |
| POTOMAC TITLE CORPORATION | Printed | 09/25/06 | 09/25/06 | 5279 | | 189.75 |
| Southshore Title & Escrow, Inc. | Printed | 09/25/06 | 09/25/06 | 5280 | | 6,849.56 |
| D.C. Treasurer | Printed | 09/25/06 | 09/25/06 | 5281 | | 6,347.33 |
| TIMOTHY F. GEPPERT | Printed | 09/26/06 | 09/26/06 | 5283 | | 333,032.60 |
| TIMOTHY F. GEPPERT | Printed | 09/26/06 | 09/26/06 | 5284 | | 55,900.00 |

| | |
|---|---|
| TitleExpress Escrow System | Printed   10/16/06 by PAM  at 16:39 |

# Disbursement Statement

Page: 2

Account No: 20079680

Bank: MD/DC Escrow Account
Order #: 1510VA-DC

| TIMOTHY F. GEPPERT | Printed | 09/26/06 | 09/26/06 | 5285 | | 327,000.00 |
|---|---|---|---|---|---|---|
| D.C. Treasurer | Printed | 10/16/06 | 10/16/06 | 5399 | | 1,309.00 |
| | Voided | 06/21/06 | 09/25/06 | | | |
| | Voided | 06/21/06 | 09/25/06 | | | |

|  | TOTAL FUNDS HELD: | 8,841.00 | |
|---|---|---|---|
| | TOTAL FUNDS DISBURSED: | | 1,121,514.00 |

| Received/Disbursed Difference: | 8,841.00 |
|---|---|
| Projected Balance: | 0.00 |

CO-386-online
10/03

# United States District Court
# For the District of Columbia

IndyMac Bank, F.S.B.　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff　　　　)
　　　　vs　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
Lemarcos A. Irving, et al.　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant　　　　)

C:　Case: 1:07-cv-01678
　　Assigned To : Roberts, Richard W.
　　Assign. Date : 9/21/2007
　　Description: General Civil

## CERTIFICATE RULE LCvR 7.1

I, the undersigned, counsel of record for ___IndyMac Bank, F.S.B.___ certify that to the best of my knowledge and

belief, the following are parent companies, subsidiaries or affiliates of ___IndyMac Bank, F.S.B.___ which have

any outstanding securities in the hands of the public:

IndyMac Bancorp, Inc.; Financial Freedom Senior Funding Corporation; and IndyMac ABS, Inc.

These representations are made in order that judges of this court may determine the need for recusal.

Attorney of Record

_____
Signature

___424712___
BAR IDENTIFICATION NO.

Michael N. Russo, Jr.
Print Name

125 West St., 4th floor, PO Box 2289
Address

Annapolis, MD 21404
City　　　　State　　　　Zip Code

301-261-2247 / 410-268-6600
Phone Number

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| IndyMac Bank, F.S.B. | Lemarcos A. Irving, et al. |

| | |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ Los Angeles (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ Charles (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Michael N. Russo, Jr. Council, Baradel, Kosmerl & Nolan, P.A. 125 West St., 4th Fl., P.O. Box 2289 Annapolis, MD  21404 | |

## II. BASIS OF JURISDICTION

(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**◉ E. General Civil (Other)        OR        ○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☒ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 1332

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 3,300,000.00 <br> JURY DEMAND: | Check YES only if demanded in complaint <br> YES ☒   NO ☐ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 9/21/07     SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.