## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B. | * | |
| Plaintiff | * | |
| v. | * | Case No.: 1-07-cv 01678 |
| LEMARCOS A. IRVING, et al. | * | |
| Defendants | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MOTION FOR ENTRY OF DEFAULT JUDGMENT
## AS TO DEFENDANTS ALBERT SMITH, ALAN DAVIS, JUBILEE REALTY & ASSOCIATES, LLC AND CORPORATE MANAGEMENT SERVICES, INC.

Plaintiff IndyMac Bank, F.S.B.[1], and Federal Deposit Insurance Corporation as receiver for IndyMac Bank, F.S.B., ("FDIC-R") proposed intervenor and substitute for IndyMac, by Council, Baradel, Kosmerl & Nolan, P.A., Michael N. Russo, Jr. and Michael S. Steadman, Jr., its attorneys, hereby moves, pursuant to F.R.C.P. 55(b), for a judgment by default, and, as reasons therefore states as follows:

1.    The Complaint was filed in this Court on September 21, 2007.

2.    The Summons and Complaint, or Amended Complaint, were served on Albert Smith on September 24, 2007, on Alan Davis on November 3, 2007, on Jubilee Realty & Associates, LLC on March 15, 2008 and on Corporate Management Services, Inc. on October 23, 2007.

---

[1] On August 8, 2008, the Federal Deposit Insurance Corporation, as the duly appointed receiver, filed a Motion to Intervene and Substitute the Federal Deposit Insurance Corporation as the Plaintiff for the above captioned action. Plaintiff requests that should this Court grant the Motion for Entry of Default Judgment, that this Court extend the relief to the intervened and substituted Plaintiff, Federal Deposit Insurance Corporation - Receiver.

3.    There has been no Answer or other responsive pleading filed by any of the aforementioned Defendants.

4.    On July 10, 2008, default was entered in the civil docket in the office of the clerk of this Court against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc.

5.    Since the entry of default by the clerk of this Court, the aforementioned Defendants have not filed any responsive pleading.

6.    Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. are not in the military, pursuant to Affidavits of Non-Military Service previously filed with this Court, and are not infants or incompetent.

7.    Attached to the Memorandum in Support of this Motion at Exhibit F is an Affidavit of Ignacio Gomez setting forth that the damages suffered thus far by IndyMac is $1,164,655.92.

8.    Plaintiff respectfully requests that this Court defer the issue of punitive damages, costs and attorneys fees as to Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. until the time in which a final judgment is issued against all remaining Defendants in this action.

WHEREFORE, Plaintiffs IndyMac Bank, F.S.B. and FDIC-R move that this Court make and enter a default judgment against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. in the amount of $1,164,655.92, plus post-judgment interest, defer the entry of punitive damages, costs and attorneys fees against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC

2

and Corporate Management Services, Inc., and for any such further relief as this Court may deem appropriate.

COUNCIL, BARADEL,
KOSMERL & NOLAN, P.A.

Date:  August 14, 2008

By:      /s/MICHAEL N. RUSSO, JR.
Michael N. Russo, Jr.
D.C. Bar No. 424712
Michael S. Steadman, Jr.
D.C. Bar No. 502347
125 West Street, 4th Floor
Post Office Box 2289
Annapolis, Maryland 21404-2289

Annapolis:  (410) 268-6600
Baltimore:  (410) 269-6190
Washington: (301) 261-2247

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Motion was sent via electronic service and/or first class mail, postage prepaid this 14th day of August, 2008, to:

Sean Michael Hanifin, Esquire
Michael Kenneth, Esquire
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006-2688
*Attorney for Defendant Southshore Title & Escrow, Inc.*

Douglas Richard Taylor, Esquire
P.O. Box 4566
Rockville, MD 20850
*Attorney for Defendant Timothy F. Geppert, Individually and trading as Geppert Real Estate, an unincorporated entity trading as Geppert Real Estate.*

3

Matthew Wesley Carlson, Esquire
THOMPSON O'DONNELL, LLP
1212 New York Avenue, NW
Suite 1000
Washington, DC 20005-3987
*Attorney for Defendant Fairfax Realty, Inc.*

Michael Thomas Hamilton, Esquire
Michelle J. Marzullo, Esquire
MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
600 Baltimore Avenue – Suite 305
Towson, MD 21204
*Attorneys for Defendants Legacy Financial Corporation and Samuel Adebayo*

Jan E. Simonson, Esquire
CARR MALONEY, P.C.
1615 L Street, NW
Suite 500
Washington, DC 20036
*Attorney for Defendant William C. Harvey & Associates, Inc.*

Mr. and Mrs. Lemarcos Irving
5755 Oak Forest Court
Indian Head, Maryland 20640
*Defendants, Pro Se*

Mr. Albert Smith
4140 Ferry Landing Rd.
Dunkirk, MD 20754
*Defendant*

Corporate Management Services, Inc.
Resident Agent: Alan R. Davis
1400 Spring St., Ste. 415
Silver Spring, MD 20910
*Defendant*

Mr. Alan R. Davis
7708 Rydal Terrace
Derwood, Maryland 20855
*Defendant*

Jubilee Realty & Associates, LLC
4140 Ferry Landing Road
Dunkirk, Maryland 20754
*Defendant*

/s/ Michael N. Russo, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B. | * | |
| Plaintiff | * | |
| v. | * | Case No.: 1-07-cv 01678 (RWR) |
| LEMARCOS A. IRVING, et al. | * | |
| Defendants | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Plaintiff IndyMac Bank, F.S.B. and the Federal Deposit Insurance Corporation ("FDIC"), as the duly appointed Receiver ("FDIC-R") for Plaintiff IndyMac Bank, F.S.B. ("IndyMac"), by Council, Baradel, Kosmerl & Nolan, P.A., Michael N. Russo, Jr. and Michael S. Steadman, Jr., its attorneys, submit this Memorandum in Support of its Motion for Entry of Default Judgment, and states as follows:

**Relevant Procedural History**

On September 21, 2007, IndyMac filed its Complaint with this Court. On January 31, 2008, IndyMac's First Amended Complaint was docketed and on April 10, 2008, IndyMac's Second Amended Complaint was docketed.

The Summons and Complaint, or Amended Complaint, were served on Albert Smith on September 24, 2007, on Alan Davis on November 3, 2007, on Jubilee Realty & Associates, LLC on March 15, 2008 and on Corporate Management Services, Inc. on October 23, 2007. As no Answer or other responsive pleading having been filed by any of the aforementioned Defendants, on July 10, 2008, default was entered in the civil docket in the office of the clerk

1

of this Court against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. (hereinafter collectively referred to as "defaulted Defendants."). Since the entry of default, the defaulted Defendants have not filed an Answer, or any other responsive pleading with this Court. Pursuant to F.R.C.P. 55(b), an Entry of Default Judgment is appropriate at this time.

On August 8, 2008, FDIC-R filed a Motion to Intervene and Substitute Federal Deposit Insurance Corporation as the Plaintiff for the above captioned action. Plaintiffs request that should this Court grant the Motion for Entry of Default Judgment, that this Court extend the relief to the substituted Plaintiff.

### Relevant Factual Background

By a Deed dated February 11, 2005, and recorded with the Recorder of Deeds for the District of Columbia on March 4, 2005, at Instrument No. 2005031077 Corporate Management Services ("CMS") obtained fee-simple ownership of property known as 7336 14th Street, N.W., Washington, DC 20010 (hereinafter referred to as "Subject Property."). (See attached Exhibit 1.) By a Regional Sales Contract dated September 12, 2006, CMS contracted to sell the Subject Property to Lemarcos and Nina Irving (collectively "Irvings") for a sales price of One Million One Hundred Fifty Thousand Dollars ($1,150,000.00). (See attached Exhibit 2.)

The Irvings engaged the services of Legacy Financial Corporation ("Legacy") to obtain purchase money financing for their purchase of the Subject Property. Legacy arranged for the Irvings to obtain purchase money financing from IndyMac which was to include a construction loan for the renovation of the Subject Property.

On or about September 22, 2006, Southshore Title & Escrow, Inc. ("Southshore") conducted a real estate settlement for the Sale of the Subject Property from CMS to the Irvings. (See attached Exhibit 3, and Exhibit A attached thereto.)  The HUD-1 from the settlement indicates that the Irvings purchased the Subject Property with a Contract Sales Price of $1,081,000.00 and obtained a loan in the amount of $1,200,000.00. (See attached Exhibit 3, and Exhibit A attached thereto.)

By a Deed dated September 22, 2006, and recorded with the Recorder of Deeds for the District of Columbia on November 20, 2006, CMS conveyed fee-simple title to the Subject Property to the Irvings. (See attached Exhibit 4.)  By a Deed of Trust dated September 22, 2006, and recorded on November 20, 2006, with the Recorder of Deeds for the District of Columbia at Instrument Number 2006156795, the Irvings conveyed a first position lien interest in the Subject Property to IndyMac. (See attached Exhibit 3, and Exhibit C attached thereto.) The Irvings have not remained current with their IndyMac loan and the current total amount due and owing to IndyMac is $1,164,655.92, plus interest that continues to accrue. (See Affidavit of Ignacio Gomez Exhibit 3.)

IndyMac has practices and procedures in place to permit and ensure a properly and accurately underwritten loan to purchase money borrowers.  In this case, IndyMac utilized the practices and procedures to ensure that the purchase money loan made to the Irvings was accurately and appropriately underwritten.  After IndyMac provided its loan to the Irvings, IndyMac investigated the circumstances under which the Irvings purchased the Subject Property and the settlement of the Irvings purchase of the Subject Property.  Upon investigation, IndyMac determined that a fraudulent scheme was set in place by many parties

that were a part of the Irvings purchase of the Subject Property, including the named Defendants in the above captioned action. The fraudulent scheme was developed by the Defendants in the above captioned action to entice and encourage IndyMac to provide a purchase money loan to the Irvings under false pretenses. The fraudulent scheme was to the detriment of IndyMac and resulted in significant losses.

As a result of IndyMac's internal investigation and the discoveries as to the fraudulent and misleading conduct of many of the parties subject to the settlement of the Subject Property, IndyMac initiated the above captioned action.

**Argument**

F.R.C.P. 55(a) states "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." As indicated above, on July 10, 2008, the Clerk of this Court entered a default against the defaulting Defendants. F.R.C.P. 55(b)(2) states that "judgment by default may be entered as follows: … (b) … the party entitled to a judgment by default shall apply to the court therefor." In *Flynn v. Masonry*, 223 F.R.D. 176, 177 (DC 2005), the United States District Court for the District of Columbia stated "a court is empowered to enter a default judgment against a defendant who fails to defend its case." The Court went on to state that F.R.C.P. 55(b) "authorizes the Court to enter a default judgment against the defendant for the amount claimed plus costs." *Id.* The defaulted Defendants have failed to appear in this action to Answer IndyMac's Complaint, as amended, or otherwise plead and Plaintiffs herein apply to this Court for a default judgment to be entered against the defaulted Defendants for the amount of IndyMac's losses.

The fraudulent scheme developed by the Defendants to entice and encourage IndyMac to provide a purchase money loan to the Irvings resulted in IndyMac suffering significant losses, including the amount of the loan provided to the Irvings. After the Irvings obtained the loan from IndyMac, the Irvings did not remain current with their obligations under the loan resulting in the loan going into default. (See attached Exhibit 3.) The IndyMac loan remains in default with a current total amount due of $1,164,655.92, plus interest that continues to accrue. (See attached Exhibit 3.) Accordingly, this Court should enter default judgment against the defaulted Defendants in the amount of IndyMac's loss of $1,164,655.92, plus post-judgment interest.

## Conclusion

For the reasons stated above, this Court should enter default judgment in the amount of $1,164,655.92, plus post-judgment interest, against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. for IndyMac's losses and for the defaulted Defendants' failure to Answer IndyMac's Complaint, as amended, or otherwise defend the above captioned case.

IndyMac respectfully requests that this Court defer the issue of punitive damages, costs and attorneys fees as to Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. until the time in which a final judgment is issued against all remaining Defendants in this action.

WHEREFORE, Plaintiffs IndyMac Bank, F.S.B. and FDIC-R move that this Court make and enter a judgment against Defendants Albert Smith, Alan Davis, Jubilee Realty &

Associates, LLC and Corporate Management Services, Inc. in the amount of $1,164,655.92, plus post-judgment interest, defer the entry of punitive damages against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc., and for any such further relief as this Court may deem appropriate.

COUNCIL, BARADEL,
KOSMERL & NOLAN, P.A.

Date:  August 14, 2008

By:      /s/MICHAEL N. RUSSO, JR.
         Michael N. Russo, Jr.
         D.C. Bar No. 424712
         Michael S. Steadman, Jr.
         D.C. Bar No. 502347
         125 West Street, 4th Floor
         Post Office Box 2289
         Annapolis, Maryland 21404-2289

         Annapolis:  (410) 268-6600
         Baltimore:  (410) 269-6190
         Washington: (301) 261-2247

         Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Memorandum was sent via electronic service and/or first class mail, postage prepaid this 14th day of August, 2008, to:

Sean Michael Hanifin, Esquire
Michael Kenneth, Esquire
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006-2688
*Attorney for Defendant Southshore Title & Escrow, Inc.*

Douglas Richard Taylor, Esquire
P.O. Box 4566
Rockville, MD 20850
*Attorney for Defendant Timothy F. Geppert, Individually and trading as Geppert Real Estate, an unincorporated entity trading as Geppert Real Estate.*

Matthew Wesley Carlson, Esquire
THOMPSON O'DONNELL, LLP
1212 New York Avenue, NW
Suite 1000
Washington, DC 20005-3987
*Attorney for Defendant Fairfax Realty, Inc.*

Michael Thomas Hamilton, Esquire
Michelle J. Marzullo, Esquire
MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
600 Baltimore Avenue – Suite 305
Towson, MD 21204
*Attorneys for Defendants Legacy Financial Corporation and Samuel Adebayo*

Jan E. Simonson, Esquire
CARR MALONEY, P.C.
1615 L Street, NW
Suite 500
Washington, DC 20036
*Attorney for Defendant William C. Harvey & Associates, Inc.*

Mr. and Mrs. Lemarcos Irving
5755 Oak Forest Court
Indian Head, Maryland 20640
*Defendants, Pro Se*

7

File No. **1193VA-DC**
DEED-SHORT FORM D.C.

  

LT1-5-2005031077-1

LT2-6-6-2

**This Deed**, made this the 11th day of February, 2005, by and between **7336, LLC, a body corporate of the DISTRICT OF COLUMBIA**, party of the first part, and **CORPORATE MANAGEMENT SERVICES, LLC**, party of the second part.

**Witnesseth**, that in consideration of the sum of **SIX HUNDRED THIRTY FIVE THOUSAND AND 00/100 DOLLARS ($635,000.00)**, the party of the first part does hereby grant unto the party of the second part, in fee simple, as sole owner, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia which has a **Lot No. of in Square**, being more fully described as follows, to wit:

All that certain lot or parcel of land situate in the **District of Columbia** and being more particularly described as follows:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16TH STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above-described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

Which has a mailing address of:  **7336 14TH ST, NW**
                                                         **WASHINGTON, DC 20010**

Title insurer: **First American Title Insurance Company**

**And** the said party of the first part covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.



EXHIBIT
ALL-STATE LEGAL®
1

**In Testimony Whereof,** 7336, LLC, has caused these presents to be signed by , its , and its corporate seal to be affixed hereto; and does hereby constitute and appoint , its , as its true and lawful attorney in fact for it and in its name to acknowledge and deliver these presents as its act and deed.

IN PRESENCE OF:                              7336, LLC

_____        By: _____

State Of _Virginia_

County Of _Fairfax_ , To Wit:

I, TAMMY L. MAGILL, a Notary Public in and for the aforesaid jurisdiction do hereby certify that , who is named as attorney-in-fact as aforesaid by virtue of the authority vested in him/her by said Corporation, and acknowledged said instrument to be the act and deed of said Corporation and the he/she executed the aforegoing and annexed deed, bearing the date of the 11th day of February, 2005, personally appeared before me in the said jurisdiction and acknowledged the same to be his act and deed.

**Witness** my hand and seal this the 11th day of February, 2005.

_____
TAMMY L. MAGILL, Notary Public

My Commission Expires: 1/31/06



AFTER RECORDING RETURN TO:
Southshore Title & Escrow, Inc.
7019 Backlick Court
Springfield, VA 22151
File No. 1193VA-DC

```
Doc# 2005031977 Fees:$13998.50
03/04/2005   2:47PM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD
```

```
RECORDING                       20.00
SURCHARGE                        5.50
RECORDATION TAX FEE          6,985.00
TRANSFER TAX FEE             6,985.00
```

# Greater Capital Area Association of REALTORS®, Inc.

 

## REGIONAL SALES CONTRACT

This SALES CONTRACT ("Contract") is made on _____ September 12 _____ 2006 ("Contract Date")
between _____ LeMarcos & Nina Irving, and/or its assigns _____ ("Purchaser")
and _____ Corporate Management Services, Inc. _____ ("Seller") who
hereby confirm and acknowledge by their initials and signatures below the prior disclosure that in this real estate transaction _____

the Seller, and _____ Jubilee Realty & Associates, LLC _____ ("Listing Company") represents
[X] the Purchaser OR [ ] the Seller. The Listing Company and Selling Company are collectively referred to as "Broker". (If the brokerage firm is acting as
a dual representative for both the Seller and the Purchaser, then the appropriate disclosure form is attached to and made a part of this Contract)

1. **REAL PROPERTY.** The Purchaser will buy and the Seller will sell for the sales price ("Sales Price"), the Seller's entire interest in the land (with all
improvements, rights and appurtenances) described as follows  TAX Map/ID # _____ 2737//0019
Legal Description: Lot(s) ____19____ , Block/Square ____2737____ , Section _____
Subdivision or Condominium _____ Shepherd Park _____ , Unit # _____ , Parking Space(s) # _____
County/City ____Washington DC____ , Deed Book/Liber _____ , Pago/Folio # _____
Street Address _____ 7336 14th Street, NW _____ , State ____DC____  Zip Code ____20012____  ("Property").

2. **PERSONAL PROPERTY, FIXTURES AND UTILITIES.** The Sales Price includes the following personal property and fixtures  A. Any existing
built-in heating and central air conditioning equipment, plumbing and lighting fixtures, sump pump, attic fans, storm windows, storm doors, screens,
installed wall-to-wall carpeting, window shades, blinds, smoke and heat detectors, tv antennas, exterior trees and shrubs and;  B  The items marked YES
below as currently installed or offered.

| YES | NO | | YES | NO | | YES | NO | | YES | NO | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [ ] | [ ] | Stove or Range | [ ] | [ ] | Disposer | [ ] | [ ] | Ceiling Fan(s) # ___ | [ ] | [ ] | Alarm System |
| [ ] | [ ] | Cooktop | [ ] | [ ] | Freezer | [ ] | [ ] | Washer | [ ] | [ ] | Intercom |
| [ ] | [ ] | Wall Oven(s) # _ | [ ] | [ ] | Window Fan(s) # ___ | [ ] | [ ] | Dryer | [ ] | [ ] | Storage Shed(s) # ___ |
| [ ] | [ ] | Refrigerator(s) # ___ | [ ] | [ ] | Window A/C Unit(s) # ___ | [ ] | [ ] | Furnace Humidifier | [ ] | [ ] | Garage Opener(s)# ___ |
| | | w/ Ice maker(s) # ___ | [ ] | [ ] | Pool, Equip. & Cover | [ ] | [ ] | Electronic Air Filter | | | w/ramote(s) # ___ |
| [ ] | [ ] | Dishwasher | [ ] | [ ] | Hot Tub, Equip. & Cover | [ ] | [ ] | Central Vacuum | [ ] | [ ] | Playground Equipment |
| [ ] | [ ] | Built-in Microwave | [ ] | [ ] | Satellite Dish and Equip. | [ ] | [ ] | Water Treatment System | [ ] | [ ] | Wood Stove |
| [ ] | [ ] | Trash Compactor | [ ] | [ ] | Window Treatments | [ ] | [ ] | Exhaust Fan(s) | [ ] | [ ] | Fireplace Screen/Doors |

Other: **AS-IS** _____

---

**WATER, SEWAGE, HEATING AND CENTRAL AIR CONDITIONING:** (Check all that apply)
Water Supply:   [X] Public  [ ] Well _____ Hot Water:   [ ] Oil  [X] Gas  [ ] Elec.  [ ] Other _____
Sewage Disposal:  [X] Public  [ ] Septic # BR _____  Air Conditioning:  [ ] Oil  [ ] Gas  [X] Elec.  [ ] Heat Pump  [ ] Other _____
                                                 Heating:  [ ] Oil  [X] Gas  [ ] Elec.  [ ] Heat Pump  [ ] Other _____

3. **EQUIPMENT, MAINTENANCE AND CONDITION.** The Purchaser accepts the Property in the condition as of the Contract Date except as
otherwise provided herein. The Seller warrants that the existing appliances, heating, cooling, plumbing, electrical systems and equipment, and smoke and
heat detectors (as required), will be in normal working order as of the possession date. The Seller will deliver the Property in substantially the same
condition as on the Contract Date and broom clean with all trash and debris removed. The Purchaser and the Seller will not hold the Broker liable for any
breach of this paragraph.

4  **PRICE AND FINANCING**
   A. Down Payment                                                                           $ ____1,150,000.00____

   B. Financing    1. First Trust                               $ _____

                   2. Second Trust                              $ _____

                   3. Seller Held Trust - addendum attached     $ _____

   TOTAL FINANCING                                                                           $ _____

   SALES PRICE                                                                               $ ____1,150,000.00____

---

Jubilee Realty And Associates I LC 7700 Old Branch Ave Suite D204 Clinton, MD 20735
Phone: (301) 794 - 9400      Fax. (301) 794 - 4420      Albert Smith

Produced with Zipform™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

EXHIBIT
2
ALL-STATE LEGAL®

5. **DEPOSIT. A** The Purchaser has ...ue a deposit ("Deposit") with _____ South Shore Title & Escrow _____ ("Escrow Agent") of
☐ $10,000.00 _____ by check and/or ☐ $ _____ by note due and payable on _____ . receipt of which is hereby acknowledged. **B** The Deposit will be placed in an escrow account on the Escrow Agent after Date of Ratification to conform with the laws and regulations of the appropriate jurisdiction and/or, if VA financing applies, as required by Title 38 of the U.S. Code. This account may be interest bearing and all parties to interest resulting from the Deposit. The Deposit will be held in escrow until: (i) Credited toward the Sales Price at Settlement. (ii) All parties have agreed in writing as to its disposition; (iii) A court of competent jurisdiction orders disbursement and all appeal periods have expired; or, (iv) Disposed of in any other manner authorized by the laws and regulations of the appropriate jurisdiction.

6. **DOWN PAYMENT.** The balance of the down payment will be paid at Settlement by certified or cashier's check or by bank wired funds.

7. **DEED(S) OF TRUST.**

**A. FIRST DEED OF TRUST.** The Purchaser will ☐ OBTAIN OR ☐ ASSUME. a ☐ Conventional ☐ FHA ☐ VA ☐ Other ____ First Deed of Trust loan amortized over __30__ years at a ☐ FIXED OR an ☐ ADJUSTABLE rate bearing (initial) interest of _____ % per year or market rate available. Special Terms (if any) _____

**B. SECOND DEED OF TRUST.** The Purchaser will ☐ OBTAIN, OR ☐ ASSUME a Second Deed of Trust loan amortized over _____ years at a ☐ FIXED OR an ☐ ADJUSTABLE rate bearing (initial) interest of _____ % per year or market rate available. Special Terms (if any) _____

**C. ASSUMPTION ONLY:** Assumption fee, if any, and all charges related to the assumption will be paid by the Purchaser. If the Purchaser assumes the Seller's loan: (i) The Purchaser and the Seller ☐ will, OR ☐ will not obtain a release of the Seller's liability to the U.S Government for the repayment of the loan by Settlement. (ii) The Purchaser and Seller ☐ will, OR ☐ will not obtain substitution of the Seller's VA entitlement by Settlement. (iii) Balances of any assumed loans, secondary financing and cash down payments are approximate

8. **ADDITIONAL FINANCING TERMS.**

**A. ☒ CONVENTIONAL FINANCING.** Based on the financing terms specified in this Contract, the Seller will pay $ _____ toward the Purchaser's charges, (including but not limited to loan origination fees, discount fees, buy down or subsidy fees, prepaids or other charges as allowed by the lender) The Purchaser will pay all remaining Purchaser's charges. If applicable, the Purchaser will pay at Settlement, or finance any initial private mortgage insurance

If the lender's appraisal is not equal to or greater than the Sales Price, the Purchaser will have the privilege and option of proceeding with consummation of this Contract without regard to the amount of the appraised valuation. The Purchaser's election to proceed with consummation of this Contract without regard to the amount of the appraised valuation will be made within 3 Days after the notification to the Purchaser of the appraised value. If the Purchaser does not make this election, it will be the Seller's option to lower the Sales Price to the appraised value and this Contract will remain in full force and effect at the lower Sales Price. If the Seller does not make this election, the parties may agree to mutually acceptable terms. Each election must be made by Notice within 3 Days after Notice from the other party. The parties will immediately sign any appropriate amendments. If the parties fail to agree, this Contract will become void.

**B. ☐ VA OR ☐ FHA FINANCING**

The Purchaser will ☐ pay at Settlement, OR ☐ finance any VA Funding Fee or FHA initial Mortgage Insurance Premium. Based on the financing specified in this Contract, the Seller will pay _____ toward the Purchaser's charges (including but not limited to loan origination fees, discount fees, buydown or subsidy fees, prepaids or other charges as allowed by the lender) except that the total amount of any lender charges which cannot by law or regulation be charged to the Purchaser will be paid by the Seller. These charges, if any, will first be deducted from any Seller credit, and FHA financing applies, it is expressly agreed that, notwithstanding any other provisions of this Contract, the Purchaser will not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner or Direct Endorsement Lender/Department of Veterans Affairs or the Lender Approval Processing Program (LAPP) underwriter setting forth the appraised value of the Property (excluding closing costs) of not less than $ _____ . The Purchaser will have the privilege and option of proceeding with consummation of this Contract without regard to the amount of the appraised valuation. THE APPRAISED VALUATION IS ARRIVED AT TO DETERMINE THE MAXIMUM MORTGAGE THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT/DEPARTMENT OF VETERANS AFFAIRS WILL INSURE/GUARANTEE. HUD/DEPARTMENT OF VETERANS AFFAIRS AND THE MORTGAGEE DOES NOT WARRANT THE VALUE NOR THE CONDITION OF THE PROPERTY THE PURCHASER SHOULD SATISFY HIMSELF/HERSELF THAT THE PRICE AND CONDITION OF THE PROPERTY ARE ACCEPTABLE.

If VA Financing applies, the Purchaser agrees that should the Purchaser elect to complete the purchase at an amount in excess of the reasonable value established by the Department of Veterans Affairs, the Purchaser shall pay such excess amount in cash from a source which the Purchaser agrees to disclose to the Department of Veterans Affairs, and which the Purchaser represents will not be borrowed funds except as approved by the Department of Veterans Affairs. The Purchaser's exercise of the option shall be made in writing within 3 Days of the notification to the Purchaser of the appraised value, or this Contract shall become void

If FHA financing applies, the Purchaser's exercise of the option of proceeding with consummation of the Contract without regard to the amount of the appraised valuation shall be made in writing within 3 Days of the notification to the Purchaser of the appraised value, or this Contract shall become void. The FHA loan amount may be approximate because the financed acquisition costs cannot be determined until the Settlement

9. **LOAN APPLICATION AND APPROVAL.**

**A. FINANCING APPLICATION.** The Purchaser will make written application for the financing or assumption called for in this Contract ("Specified Financing") within 7 days after Date of Ratification. The Purchaser grants permission for the Selling Company and the lender to disclose to the Listing Company and the Seller general information available about the progress of the loan application and loan approval process.

**B. LENDER'S APPROVAL CONTINGENCY.** This Contract is contingent until 9 p.m. __15__ Days after Date of Ratification ("Deadline") upon the Purchaser Delivering to the Seller a letter from the lender stating that the Purchaser is approved for the Specified Financing ("Lender's Letter"). Upon Seller's receipt of the Lender's Letter, this Contract is no longer contingent on the Purchaser being approved for the Specified Financing and this Contract will remain in full force and effect. TIME IS OF THE ESSENCE.

   (i) If the Purchaser does not Deliver the Lender's Letter by the Deadline, the lender's approval contingency will continue, unless the Seller at Seller's option gives Notice to the Purchaser that this Contract will become void. If the Seller Delivers such Notice this Contract will become void at 9 pm on the third day following Delivery of Seller's Notice unless prior to that date and time.
   a. Purchaser Delivers to Seller the Lender's Letter, OR
   b. Purchaser removes this LENDER'S APPROVAL CONTINGENCY and provides Seller with evidence of sufficient funds available to complete Settlement without obtaining financing.
   (ii) The Purchaser may substitute alternative financing for Specified Financing provided:
   a. There is no additional expense to the Seller; and
   b. The Settlement Date is not delayed.

GCAAR #1301 - Regional Sales Contract
(Previously form # 103)                    Page 2 of 5          Please initial: Purchaser ____ / ____ Seller ____ / ____
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

(iii) If prior to satisfaction or r___al of the LENDER'S APPROVAL CONTINGENC___ue Purchaser receives a written rejection for the Specified Financing and Delivers a copy of the written rejection to the Seller, this Contract will become void.

C. **DEFAULT.** The Purchaser will be in default if Settlement does not occur on the Settlement Date because the Purchaser:
   (i) Fails to lock-in the interest rate(s) as specified above and the rate(s) increase so that the Purchaser no longer qualifies for such financing, OR
   (ii) Applies for, and fails to obtain, alternative financing instead of the Specified Financing, unless the Seller consents in writing to the alternative financing terms, in which case the alternative financing becomes the Specified Financing; OR
   (iii) Fails to comply with the lender's reasonable requirements in a timely manner; OR
   (iv) Fails to immediately give Notice to the Seller or the Broker of any material adverse changes in the Purchaser's assets, liabilities, or income; OR
   (v) Does not have the down payment, closing fees and any other funds to settle as provided in this Contract; OR
   (vi) Does or fails to do any act following the Date of Ratification that prevents the Purchaser from obtaining the financing; OR
   (vii) Makes any deliberate misrepresentations, material omissions or inaccuracies in financial information that results in the Purchaser's inability to secure the financing.

**10. PURCHASER'S REPRESENTATIONS.** The Purchaser ☒ will, OR ☐ will not occupy the Property as the Purchaser's principal residence. Unless specified in a written contingency, neither this Contract nor the financing is dependent or contingent on the sale and settlement or lease of other real property The Selling Company ☐ is, OR ☒ is not authorized to disclose to the Listing Company and Seller the appropriate financial or credit information statement provided to the Selling Company by the Purchaser. The Purchaser acknowledges that the Seller is relying upon all of the Purchaser's representations including without limitation the accuracy of financial or credit information given to the Seller, Broker or the lender by the Purchaser

**11. ACCESS TO PROPERTY.** The Seller will provide the Broker, the Purchaser, Inspectors representing the Purchaser and representatives of lending institutions for appraisal purposes, reasonable access to the Property to comply with this Contract. The Purchaser and/or the Purchaser's representative will have the right to make an inspection prior to Settlement and/or occupancy, at which time the Seller will have all utilities in service.

**12. WELL AND SEPTIC.** If the Property is on well and/or septic systems, the ☒ Purchaser, at Purchaser's expense OR ☐ Seller, at Seller's expense. will furnish the Purchaser on or before Settlement with a certificate dated not more than 30 days prior to Settlement from the ☒ appropriate local government authority, or ☐ a private company, indicating that: A. The well water contains no more than the acceptable level of coliform bacteria and, B. The septic system appears to be functioning satisfactorily, and if known by public records, was installed pursuant to a valid health department permit. If either system is found defective or substandard according to the certificate, the Seller will take appropriate remedial action at the Seller's expense.

**13. TERMITE INSPECTION.** The ☒ Purchaser, at Purchaser's expense OR the ☐ Seller, at Seller's expense, will furnish a written report from a pest control firm dated not more than ☒ 30 OR ☐ 60 days prior to Settlement showing that all dwelling(s) and/or garage(s) within the Property (excluding fences or shrubs not abutting garage(s) or dwelling(s)) are free of visible evidence of active termites and other wood-destroying insects, and free from visible structural insect damage. Any extermination and structural repairs identified in the inspection report will be at the Seller's expense.

**14. REPAIRS.** If, as a condition of providing financing under this Contract, the lender requires repairs to be made to the Property, then the Purchaser will give Notice to the Seller of the lender's required repairs. Within 5 Days after Notice, the Seller will give Notice to the Purchaser whether the Seller will make the repairs. If the Seller will not make the repairs, the Purchaser will give Notice to the Seller within 5 Days after the Seller's Notice whether the Purchaser will make the repairs. If neither the Seller nor the Purchaser will make the repairs, then this Contract will become void. This clause will not release the Seller from any responsibilities set forth in the paragraphs titled PERSONAL PROPERTY, FIXTURES AND UTILITIES; EQUIPMENT, MAINTENANCE AND CONDITION, WELL AND SEPTIC; TERMITE INSPECTION; or OTHER TERMS, or any terms specifically set forth in this Contract and any addenda.

**15. DAMAGE OR LOSS.** The risk of damage or loss to the Property by fire, act of God, or other casualty remains with the Seller until the execution and delivery of the deed of conveyance.

**16. TITLE.** The title report and survey, if required, will be ordered promptly and, if not available on the Settlement Date, Settlement may be delayed for up to 10 business days to obtain the title report and survey after which this Contract, at the option of the Seller, may be terminated and the Deposit will be refunded in full to the Purchaser according to the terms of the DEPOSIT paragraph. Fee simple title to the Property, and everything that conveys with it, will be sold free of liens except for any loans assumed by the Purchaser. The Seller will pay any special assessments and will comply with all orders, requirements, or notices of violations of any county or local authority, condominium unit owners' association, homeowners' or property owners' association or actions in any court on account thereof, against or affecting the Property on the Settlement Date. Title is to be good and marketable, and insurable by a licensed title insurance company with no additional risk premium. Title may be subject to commonly acceptable easements, covenants, conditions and restrictions of record, if any, otherwise, the Purchaser may declare this Contract void, unless the defects are of such character that they may be remedied within 30 Days beyond the Settlement Date. In case action is required to perfect the title, such action must be taken promptly by the Seller at the Seller's expense. The Broker is hereby expressly released from all liability for damages by reason of any defect in the title. The Seller will convey the Property by general warranty deed with English covenants of title (Virginia); general warranty deed (West Virginia); special warranty deed (D.C. and Maryland). The Seller will sign such affidavits, lien waivers, tax certifications, and other documents as may be required by the lender, title insurance company, Settlement Agent, or government authority, and authorizes the Settlement Agent to obtain pay-off or assumption information from any existing lenders.

**17. POSSESSION DATE.** Unless otherwise agreed to in writing between the Seller and the Purchaser, the Seller will give possession of the Property at the Settlement If the Seller fails to do so and occupies the Property beyond the Settlement, the Seller will be a tenant by sufferance of the Purchaser and hereby expressly waives all notice to quit as provided by law. The Purchaser will have the right to proceed by any legal means available to obtain possession of the Property. The Seller will pay any damages and costs incurred by the Purchaser including reasonable attorney fees.

**18. SETTLEMENT.** The Seller and the Purchaser will make full settlement in accordance with the terms of this Contract ("Settlement") on, or with mutual consent before, _September 15, 2006_, ("Settlement Date") except as otherwise provided in this Contract

**19. SETTLEMENT AGENT.** (Not for use in Virginia, see the Virginia Jurisdictional Addendum) The Purchaser selects ___South Shore Title &___ ___Escrow___ ("Settlement Agent") to conduct the Settlement. Either party may retain their own counsel. The Purchaser agrees to contact the Settlement Agent within 10 Days after the Date of Ratification to schedule Settlement. The Settlement Agent will order the title exam and survey if required

---

GCAAR #1301 - Regional Sales Contract
(Previously form # 103)

Page 3 of 5

Please initial: Purchaser _____ / _____    Seller _____ / _____

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

SEP-12-2006 17:42 From:    To:7035525393    P.4/17

20. **FEES.** Fees for the preparation ___ e Deed, that portion of the Settlement Agent's ___ billed to the Seller, costs of releasing existing encumbrances, appropriate legal fees and any other proper charges assessed to the Seller will be paid by the Seller. Fees for the title exam (except as otherwise provided) survey, recording (including those for any purchase money trusts) and that portion of the Settlement Agent's fee billed to the Purchaser, appropriate legal fees and any other proper charges assessed to the Purchaser will be paid by the Purchaser. Fees to be charged will be reasonable and customary for the jurisdiction in which the Property is located  (Recording, Transfer and Grantor's Taxes are covered in the appropriate jurisdictional addenda).

21. **BROKER'S FEE.** The Seller irrevocably instructs the Settlement Agent to pay the Broker compensation ("Broker's Fee") as set forth in the listing agreement and to disburse the compensation offered by the Listing Company to the Selling Company in writing as of the Contract Date, and the remaining amount of Broker's compensation to the Listing Company.

22. **ADJUSTMENTS.** Rents, taxes, water and sewer charges, front foot benefit and house connection charges, condominium unit owners' association, homeowners' and/or property owners' association regular periodic assessments (if any) and any other operating charges, are to be adjusted to the day of Settlement. Any heating or cooking fuels remaining in supply tank(s) at Settlement will become the property of the Purchaser. Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the collector of taxes, if any, except that recorded assessments for improvements completed prior to Settlement, whether assessments have been levied or not, will be paid by the Seller or allowance made at Settlement. If a Deed of Trust is assumed, interest will be adjusted to the Settlement Date and the Purchaser shall reimburse the Seller for existing escrow accounts, if any.

23. **ATTORNEY'S FEES.** In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court or arbitrator(s). In the event a dispute arises resulting in the Broker being made a party to any litigation or if the Broker is required to bring litigation to collect the Broker's Fee, the Purchaser and Seller agree to indemnify the Broker, its employees, and/or licensees for all attorney fees and costs of litigation, unless the litigation results in a judgment against the Broker, its employees and/or licensees

24. **PERFORMANCE.** Delivery of the required funds and executed documents to the Settlement Agent will constitute sufficient tender of performance. Funds from this transaction at Settlement may be used to pay off any existing liens and encumbrances, including interest, as required by lender(s) or lienholders

25. **DEFAULT.** If the Purchaser fails to complete Settlement, at the option of the Seller, the Deposit may be forfeited as liquidated damages and not as a penalty, in which event the Purchaser will be relieved from further liability to the Seller. If the Seller does not elect to accept the Deposit as liquidated damages, the Deposit may not be the limit of the Purchaser's liability in the event of a default. If the Deposit is forfeited, or if there is an award of damages by a court or a compromise agreement between the Seller and Purchaser, the Broker may accept and the Seller agrees to pay the Broker one-half of the Deposit in lieu of the Broker's Fee, (provided Broker's share of any forfeited Deposit will not exceed the amount due under the listing agreement). If the Seller fails to complete Settlement, the Purchaser will have all legal or equitable remedies, including specific performance and/or damages. If either the Seller or Purchaser refuses to execute a release of Deposit when requested to do so in writing and a court finds that they should have executed the agreement, the party who so refused to execute a release of Deposit will pay the expenses, including, without limitation, reasonable attorney's fees, incurred by the other party in the litigation. The Seller and Purchaser agree that no Escrow Agent will have any liability to any party on account of disbursement of the Deposit or on account of failure to disburse the Deposit, except only in the event of the Escrow Agent's gross negligence or willful misconduct. The parties further agree that the Escrow Agent will not be liable for the failure of any depository in which the Deposit is placed and that the Seller and Purchaser each will indemnify, defend and save harmless the Escrow Agent from any loss or expense arising out of the holding, disbursement or failure to disburse the Deposit, except in the case of the Escrow Agent's gross negligence or willful misconduct. If either the Purchaser or the Seller is in default, then in addition to all other damages, the defaulting party will immediately pay the costs incurred for the title examination, appraisal, survey and the Broker's Fee in full

26. **OTHER DISCLOSURES.** The Purchaser and Seller are advised to seek professional advice concerning the condition of the Property or other legal and tax matters. The following subparagraphs disclose some matters which the parties may investigate further. These disclosures are not intended to create a contingency. Any contingency must be specified by adding appropriate terms to this Contract. The parties acknowledge the following disclosures:

A. **PROPERTY CONDITION.** See EQUIPMENT, MAINTENANCE AND CONDITION Paragraph. Various inspection services and home warranty insurance programs are available. The Broker is not advising the parties as to certain other issues, including without limitation: water, sewer or septic; soil condition; flood hazard areas; possible restrictions of the use of the Property due to restrictive covenants, zoning, subdivision, or environmental laws, easements or other documents; airport or aircraft noise; planned land use, roads or highways; and construction materials and/or hazardous materials, including without limitation flame retardant treated plywood (FRT), radon, urea formaldehyde foam insulation (UFFI), polybutylene pipes, synthetic stucco (EIFS), underground storage tanks, asbestos and lead-based paint. Information relating to these issues may be available from appropriate government authorities

B. **LEGAL REQUIREMENTS** All contracts for the sale of real property must be in writing to be enforceable. Upon ratification and delivery, this Contract becomes a legally binding agreement. Any changes must be made in writing.

C. **FINANCING.** Mortgage rates and associated charges vary with financial institutions and the marketplace. The Purchaser has the opportunity to select the lender and the right to negotiate terms and conditions of the financing subject to the terms of this Contract. The financing may require a substantial lump sum (balloon) payments on the due dates. The Purchaser has not relied upon any representations regarding the future availability of mortgage money or interest rates for the refinancing of any such lump sum payments.

D. **BROKER.** The Broker may from time to time engage in the general insurance, title insurance, mortgage loan, real estate settlement, home warranty and other real estate-related businesses and services. Therefore, in addition to the Broker's Fee specified herein, the Broker may receive compensation related to other services provided in the course of this transaction The Purchaser and Seller acknowledge that the Broker is being retained solely as a real estate agent and not as an attorney, tax advisor, lender, appraiser, surveyor, structural engineer, home inspector or other professional service provider.

27. **ASSIGNABILITY.** This Contract may not be assigned without the written consent of the Purchaser and the Seller. If the Purchaser and Seller agree in writing to an assignment of this Contract, the original parties to this Contract remain obligated hereunder until Settlement.

28. **DEFINITIONS.** "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery and the time period will end at 9 p.m. on the Day specified. If the Settlement Date falls on a Saturday, Sunday, or legal holiday, then the Settlement will be on the prior business day. "Date of Ratification" means the date of final acceptance in writing of all the terms of this Contract (not the date of expiration or removal of any contingencies). "Delivery" means hand-carried, sent by overnight delivery service, by facsimile transmission as provided for in the NOTICES Paragraph, or when receipt is acknowledged in writing. In the event of overnight delivery service, Delivery will be deemed to have been made on the Day following the sending. The masculine includes the feminine and the singular includes the plural.

GCAAR #1301 - Regional Sales Contract
(Previously form # 103)

Page 4 of 6

Please Initial: Purchaser _____ / _____  Seller _____ / _____

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

29. **NOTICES.** All notices ("Notice") required to be given by this Contract will be in writing and will be effective as of the date on which such Notice is Delivered:
   A.  Addressed to the Seller at: _____ _____ _____ _____ **OR**
        transmitted by facsimile to _____
   B.  Addressed to the Purchaser at: _____ _____ _____ _____ **OR**
        transmitted by facsimile to _____

30. **MISCELLANEOUS.** This Contract may be signed in one or more counterparts, each of which is deemed to be an original, and all of which together constitute one and the same instrument. Documents obtained via facsimile machines will also be considered as originals. Typewritten or handwritten provisions included in this Contract will control all pre-printed provisions that are in conflict.

31. **VOID CONTRACT.** If this Contract becomes void, both parties will immediately execute a release directing that the Deposit be refunded in full to the Purchaser according to the terms of the DEPOSIT paragraph.

32. **ADDITIONS.** The appropriate JURISDICTIONAL ADDENDUM and LEAD BASED PAINT ADDENDA (If applicable) must be attached and made a part of this Contract. The following are made a part of this Contract.

☒ Yes ☐ No  STATE JURISDICTIONAL ADDENDUM ☒ DC ☐ VA ☐ MD ☐ WVA ☐ Other ___
☐ Yes ☒ No  HOME INSPECTION CONTINGENCY                  ☐ Yes ☒ No  LEAD - BASED PAINT DISCLOSURE FORM
☐ Yes ☒ No  RADON TESTING CONTINGENCY                     ☐ Yes ☒ No  LEAD - BASED PAINT INSPECTION CONTINGENCY
☐ Yes ☒ No  SALE OF HOME CONTINGENCY                      ☐ Yes ☒ No  FHA HOME INSPECTION NOTICE
☐ Yes ☒ No  CONDO/COOP ADDENDUM (DC and MD)
☐ Yes ☒ No  HOME WARRANTY POLICY paid for by: ☐ Purchaser or ☐ Seller.
                Cost not to exceed $ _____ _____ Warranty provider to be _____ _____ _____
☐ Yes ☒ No  OTHER (specify). _____ _____ _____ _____ _____

33. **OTHER TERMS.** _____ _____ _____ _____ _____

34. **ENTIRE AGREEMENT.** This Contract will be binding upon the parties, and each of their respective heirs, executors, administrators, successors and permitted assigns. The provisions hereof will survive the delivery of the deed and will not be merged therein. This Contract, unless amended in writing, contains the final and entire agreement of the parties and the parties will not be bound by any terms, conditions, oral statements, warranties or representations not herein contained. The interpretation of this Contract will be governed by the laws of the appropriate jurisdiction.

**SELLER:**                                          **PURCHASER:**

___/_____              (SEAL)       ___/_____              (SEAL)
Date   Signature Corporate Management Services,      Date   Signature LeMarcos & Nina Irving

___/_____              (SEAL)       ___/_____              (SEAL)
Date   Signature                                     Date   Signature and/or its assigns

Date of Ratification (see DEFINITIONS PARAGRAPH) _____ _____

For Information purposes only:

Listing Company's Name and Address:              Selling Company's Name and Address:
                                                 Jubilee Realty & Associates, LLC

Office # _____ Fax # _____           Office # _____ Fax # _____
MRIS Broker Code _____ MRIS Office ID# ___  MRIS Broker Code: MRIS Office ID# _____
Agent Name _____                           Agent Name Albert Smith
Agent MRIS ID# _____                       Agent MRIS ID# _____
Agent Email Address _____                  Agent Email Address _____

©1999. This is a suggested form owned by certain REALTOR® Associations ("Associations"). This form has been created and printed exclusively for the use of REALTORS® and members of the Associations, who may copy or otherwise reproduce this form in identical form with the addition of their company logo and with any other changes being set forth in a clearly marked separate addendum. Any other use of this form by REALTORS® or members of Associations, or any use of this form whatsoever by non-members of Associations, is prohibited without prior written authorized consent of the Associations

GCAAR #1301 - Regional Sales Contract
(Previously form # 103)                          Page 5 of 5

P. 6/17          763256533Z          :oT          :moɿꟻ Ɛ4:ᵀᴵ 900S-SI-ꟼƎƧ

 

### Addendum of Clauses
#### FOR USE WITH EITHER THE MARYLAND ASSOCIATION OF REALTORS® (MAR) RESIDENTIAL CONTRACT OF SALE OR THE REGIONAL SALES CONTRACT

The Contract of Sale dated __September 12, 2006__ , Address ____ 7336 14th Street, NW ____
City _____ , State ____ DC ____ Zip ____ 20012 ____ between
Seller _____ Corporate Management Services, Inc. _____ and
Buyer _____ LeMarcos & Nina Irving, and/or its assigns _____

is hereby amended by the incorporation of this Addendum, which shall supersede any provisions to the contrary in the Contract.

It is expressly provided that only the numbered paragraphs which are checked and initialed by all Parties shall be made a part of said contract. TIME IS OF THE ESSENCE WITH REGARD TO EACH PROVISION OF THIS ADDENDUM WHICH CONTAINS TIMEFRAMES.

☐ 1.  HOME INSPECTION CONTINGENCY. This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") for inspections of the property, not including radon or lead-based paint inspections, which require separate contingencies, by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. The Seller will have all utilities in service at the time of inspection(s). This contingency will terminate at the Deadline unless by the Deadline the Buyer Delivers to the Seller either A or B:

A.  A copy of the report(s) from the inspection(s) of the property together with a Home Inspection Notice (see GCAAR Home Inspection Notice) listing home inspection conditions or items that the Buyer requires the Seller to repair, and/or stipulating a dollar credit, as allowed by the lender, to be paid at settlement by the Seller toward Buyer's charges to buy the property.

If the Seller elects not to perform in accordance with the Home Inspection Notice or makes another offer, the Seller will Deliver notice to the Buyer of such decision within 3 Days after Delivery of the Home Inspection Notice.

Within 3 Days after Delivery of a notice from the other party, the other party may:

(i)    Deliver notice accepting the terms contained in the other party's notice; or
(ii)   Deliver notice continuing negotiations by making another offer; or
(iii)  Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of Notice from the other party will result in acceptance by both parties of the terms of the most recent Notice.

B.  Notice declaring this Contract void.

☐ 2.  GENERAL INSPECTION CONTINGENCY. This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") for satisfactory inspections of the property by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. The Seller will have all utilities in service at the time of inspection(s). In the event of an unsatisfactory inspection, as determined by Buyer in his sole discretion, Buyer may, by Notice to Seller, declare this contract null and void in which case Buyer's deposit shall be refunded in full. In the event such Notice is not given by the Deadline, this contract will remain in full force and effect.

☒ 3.  "AS IS" PROPERTY CONDITION. The Property, including but not limited to electrical, plumbing, heating, air conditioning, equipment and fixtures ("the Property"), is sold and shall be delivered in "As Is" physical condition, to be determined as of the _____ Date of Ratification, __09/12/2006__ the Date of the Home Inspection or _____ (other) _____

The Seller makes no representation or warranty, express or implied, as to the condition of the Property or any equipment or System contained therein. All clauses in this Contract pertaining to Property condition, termites or compliance with city, state or county regulations are hereby deleted from this Contract. Smoke detectors will be installed as required by the laws or regulations of the appropriate jurisdiction. The property shall be delivered free and clear of trash and debris and broom clean.

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

GCAAR Form # 1332 - MC & DC                         1 of 6                                      10/2005

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 294 - 9400        Fax: (301) 794 - 4420        Albert Smith                      Davis-Irving
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

**4. RADON INSPECTION C        INGENCY.** This Contract is contingent until 9 p.m. on the _____ _____ Day after the Date of Ratification ("Deadline") to allow the Buyer, at the Buyer's discretion and expense, to have the property inspected for the presence of radon by a Testing Firm listed with the U.S. Environmental Protection Agency ("EPA"), National Radon Safety Board ("NRSB"), or the National Environmental Health Association ("NEHA") using an EPA approved testing method. **Testing device to be placed and retrieved by an EPA, NRSB or NEHA listed technician or their authorized subcontractor.** This contingency will terminate at the Deadline unless by the Deadline, the Buyer Delivers to the Seller a copy of the radon testing report which confirms the presence of radon that equals or exceeds the action level established by the EPA together with either A or B:

**A.** Radon Testing Notice requiring the Seller at Seller's expense prior to settlement to remediate the radon condition by contracting with an **EPA, NRSB or NEHA** listed remediation firm to reduce the presence of radon below the action level established by the EPA and to provide Buyer written verification that the required remediation has been performed.

If the Seller elects not to perform in accordance with the Radon Testing Notice or makes another offer, the Seller will Deliver notice to the Buyer of such decision within 3 Days after Delivery of the Radon Testing Notice.

Within 3 Days after Delivery of a notice from one party, the other party may:
    (i)   Deliver notice accepting the terms contained in the other party's notice; or
    (ii)  Deliver notice continuing negotiations by making another offer; or
    (iii) Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient delivers to the other party notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent notice.

**B.** Notice declaring this Contract void.

**5. LEAD-BASED PAINT INSPECTION CONTINGENCY** This Contract is contingent until 9 p.m. on the _____ _____ Day after the Date of Ratification (**must be 10 days or such other period as shall be mutually agreeable to the Buyer and Seller**) ("Deadline") to allow Buyer, at Buyer's discretion and expense, to have a risk assessment or inspection of the interior and exterior of the subject property for the presence of lead paint and/or lead-based paint hazards ("Inspection"). Such Inspection shall be performed by an individual certified by the Maryland Department of the Environment ("MDE"), for Maryland properties, or the DC Department of Health Lead Based Paint Program, for DC Properties, to conduct such assessment or inspection ("Certified Inspector"). This contingency will terminate at the Deadline unless by the Deadline, Buyer Delivers to Seller a copy of the risk assessment report or inspection report which reveals conditions for which the Certified Inspector recommends corrective action together with either A or B.

**A.** Lead-Based Paint Testing Notice identifying specific lead based paint hazards and requiring Seller at Seller's expense prior to settlement to perform requisite corrective action to abate such lead based paint hazards. In the event Seller agrees to have the corrective action performed, Seller shall furnish, not later than the date of settlement, a written certification by a Certified Inspector demonstrating that the specified conditions have been remedied.

If Seller elects not to perform in accordance with the Lead Based Paint Notice or makes another offer, Seller will Deliver notice to Buyer of such decision within 3 Days after Delivery of the Lead Based Paint Notice.

Within 3 Days after Delivery of a notice from one party, the other party may:
    (i)   Deliver notice accepting the terms contained in the other party's notice; or
    (ii)  Deliver notice continuing negotiations by making another offer; or
    (iii) Deliver notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient delivers to the other party notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent notice.

**B.** Notice declaring this Contract void.

**6. POST SETTLEMENT AIR CONDITIONING AND/OR SWIMMING POOL INSPECTION CONTINGENCY**
These provisions shall apply to the following system(s) (the "System") (check appropriate system(s)):
☐ the Air Conditioning System; and/or ☐ the Swimming Pool System (defined as the swimming pool and related equipment, including the structural integrity of the swimming pool).

Due to weather conditions, the System located at the Property cannot be adequately tested to ensure that it is in compliance with the Equipment, Maintenance and Condition paragraph or the Condition of Property and Possession paragraph, as applicable, of the Sales Contract and this Addendum (the "Required Condition"). Buyer and Seller agree that Buyer shall, at his expense, make an inspection of the System by the earliest practicable date, consistent with the weather conditions, but in no event later than the May 31 following ratification, (the "Final Inspection Date"). Seller's agreement that the System will be in the Required Condition at the time of settlement or occupancy, whichever occurs first, is hereby extended through the date of the inspection of the System, but in no event later than the Final Inspection Date.

Buyer shall give Notice to Seller of the date and time on which the inspection is to be made, and Seller shall have the option of being present or represented at said inspection. The inspection shall be conducted by a heating and air conditioning technician, or pool service company, as appropriate, licensed in the jurisdiction in which the Property is located. Buyer agrees not to attempt to operate the System prior to the scheduled date for the inspection. **In the event Buyer attempts to operate the System prior to said inspection, then any warranty hereunder, express or implied, by Seller, shall be deemed to be null and void.**

©2005 The Greater Capital Area Association of REALTORS®, Inc.

This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

In the event that the aforesaid insp...ion shows the System to be in the Required Condition... then Seller's obligations hereunder with respect to the System shall be deemed fulfilled. In the event that the aforesaid inspection shows the System not to be in the Required Condition, Buyer shall provide Notice of same to Seller no later than the Final Inspection Date, in which event Seller shall be responsible for the actual cost necessary to place the System in the Required Condition. All remedial action taken hereunder shall be performed in a good and workmanlike manner by a heating and air conditioning contractor or pool service company, as appropriate, selected by Seller who is licensed in the jurisdiction in which the Property is located, and shall be completed within 10 days after Buyer's Notice to Seller ("Seller's Timeframe"). Buyer shall make the Property available at reasonable times for the completion of such work. In the event that the System is not in the Required Condition by the expiration of Seller's Timeframe, Buyer shall be irrevocably authorized to have the required remedial action performed by a contractor meeting the aforesaid qualifications. Upon completion of the remedial action, but no later than 10 days following the expiration of Seller's Timeframe ("Buyer's Timeframe"), Buyer shall provide a Notice to Seller including a copy of the contractor's invoice and instructions as to whether the amount shown in said invoice shall be paid directly to said contractor or to Buyer as a reimbursement for covered expenses. Upon receipt of said Notice, Seller shall immediately make payment as instructed in the Notice.

In the event that any Notice required to be given in this Addendum is not given within the timeframe specified, then Seller's obligations hereunder with respect to the System shall be deemed fulfilled.

**[X]** **7. SELLER'S CREDIT(S) TO BUYER (For use with the MAR contract).** In addition to any other amount(s) the Seller has agreed to pay under other provisions of this Contract, the Seller shall credit the Buyer at time of settlement with the sum of $ **45,045.00** towards Buyer's settlement costs. It is the Buyer's responsibility to confirm with its lender, if applicable, that the entire credit provided for herein may be utilized. **If lender prohibits the Seller from payment of any portion of this credit, then said credit shall be reduced to the amount allowed by the lender.**

**[ ]** **8. HOLDING DEPOSIT CHECK.** It is understood and agreed by all Parties that the Buyer has instructed the Escrow Agent to hold and not deposit the above described deposit check until _____ Days after Ratification at which time said check shall be deposited by the Broker.

**[ ]** **9. INTEREST-BEARING ACCOUNT DEPOSIT.** The Parties hereto agree and authorize Escrow Agent, to place the deposit in an interest-bearing escrow account. Interest shall accrue and be payable to the Buyer at time of settlement. In order to establish an Interest Bearing Account, the Buyer understands that a completed W-9 form and a copy of a government issued photo ID must be given to the Escrow Agent. A Processing fee of $ _____ shall be charged to the party receiving the interest by the above Escrow Agent for this service. In the event of a forfeiture of deposit, and interest accrued shall be payable to the Seller.

**[ ]** **10. APPRAISAL CONTINGENCY.** This Contract IS CONTINGENT until 9 p.m. on the _____ day after the Date of Ratification ("Deadline") for Buyer to obtain a written appraisal valuation of the property (hereinafter "Appraisal") certifying the value of the property to be no less than the sales price (Check with your lender to confirm that the Appraisal will be completed by the Deadline). If Buyer is obtaining financing, the Lender shall select the Appraiser. If this is a cash sale, the Buyer shall select the Appraiser. The Appraiser shall be licensed to perform appraisals in the jurisdiction in which the property is located. Seller shall make the property available for inspection by such Appraiser.

In the event that the Appraisal is lower than the Sales Price, the Buyer has the option of proceeding with this Contract at the stated Sales Price without regard to the Appraisal. However, should the Buyer decline to proceed with this Contract at the stated Sales Price (due to the Appraisal being lower than the stated Sales Price), Buyer shall deliver to Seller, by the Deadline, a Notice (See GCAAR Buyer's Appraisal Notice), requesting that the sales price be reduced to a specified lower amount of not less than the appraised value, together with a copy of the written Appraisal ("Buyer's Appraisal Notice").

Should Buyer fail to deliver Buyer's Appraisal Notice by the Deadline, Buyer's Appraisal Contingency will continue, unless Seller at Seller's option, prior to Seller's receipt of the Buyer's Appraisal Notice, gives Notice to Buyer that the Deadline has passed and the Contingency will EXPIRE. If Seller Delivers such Notice this Contingency will EXPIRE at 9 p.m. on the third day following Delivery of Seller's Notice, unless prior to that date and time Buyer delivers Buyer's Appraisal Notice. If this Contingency expires pursuant to the terms of this paragraph, this contract will remain in full force and effect.

All Notices (under this Appraisal Contingency) delivered subsequent to the delivery of the Buyer's Appraisal Notice shall be treated as follows:

WITHIN 3 DAYS AFTER NOTICE DELIVERY FROM ONE PARTY, THE OTHER PARTY MAY:

1. Deliver notice accepting the terms contained in the other party's notice; OR
2. Deliver notice continuing negotiations by making another offer; OR
3. Deliver notice that this Contract will become void at 9:00 p.m. on the 3rd Day following Delivery, unless the recipient delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case, this Contract will remain in full force and effect.

FAILURE OF EITHER PARTY TO RESPOND WITHIN 3 DAYS AFTER NOTICE DELIVERY WILL RESULT IN THE <u>CONTRACT BECOMING VOID.</u>

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only
Previous editions of this Form should be destroyed.

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com          Davis-Irving

**11. PREQUALIFICATION LETTER CONTINGENCY.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the Buyer Delivering to the Seller a prequalification letter from an institutional lender stating that the financing described in this Contract is available to the Buyer and, based upon written loan application, a preliminary credit report, and the information provided by the Buyer, the financing should be committed subject to appropriate verification, approval and commitment. At anytime after the Deadline, but prior to Delivery to the Seller of the prequalification letter, the Seller may give notice to the Buyer declaring this Contract void.

**12. GIFT LETTER.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the Buyer providing to the Seller a Gift Letter and necessary documentation satisfactory to the lender ("Gift Letter") in the amount of $ _____ from _____. At any time after the Deadline, but prior to Delivery to the Seller of the Gift Letter, the Seller may give notice to the Buyer declaring this Contract void. Once the Gift Letter has been Delivered, if the Buyer does not have the gift funds to settle as provided in this Contract, the Buyer will be in default.

**13. SALE OF THE BUYER'S PROPERTY AND KICK-OUT.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") upon the sale of the Buyer's property located at _____ ("Buyer's Property"). If the Buyer does not satisfy or remove this contingency by the Deadline pursuant to paragraph 13C below, then at any time after the Deadline, but prior to the Buyer satisfying or removing this contingency, either the Seller or the Buyer may declare this Contract void by providing notice to the other party.

A.   The Seller may continue to offer the Property for sale and accept bona fide back-up offers to this Contract. If during the term of this contingency, a back-up offer is accepted, the Seller will Deliver notice to the Buyer requiring that this contingency be satisfied or removed pursuant to paragraph 13C below not later than 9 p.m. on the _____ Day after Delivery of the notice, or this Contract will become void.

B.   The Buyer's Property will be listed exclusively and actively marketed by a licensed real estate broker and entered into a multiple listing service within 3 Days after the Date of Ratification at a price not to exceed $ _____

C.   The Buyer may:

(i)   satisfy this contingency by Delivering to the Seller a copy of the ratified contract for the sale of the Buyer's Property with evidence that all contingencies, other than financing, have been removed or waived, together with a prequalification letter as described in the Prequalification Letter Contingency paragraph of this addendum for the Buyer of the Buyer's Property, or

(ii)   remove this contingency by Delivering to the Seller (a) the lender's letter stating that the financing is not contingent in any manner upon the sale and settlement of any real estate or obtaining a lease of any real estate and that the Buyer has sufficient funds available for the down payment and closing costs necessary to complete settlement; or (b) evidence of sufficient funds available to complete settlement without obtaining financing.

D.   If the Buyer satisfies the requirements of Paragraph 13C (i) above, this Contract will remain contingent upon the settlement of the sale of the Buyer's Property. Settlement under this Contract may not be delayed more than _____ Days after the settlement date (specified in this contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver notice to the Seller together with evidence of such voiding, at which time either the Seller or the Buyer may declare this Contract void by Delivering notice to the other party. This paragraph will survive the satisfaction of the contingency for the sale of the Buyer's Property.

**14. BACK-UP CONTRACT OR OFFER.** This Contract is first back-up to another contract or offer dated _____ between the Seller and _____ as the Buyer. This Contract shall become the primary contract immediately upon Delivery of notice from the Seller that the other contract or offer is void along with a copy of the fully executed release. The Buyer may void this back- up contract at any time prior to its becoming primary by Delivering notice to the Seller. If the contract dated _____ settles, this back-up contract will become void. The rights and obligations of the parties to the primary contract are superior to the rights and obligations of the parties to this back-up contract. If the contract under which the parties shall not commence until the date this contract becomes primary. Additionally, the date for Settlement will be _____ days after the date this contract becomes primary.

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Davis-Irving

**15. COINCIDING SETTLEMENTS.** Settlement on this Contract is contingent upon the settlement on the contract for the sale of the Buyer's Property located at _____ ("Buyer's Property.") A copy of said contract is attached evidencing that all contingencies, other than financing, have been removed or waived, along with a prequalification letter as described in the Prequalification Letter Contingency paragraph of this addendum for the Buyer of the Buyer's Property. Settlement under this Contract may not be delayed more than _____ Days after the settlement date (specified in this Contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver notice to the Seller together with evidence of such voiding, at which time either the Seller or the Buyer may declare this Contract void by Delivering notice to the other party

**16. OPTION TO KEEP HOUSE ON MARKET.** The Seller may continue to offer this property for sale and accept bona fide back-up offers to this Contract. If during the contingency period(s) as set forth in paragraph #'s _____ #'s _____ of form # _____ , a back-up offer is accepted, the Seller will Deliver notice to the Buyer together with a copy of said back-up Contract requiring that said contingency(ies) be satisfied or removed no later than 9 p.m. on the _____ Day after Delivery of the notice, or this Contract will become void.

**17. CONTINGENT ON THE SELLER PURCHASING ANOTHER HOME.** This Contract is contingent until 9 p.m. on the _____ Day after the Date of Ratification ("Deadline") to allow the Seller to obtain a ratified contract to purchase another home. This provision will terminate at the Deadline and this Contract will remain in full force and effect unless the Seller declares this Contract void by Delivering notice to the Buyer by the Deadline.

**18. THIRD PARTY APPROVAL.** This Contract is contingent upon the approval of _____ by 9 p.m. on the _____ Day after the Date of Ratification ("Deadline"). If notice of disapproval is not Delivered to the other party by the Deadline, this contingency will terminate and this Contract will remain in full force and effect. No notice of approval is required. If notice of disapproval is Delivered by the Deadline, this Contract will become void.

**19. ITEMS TO BE REMOVED.** Notwithstanding the provisions of this Contract, the following fixtures and/or items of personal property shall not convey and shall be removed from the subject property by the Seller prior to settlement and will not be replaced: _____ _____ _____ _____ _____ _____

**20. POST-SETTLEMENT OCCUPANCY AGREEMENT.** The Parties agree that the Seller shall occupy the property for a period of _____ days following settlement at the rate of $ _____ $ _____ at the time of settlement. The Seller and the Buyer acknowledge that they have read and executed, or will execute at settlement, the GCAAR Post-Settlement Occupancy Agreement and agree to be bound by its terms and provisions.

**21. PRE-SETTLEMENT OCCUPANCY AGREEMENT.** The Parties agree that Buyer shall occupy the property prior to settlement commencing on the _____ day of _____ at the rate of $ _____ per day. The Seller and the Buyer acknowledge that they have read and executed, or will execute prior to occupancy, the GCAAR Pre-Settlement Occupancy Agreement and agree to be bound by its terms and provisions.

**22. LICENSED SELLER/BUYER AGENT.** (NOTE: This clause should be used when Buyer or Seller is a licensed real estate agent or is related to one of the Parties. Failure to include could result in violation of the law.) The Parties acknowledge that _____ is a licensed real estate agent in _____ (DC, MD, VA) associated with _____ and may share in the brokerage fee to be paid and is the Buyer, Seller or is related to one of the Parties hereto.

**23. BROKERAGE FEE PAID BY THE BUYER.** It is understood and agreed by all parties that (company name) _____ , (agent's name) _____ , is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker.") The Seller has no obligation to the Buyer's Broker, and does not owe a brokerage fee or other consideration of any nature to said Buyer's Broker. This settlement office is directed to collect from the Buyer funds, at settlement, and to disburse said fee, as per the separate Buyer's Broker Agreement between the Buyer's Broker and the Buyer. This Buyer's Broker's fee is separate and apart from any brokerage fee owed to the Seller's Listing Broker pursuant to the agency paragraph of the contract. The parties acknowledge that the said Buyer's Broker relationship was disclosed to the Seller and/or the Seller's agent prior to showing the property to the Buyer.

[X] **24. AGREEMENT BETWEEN SELLER (FSBO/BUILDER) AND BUYER'S BROKER.** It is understood and agreed by all Parties that (agent's name) __Albert Smith__ , of (company name) __Jubilee Realty & Associates, LLC__ is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker.") The Seller agrees to pay to the Buyer's Broker a cash payment of $ __60,600.00__ . The settlement office is hereby irrevocably directed to deduct from the proceeds of the sale at settlement and pay the said Buyer's Broker fee. This fee is separate and apart from, and is in addition to, any brokerage fee owed to any Listing Broker pursuant to the agency paragraph of this Contract. The Parties acknowledge that said Buyer's Broker relationship was disclosed to the Seller and/or the Seller's agent prior to showing the property to the Buyer.

©2005 The Greater Capital Area Association of REALTORS®, Inc
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

GCAAR Form # 1332 - MC & DC                    5 of 6                    10/2005

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com                    Davis-Irving

**25. MASTER PLAN REVIEW FOR MONTGOMERY COUNTY PROPERTIES.** (except City of Rockville.) Notwithstanding any provisions to the contrary, this Contract is contingent until 9:00 P.M. on the _____ Day after the Date of Ratification ("Deadline"), to allow the Buyer the opportunity to review the applicable County Master Plan and the municipal land use plan for the area in which the property is located as well as any amendment to either plan and any approved official map showing planned uses, roads and highways, parks and other public facilities affecting the property ("Master Plan"). In the event the Buyer is dissatisfied with anything contained in the applicable Master Plan or municipal land use plan, in the Buyer's sole discretion, the Buyer shall Deliver notice of disapproval to the Seller on or before the Deadline specified in this paragraph, in which event this Contract shall be null and void and the Buyer's deposit shall be returned. If no such notice is received by said Deadline, this contingency shall automatically expire and be of no force and effect. (This clause may not be used for property within the corporate limits of the City of Rockville.)

**26. ADDITIONAL PROVISIONS:**
_____
_____
_____
_____
_____

**THE FOLLOWING GENERAL PROVISIONS PARAGRAPH SHALL APPLY TO THIS ENTIRE CONTRACT AND THE NOTICES PARAGRAPH SHALL SUPERSEDE ANY OTHER NOTICE PROVISION IN THIS ENTIRE CONTRACT.**

**GENERAL PROVISIONS.** This Contract shall be deemed ratified when the contract, all addenda and any modifications thereto have been signed and initialed, where required by all parties, and Delivered to the other party pursuant to the Notices paragraph.

**NOTICES.** All notices under the contract shall be in writing. Notices to the Seller shall be effective when delivered to the Seller or an Agent of the Seller named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Seller, as applicable, or alternatively, to the Agent's Supervising Manager.) Notices to the Buyer shall be effective when delivered to the Buyer or an Agent of the Buyer named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Buyer, as applicable, or alternatively, to the Agent's Supervising Manager). "Purchaser" means "Buyer" and vice versa. "Delivery" means hand carried, sent by overnight delivery service, sent by wired or electronic medium which produces a tangible record of the transmission (such as telegram, mailgram, telecopier or "Fax", email which includes an attachment with an actual copy of the executed instruments being transmitted, or U.S. Postal mailing.) In the event of overnight delivery service, Delivery will be deemed to have been made on the next business Day (Monday through Friday excluding federal holidays) following the sending, unless earlier receipt is acknowledged in writing. In the event of U.S. Postal mailing, Delivery will be deemed to have been made on the third business Day (Monday through Saturday, excluding federal holidays) following the mailing, unless earlier receipt is acknowledged in writing. "Day" or "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery, and the time period will end at 9 p.m. on the Day specified. The provisions of this paragraph regarding delivery of notices shall also be applicable to delivery of resale packages for condominiums, cooperatives and/or homeowners associations as may be required in a separate addendum.

Except as modified by this Addendum, all of the terms and provisions of this Contract are hereby expressly ratified and confirmed and will remain in full force and effect. The captions and headings are for convenience of reference only.

| | | | |
|---|---|---|---|
| SELLER Corporate Management Services, DATE | | BUYER LeMarcos & Nina Irving DATE | |
| SELLER _____ DATE | | BUYER and/or its assigns DATE | |
| HOME TELEPHONE NUMBER | | HOME TELEPHONE NUMBER | |
| OFFICE TELEPHONE NUMBER | | OFFICE TELEPHONE NUMBER | |
| FAX NUMBER | | FAX NUMBER | |
| LISTING AGENT: | | SELLING AGENT/BUYER'S AGENT: | |
| Name | | Name Albert Smith | |
| Real Estate License Number and Jurisdiction | | Real Estate License Number and Jurisdiction | |

©2005 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

GCAAR Form # 1332 - MC & DC

6 of 6

10/2005
Davis-Irving

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com



 

## Washington, DC Jurisdictional Addendum
### (REQUIRED NOTICE AND DISCLOSURE ADDENDUM
### FOR USE WITH THE REGIONAL CONTRACT)

The Contract of Sale between _____ _____ **Corporate Management Services, Inc.** _____ , Seller, and
_____ **LeMarcos & Nina Irving, and/or its assigns** _____ , Buyer, dated
**September 12, 2006** for the sale of Lot _____ **19** _____ Square **2737** Parking Space _____
Subdivision/Condominium Project _____ **Shepherd Park** _____ also known as
_____ **7336 14th Street, NW** _____ Washington, DC, **20012**
_____ (Address) _____ (Zip)
is hereby amended by the incorporation of the following paragraphs, which shall supersede any provisions to the contrary in the Contract.

**1. LEAD - BASED PAINT HAZARD.** A Seller who fails to give the required Lead-Based Paint Disclosure Form and Pamphlet may be liable under the Act for three times the amount of damages. The Seller represents that residential Property [X] was built prior to 1978 OR [ ] was not built prior to 1978 OR [ ] building date is uncertain. If the dwelling(s) was built prior to 1978 or if the building date is uncertain, this Contract is not complete and not ratified unless it includes, and the Seller and Buyer both accept the Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards, whereby the Buyer acknowledges receipt of required Lead Paint Information and has either taken the opportunity to incorporate a Lead-Based Paint Inspection contingency or waived such a right. The Seller and any agent involved in the transaction are required to retain a copy of the completed Lead-Based Paint Disclosure form for a period of 3 years following the date of settlement. The Seller and Buyer acknowledge by their respective initials below that they have read and understand the provisions of this paragraph.

_____ / _____ Seller's Initials          _____ / _____ Buyer's Initials

**2. SELLER DISCLOSURE.** Buyer acknowledges receipt of the Seller's Disclosure Statement pursuant to D.C. Code 45-951 prior to the submission of the offer [X] Yes [ ] No.

_____ / _____ Buyer's Initials

**3. RECORDATION AND TRANSFER TAXES.** The D.C. Recordation Tax will be paid by the Buyer and the D.C. Transfer Tax will be paid by the Seller.

**4. D.C. SOIL DISCLOSURE REQUIREMENTS.** The characteristic of the soil on the subject Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976 and as shown on the Soil Maps of the District of Columbia at the back of that publication is _____

_____ _____ _____ _____ _____
For further information, the Buyer can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the Department of Agriculture.

**5. TENANCY.** Seller represents that property [ ] is [X] is not subject to an existing residential lease or tenancy.

a. If the Property is tenant occupied, Buyer hereby certifies that Buyer [ ] will [ ] will not occupy the Property.

b. The Property is sold and shall be conveyed free of existing tenancy except as follows:

_____ _____ _____ _____ _____
(hereinafter the "Tenant(s)"). Without the prior written consent of Buyer (which shall not be unreasonably withheld) Seller shall not modify the terms of or terminate such tenancy, except for non-payment of rent or enter into any new leases or tenancies with respect to the Property. Seller represents to Buyer and Agents that on _____ _____ (date), Seller has provided to the Tenant(s) a written notice of the intended sale of the Property and a bona fide offer of sale or will provide same pursuant to the following paragraph. Seller and Buyer further acknowledge that, in addition to the rights under the bona fide offer of sale, the Tenant(s) has an additional fifteen (15) day right of first refusal to purchase the Property during the period specified by District of Columbia law and regulations.

© 2005, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed

Nooker Realty And Associates LL, 7700 Old Branch Ave Suite #204 Clinton MD 20735
Albert Smith                  Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

Phone: (301) 704-9400     Fax: (301) 704-4420               Davis-Irving

Seller further represents and agrees that within two (2) days after final ratification of this Contract Seller will hand-deliver to the Tenant(s) and send by first-class mail the notice of right of first refusal required by District of Columbia law and regulations and a copy of this Contract. In the event that prior to the date of this Contract Seller has not provided to the Tenant(s) a written notice of the intended sale of the Property and a bona fide offer of sale, Seller represents and agrees that within two (2) days after final ratification of this Contract Seller will hand-deliver and send by first class mail to the Tenant(s) a written notice of the intended sale of the Property, a bona fide offer of sale, of right of first refusal and a copy of this Contract. Upon or after execution of a Contract of sale of the Property between Seller and the Tenant(s), at the option of Buyer (exercisable by written notice to Seller) this Contract shall be void and the deposit hereunder shall be returned to Buyer. If, however, the Tenant(s) shall fail to exercise the foregoing rights to purchase the Property or shall execute and deliver a valid rejection of said rights, then this Contract shall remain in full force and effect. The Seller shall keep Buyer and the Agents apprised of all negotiations, correspondence, Contracts and other developments with respect to negotiations with the Tenant(s). All actions required hereunder to be taken by Seller shall be taken in accordance with District of Columbia law and regulations.

**6. UNDERGROUND STORAGE TANK DISCLOSURE. (Applicable to single family sales only.)**
In accordance with the requirements of Section 3(g) of the District of Columbia Underground Storage Tank Management Act of 1990 (D.C. Code Section 6-995.2), as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (the "Act") and the regulations adopted thereunder by the District of Columbia (the "Regulations"), Seller hereby informs Buyer that Seller has no knowledge of the existence or removal during Seller's ownership of the Property of any underground storage tanks as that term is defined in the Act and the Regulations, except as follows:

_____

I hereby certify that I have received and read a copy of the disclosure notice in this paragraph prior to signing this Contract.
Buyer: _____
LeMarcos & Nina Irving                              and/or its assigns

**7. FOREIGN INVESTMENT TAXES-FIRPTA:** Section 1445 of the United States Internal Revenue Code of 1986 provides that a buyer of a residential real property located in the United States must withhold federal income taxes from the payment of the purchase price if (a) the purchase price exceeds $300,000.00 or the purchase price is less than or equal to $300,000.00 and the property will not be owner occupied and (b) Seller is a foreign person for purposes of U.S. income taxation (foreign person). A foreign person includes, but is not limited to, a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined by the Internal Revenue Code and applicable regulations). Seller represents that Seller is not a foreign person and agrees to execute an affidavit to this effect at the time of settlement.

**8. CONDOMINIUM/COOPERATIVE/HOMEOWNERS ASSOCIATION:** Seller represents that this property ☐ is ☐ is not subject to a condominium, cooperative or homeowners association that is entitled to assess a mandatory fee. The current fee is _____ per _____

**9. NOTICES.** All notices under the contract shall be in writing. Notices to the Seller shall be effective when delivered to the Seller or an Agent of the Seller named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Seller, as applicable, or alternatively, to the Agent's Supervising Manager). Notices to the Buyer shall be effective when delivered to the Buyer or an Agent of the Buyer named in the contract (including a Dual Agent, Intra-Company Agent, or Designated Representative assigned to the Buyer, as applicable, or alternatively, to the Agent's Supervising Manager). "Purchaser" means "Buyer" and vice versa. "Delivery" means hand carried, sent by overnight delivery service, sent by wired or electronic medium which produces a tangible record of the transmission (such as telegram, mailgram, telecopier or "Fax", email which includes an attachment with an actual copy of the executed instruments being transmitted, or U.S. Postal mailing.) In the event of overnight delivery service, Delivery will be deemed to have been made on the next business Day (Monday through Friday, excluding federal holidays) following the sending, unless earlier receipt is acknowledged in writing. In the event of U.S. Postal mailing, Delivery will be deemed to have been made on the third business Day (Monday through Saturday, excluding federal holidays) following the mailing, unless earlier receipt is acknowledged in writing. "Day" or "Days" means calendar days unless otherwise specified. For the purpose of computing time periods, the first Day will be the Day following Delivery, and the time period will end at 9 p.m. on the Day specified. The provisions of this paragraph regarding delivery of notices shall also be applicable to delivery of resale packages for condominiums, cooperatives and/or homeowners associations as may be required in a separate addendum.

Seller _____  Date _____    Buyer _____  Date _____
Corporate Management Services,                                LeMarcos & Nina Irving

Seller _____  Date _____    Buyer _____  Date _____
                                                              and/or its assigns

© 2005, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.



### Prince George's County Association of REALTORS®, Inc.
#### ADDENDUM
Agreement Between Seller & Buyer's Broker
(FSBO/Builder)

Special Provisions attached to and hereby made a part of the Contract, dated __September 12, 2006__, for the purchase and sale of Lot _____ Block _____ Subdivision _____ ___ _____ ___ located at 7336 14th Street, NW, , DC 20012 _____ _____ ___, Prince George's County between Corporate Management Services, Inc. _____ _____ ____ (Sellers) and LaMarcos & Nina Irving, and/or its assigns _____ _____ ____ (Buyers).

It is understood and agreed by all parties that (agent's name) _____ Albert Smith of (Company Name) ____ Jubilee Realty & Associates, LLC ____, is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker").

The Seller agrees to pay to the Buyer's Broker a cash payment of $ 60,600.00 _____. The Settlement Office is hereby irrevocably directed to deduct and pay said Buyer's Broker's fee from the proceeds of the sale. This fee is separate and apart from, and is in addition to, any brokerage fee owed to any Listing Broker pursuant to the agency paragraph of the above-referenced Contract.

The parties acknowledge that said Buyer's Broker relationship was disclosed to Seller and/or Seller's agent prior to showing the property to the Buyer.

Seller Corporate Management Services, _____

Jubilee Realty & Associates, LLC
Buyer's Broker

Seller _____

By: _____
Authorized Agent
Albert Smith

Date _____

Date _____

This Recommended Form is property of the Prince George's County Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

PGCAR Form #600 FSBO - Agreement between Seller & Buyer's Broker - Authorization to Show

Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD 20735
Phone: (301) 794 - 9400    Fax: (301) 794 - 4420    Albert Smith
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035    www.zipform.com    Davis-Irving

SEP-12-2006 17:45 From:    To:7035556393    P.15/17

  

## GENERAL ADDENDUM

Special provisions attached to and hereby made a part thereof, the Contract dated _____ **September 12, 2006** _____

on Lot _____ **19** _____, Block _____ **2737** _____, Subdivision _____ **Shepherd Park** _____,

_____ **7336 14th Street, NW, , DC  20012** _____,

located in _____ **Washington DC** _____ Maryland between

(Purchasers) _____ **LeMarcos & Nina Irving, and/or its assigns** _____

and (Sellers) _____ **Corporate Management Services, Inc.** _____.

Seller **Corporate Management Services,**

Purchaser **LeMarcos & Nina Irving**

Seller

Purchaser **and/or its assigns**

Date

Date

© 1989, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only
Previous editions of this Form should be destroyed.

GCAAR #1320 - General Addendum                                    Page 1 of 1
Jubilee Realty And Associates LLC 7700 Old Branch Ave Suite B204 Clinton, MD  20735                    10/89
Phone.(301) 794 - 9400        Fax: (301) 794 - 4420        Albert Smith
Produced with ZipForm™ by RF FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035   www.zipform.com          Davis-Irving

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

INDYMAC BANK, F.S.B.                         *

    Plaintiff                            *

    v.                                   *          Case No.: 1-07-cv 01678

LEMARCOS A. IRVING, et al.                   *

    Defendants                           *

*    *    *    *    *    *    *    *    *    *    *    *

## AFFIDAVIT OF IGNACIO GOMEZ

The undersigned does hereby certify under the penalties of perjury that the following facts and allegations are true and correct and are made of my personal knowledge:

1.      I am over 18 years of age and am competent to testify in the above entitled action as to the matters set forth herein.

2.      The undersigned is employed by IndyMac Federal Bank, F.S.B., formerly IndyMac Bank, F.S.B., (hereinafter collectively referred to as "IndyMac") as Vice President, Manager of Repurchase Administration and Co-Director of Fraud Recovery and Loss Mitigation.

3.      The undersigned has reviewed the business records of IndyMac as kept in the regular course of business activity and as the records pertain to Lemarcos A. Irving and Nina Q. Irving and the property known as 7336 14th Street, N.W., Washington, D.C. 20010.  It is IndyMac's regular practice to make keep and maintain such records.

4.      On September 22, 2006, IndyMac provided a loan to Lemarcos and Nina Irving in the amount of $1,200,000.00 for their purchase of the property known as 7336 14th Street,

1


EXHIBIT
3
ALL-STATE LEGAL®

N.W., Washington, D.C. 20010 and for construction renovations to occur at the aforementioned property. (See attached Exhibit A.)

5.    In accordance with the loan provided to Lemarcos and Nina Irving, a Promissory Note was executed by Lemarcos and Nina Irving evidencing the debt owed to IndyMac in the amount of $1,200,000.00. (See attached Exhibit B.)

6.    In addition to the Note, Lemarcos and Nina Irving also executed a Deed of Trust which placed a first lien position against the aforementioned property in the amount of the loan, $1,200,000.00. (See attached Exhibit C.)

7.    The loan from IndyMac to Lemarcos and Nina Irving for the aforementioned property did not remain current and has been in default.

8.    The current total amount due to IndyMac for the aforementioned loan is $1,164,655.92, with interest continuing to accrue. This amount represents the sum certain of ascertainable damages that IndyMac has suffered thus far.

Name: Ignaco Gomez
Title: Vice President, IndyMac Federal Bank, F.S.B.

** NOTARY SECTION ON FOLLOWING PAGE**

2

State of California
County of ___LOS ANGELES___

Subscribed and sworn to (or affirmed) before me on this ___13___
day of ___August___, 20 08, by ___IGNACIO GOMEZ___

_____,
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.



CASSANDRA VALENZUELA
Commission # 1768208
Notary Public - California
Los Angeles County
My Comm. Expires Sep 1, 2011

Signature _____

Attached to Hearing - District of Columbia

Previous editions are obsolete

form HUD-1 (3/86) ref Handbook 4305.2

<table>
<tr><td>A.</td><td colspan="2">Settlement Statement <span>FINAL</span><br>U.S. Department of Housing and Urban Development<br>OMB No. 2502-0265 (expires 9/30/2006)</td></tr>
</table>

| B. TYPE OF LOAN | |
|---|---|
| 1. ☐FHA    2. ☐FmHA    3. ☒Conv. Unins.<br>4. ☐VA    5. ☐Conv. Ins. | |
| 6. FILE NUMBER<br>1510VA-DC | 7. LOAN NUMBER<br>124039788-PERM |
| 8. MORTGAGE INSURANCE CASE NUMBER | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 09/22/2006 at 15:52 PAM

**D. NAME OF BORROWER:** LEMARCOS A. IRVING and NINA Q. IRVING
**ADDRESS:** 5755 OAK FOREST COURT, INDIAN HEAD, MD 20640
**E. NAME OF SELLER:** CORPORATE MANAGEMENT SERVICES, INC
**ADDRESS:**
**F. NAME OF LENDER:** INDYMAC BANK FSB
**ADDRESS:** 3465 Foothill Blvd, Pasadena, CA 91107
**G. PROPERTY ADDRESS:** 7336 14TH STREET, NW, WASHINGTON, DC 20010
SQUARE 2737, LOT 0019
**H. SETTLEMENT AGENT:** Southshore Title & Escrow, Inc., P) 703-256-5880 F)703-256-5393
**PLACE OF SETTLEMENT:** 7019 Backlick Court, Springfield, VA 22151
**I. SETTLEMENT DATE:** 09/22/2006

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 1,081,000.00 | 401. Contract sales price | 1,081,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 349,105.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 109. 2nd Half 2006 Property Taxes | 2,780.00 | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 1,432,885.50 | **420. GROSS AMOUNT DUE TO SELLER** | 1,081,000.00 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 10,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 1,200,000.00 | 502. Settlement charges to seller (line 1400) | 12,596.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of First Mortgage Loan | 326,266.12 |
| | | AMERICAN INDUSTRY GROUP, LLC | |
| 205. | | 505. Payoff of Second Mortgage Loan | 333,032.60 |
| | | TIMOTHY F. GEPPERT | |
| 206. | | 506. Payoff of Third Mortgage Loan | 55,900.00 |
| | | TIMOTHY F. GEPPERT | |
| 207. | | 507. Current Water Bill | 63.43 |
| | | DC Water & Sewer | |
| 208. | | 508. Water Escrow | 150.00 |
| 209. | | 509. Tax Certificate Escrow | 10,000.00 |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes   04/01/06 to 09/22/06 | 2,644.52 | 510. City/town taxes   04/01/06 to 09/22/06 | 2,644.52 |
| 213. | | 513. Special Assessment | 6,347.33 |
| 214. | | 514. Contractor | 7,000.00 |
| 215. | | 515. | |
| 216. | | 516. Payment towards 1st trust | 327,000.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 1,212,644.52 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 1,081,000.00 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 1,432,885.50 | 601. Gross amount due to seller (line 420) | 1,081,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | 1,212,644.52 | 602. Less reduction amount due seller (line 520) | 1,081,000.00 |
| **303. CASH FROM BORROWER** | 220,240.98 | **603. CASH TO SELLER** | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No: 11-3663741) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: _____ - ____ - _____    SELLER(S) SIGNATURE(S): _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)



EXHIBIT
A
ALL-STATE LEGAL®

Previous editions are obsolete

form HUD-1 (3/86) ref Handbook 4305.2

| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | File Number: **10VA-C | FINAL    PAGE 2 |
| SETTLEMENT STATEMENT | TitleExpre, ttement Stream Printed 09/22/2006 at 15:52 PAM | |

| L. SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $1,081,000.00 @ 0.000 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | 20,295.00 | |
| 801. Loan Origination Fee 0.000 % Legacy Financial Corporation | | | |
| 802. Loan Discount % | | | |
| 803. Appraisal Fee | to Harvey and Associates (P.O.C.) 750.00 Buyer | | |
| 804. Credit Report | to MCR (P.O.C.) 13.00 Buyer | | |
| 805. Flood Certification Fee | to LSI | 12.00 | |
| 806. Tax Service Fee | to INDYMAC BANK FSB | 75.00 | |
| 807. Underwriting Fee | to INDYMAC BANK FSB | 200.00 | |
| 808. Processing Fee | to Legacy Financial Corporation | 380.00 | |
| 809. Funding Fee | to INDYMAC BANK FSB | 700.00 | |
| 810. YSP Pd by Lender | to Legacy Financial Corporation $4,500.00 POC by Lender | | |
| 811. Indymac Admin Fee | to INDYMAC BANK FSB | 995.00 | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | |
| 901. Interest From | to @$ /day | | |
| 902. Mortgage Insurance Premium for | to | | |
| 903. Hazard Insurance Premium for | 1 yr to M.A. CHENAULT INSURANCE SERVICES | 3,680.00 | |
| 904. | | | |
| 905. Construction Reserves | to INDYMAC BANK FSB | 301,950.00 | |
| 1000. RESERVES DEPOSITED WITH LENDER FOR | | | |
| 1001. Hazard Insurance | mo. @ $ /mo | | |
| 1002. Mortgage Insurance | mo. @ $ /mo | | |
| 1003. City Property Taxes | mo. @ $ /mo | | |
| 1004. County Property Taxes | mo. @ $ /mo | | |
| 1005. Annual Assessments | mo. @ $ /mo | 0.00 | 0.00 |
| 1009. Aggregate Analysis Adjustment | | | |
| 1100. TITLE CHARGES | | 250.00 | 250.00 |
| 1101. Settlement or closing fee | to Southshore Title & Escrow, Inc. | 464.75 | |
| 1102. Abstract or title search | to POTOMAC TITLE CORPORATION | 125.00 | |
| 1103. Title examination | to Southshore Title & Escrow, Inc. | 50.00 | |
| 1104. Title insurance binder | to Southshore Title & Escrow, Inc. | | 275.00 |
| 1105. Document Preparation | to Southshore Title & Escrow, Inc. | | |
| 1106. Notary Fees | | | |
| 1107. Attorney's fees | | | |
| (includes above items No: ) | | | |
| 1108. Title insurance | to First American Title Insurance Company | 7,192.75 | |
| (includes above items No: ) | | | |
| 1109. Lender's Policy | 1,200,000.00 - 3,575.00 | - | |
| 1110. Owner's Policy | 1,081,000.00 - 3,617.75 | | |
| 1111. Delivery Fees | to Southshore Title & Escrow, Inc. | 50.00 | |
| 1112. Release Procurement Fee | to Southshore Title & Escrow, Inc. | | 180.00 |
| 1113. | | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | |
| 1201. Recording Fees Deed $26.50 Mortgage $ 208.50 ; Release $ | | 235.00 | |
| 1202. City Transfer Tax Deed $11,891.00 ; Mortgage $ | | | 11,891.00 |
| 1203. City Recordation Tax Deed $11,891.00 ; Mortgage $ | | 11,891.00 | |
| 1204. Construction Tax Deed $ ; Mortgage $ | | | |
| 1205. | | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | |
| 1301. Date Down Endorsement | to Fidelity | 500.00 | |
| 1302. Builders Evaluation | to INDYMAC BANK FSB | 60.00 | |
| 1400. TOTAL SETTLEMENT CHARGES | (enter on lines 103, Section J and 502, Section K) | 349,105.50 | 12,596.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

CORPORATE MANAGEMENT SERVICES, INC

LeMARCOS A. IRVING

NIKA D. IRVING
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

9/27/06

Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.



# FIXED/ADJUSTABLE RATE NOTE

### (1 Year Libor Index - Rate Caps)

Loan #: 124039788-PERM

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

September 22, 2006          PASADENA                              California
[Date]                       [City]                                [State]

7336 14th Street Northwest
Washington, DC  20010

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   1,200,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
INDYMAC BANK, F.S.B.
a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

This Note, as amended by the attached Residential Construction Loan Addendum Amending Note (the "Addendum"), represents both a construction/home improvement loan and a permanent mortgage loan. During the Construction Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note and ending on the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will be in default under the Addendum and under this Note. If Completion has occurred prior to the Permanent Loan Commencement Date, then the loan evidenced by this Note will automatically become a permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of the Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in this Note on the Permanent Loan Commencement Date.

I will pay interest beginning on the Permanent Loan Commencement Date at the Initial Interest Rate. The "Initial Interest Rate" will be calculated by adding (i) the Index described in Section 4(B) of this Note that is most recently available as of the day that is 45 days prior to the Permanent Loan Commencement Date, to (ii) the Margin described in Section 4(C), and (iii)
Zero                                            percentage points ( 0.000      %), and rounding the result to the nearest one-eighth percentage point (0.125%), except that the Initial Interest Rate may not be more than the Maximum Rate shown in Section 4(D) of this Note. If Completion (as defined in the Residential Construction Loan Agreement) has occurred on schedule and the Permanent Loan Commencement Date therefore occurs on or before the required Completion Date set forth in the Residential Construction Loan Agreement, and if there has been no default on or before that date under the Note or the Residential Construction Loan Agreement, then I will have a one-time option to choose to have the interest rate set forth in Section 2(A) of the Residential Construction Loan Addendum Amending Note carry over and be the Initial Interest Rate instead of having the Initial Interest Rate determined in accordance with the preceding formula. If I want to exercise this option, I will notify the Note Holder in writing prior to the Permanent Loan Commencement Date.

The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**IndyMac Bank**
**Construction-to-Perm Adjustable Rate Note**
**Intermediate Libor ARMs · Multistate**
8480826 (0506)                          Initials:
DDS-IT1

Page 1 of 5

VMP Mortgage Solutions, Inc. (800)521-7291

HCL 1012
06/05



EXHIBIT

B

ALL-STATE LEGAL




### 3.  PAYMENTS

#### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on    May 1, 2007    . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    April 1, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    155 NORTH LAKE AVENUE
PASADENA, CA  91101
or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in an amount calculated as follows (the "Initial Payment Amount"). After determining the Initial Interest Rate, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Permanent Loan Commencement Date in full on the Maturity Date at my Initial Interest Rate in substantially equal payments. My Initial Payment Amount will change in accordance with Sections 3(C) and 4(C) of this Note.

#### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

#### (A) Change Dates

The interest rate I will pay may change on the    1st    day of April, 2012    , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

#### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of Interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("Libor"), as published in *The Wall Street Journal.*

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

#### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding    Three and One Quarter    percentage point(s) (    3.250    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

#### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    13.250    % or less than    3.250    %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than    Two    percentage points (s) (    2.000    %) from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than    13.250    %.

Initials: _____

 

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of            15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be           5.000   % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.



**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

 

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option as if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
                -Borrower

Lemarcos A Irving

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

Nina Q Irving

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

*[Sign Original Only]*



DATE: September 22, 2006

LOAN #: 124039788-PERM

# RESIDENTIAL CONSTRUCTION LOAN
## ADDENDUM AMENDING NOTE
### (Multistate)

THIS Addendum is incorporated into and shall be deemed to amend and supplement the Note ("Note"), of even date herewith, given by the undersigned Borrower ("Borrower" whether one or more) to evidence Borrower's indebtedness to the Note Holder, which indebtedness is secured by that certain Security Instrument, of even date herewith, covering the premises described in the Security Instrument. Notwithstanding anything to the contrary set forth in the Note, Borrower hereby agrees to the following:

## 1. CONSTRUCTION/PERMANENT LOAN

This Note, as amended, represents both a construction/home improvement loan and a permanent mortgage loan. During the Construction Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note and ending on the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will be in default under this Addendum and under the Note. If Completion has occurred prior to the Permanent Loan Commencement Date, then the loan evidenced by the Note will automatically become a permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of this Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in the Note on the Permanent Loan Commencement Date.

## 2. INTEREST

### (A) Interest During the Construction Period

I will pay interest only on the amount advanced at the yearly rate of 8.250 %. Note Holder will calculate interest by applying a daily interest rate (determined by dividing the yearly rate by 360) to the actual outstanding balance for each day (calculating each day's outstanding balance by taking the beginning balance for that day and adding any advances made that day and subtracting any payments received or credits for that day) in the billing period, and by adjusting each billing period to equal 30 days as follows: (i) for billing periods of 31 days, Note Holder will calculate interest only for the first 30 days and will ignore the 31st day, and (ii) for a billing period of 28 or 29 days, Note Holder will calculate interest for the first 28 or 29 days in the normal manner, and will calculate interest for the remaining one or two days of the adjusted 30-day billing period by treating the outstanding balance on the last day of the billing period as the outstanding balance for such remaining one or two days of the billing period. Note Holder will calculate the interest due for each month and will mail to me a statement of the amount of interest due. I can determine the amount of interest due at any time by calling the number given to me for such inquiries by the Note Holder or Note Holder may permit me to access an internet site designated by the Note Holder for such information. I will make payments each month in the amount of the interest accrued for the prior month on or before the first (1st) day of each month. Interest will accrue on a daily basis until payment is received, and all accrued but unpaid interest for the Construction Period shall be due and payable on the Permanent Loan Commencement Date. I agree that to the extent the Loan Budget Worksheet/Line Item Cost Breakdown, as defined in the Residential Construction Loan Agreement, includes undisbursed funds allocated to interest reserve, Note Holder is authorized, in its discretion, to establish a interest reserve from the proceeds of the loan evidenced by the Note, or from the borrower's Funds Account (as defined in the Residential Construction Loan Agreement), the amount of which interest reserve shall be established by Note Holder in its sole and absolute discretion, and Note Holder shall use such interest reserve to pay interest on the Note as it becomes due. I may, in my sole option, pay accrued interest each month by check made payable directly to Note Holder, but in the event such payment is not received from me by the scheduled payment date, I will be deemed not to have exercised such option for such interest payment, and Note Holder shall pay such interest payment from the interest reserve. Amounts advanced by Note Holder from the interest reserve shall accrue interest at the rates from time to time in effect hereunder.

IndyMac Bank

Residential Construction Loan Addendum Amending Note - Fixed Const. Rate - Multistate

HCL 910
12/03

8480 343 (0312)

Page 1 of 3

VMP Mortgage Solutions, Inc. (800)521-7291

DDS-CRI



**(B) Option to Choose Alternative Permanent Product**

I have a one-time option to choose an alternative permanent loan product at any time during the 30-day period immediately preceding the Permanent Loan Commencement Date if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement and if there is no default under the Note, this Addendum or the Residential Construction Loan Agreement. If I choose to exercise this option, I may select another permanent phase loan product offered at the time I choose to exercise the option at the rates and under the terms and conditions that product is then being offered. If I exercise this option, I will sign a loan modification agreement and, if requested by Note Holder, a new Note reflecting the terms and conditions of the product that I have chosen. I understand that the terms and conditions, including interest rates of products that are offered change from time to time, and the terms and conditions, including interest rates of products that are offered at the time my option is effective may not be as attractive to me as the terms and conditions, including interest rates of products that are available at the time I sign this Addendum. If I want to exercise this option, I will notify the Note Holder in writing prior to the end of my option period, and if I do not so notify the Note Holder or if I fail for any reason to execute the required modification documents prior to the end of my option period, then the original terms and conditions of the Note will be the terms and conditions of the permanent phase of my loan beginning on the Permanent Loan Commencement Date.

## 3. ADVANCES

In the event Completion has not occurred for any reason prior to the required Completion Date specified in the Residential Construction Loan Agreement, I will be in default under the Note and this Addendum, and the Note Holder may choose any of the remedies available to it under applicable law. In such event, however, Note Holder shall have the option, in its sole and absolute discretion, to permit the loan to convert to a permanent loan as follows: (i) Note Holder shall make any remaining advances of construction funds under the Residential Construction Loan Agreement into an escrow or pledge account established for such purpose, (ii) funds may be transferred from such escrow or pledge account to the Direct Cost Disbursement Account upon Note Holder's approval and in accordance with Note Holder's instructions and upon satisfaction of any conditions for such disbursement in accordance with the Residential Construction Loan Agreement, (iii) the terms and conditions of the Residential Construction Loan Agreement shall continue until Completion has occurred, (iv) I will make payments of principal and interest on the entire amount advanced (not just on the amount disbursed) beginning on the scheduled Permanent Loan Commencement Date as if Completion had occurred as scheduled. Note Holder may require me to sign any documents it deems necessary or appropriate to effect such an arrangement, including documents granting Note Holder a security interest in the funds advanced, as a condition to agreeing to permit the conversion of my loan to a permanent loan.

## 4. LATE CHARGES

If the Note Holder has not received the full amount of any monthly payment by the end of          15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000    % of my overdue payment. I will pay this late charge promptly but only once on each late payment.

## 5. EVENTS OF DEFAULT AND ACCELERATION OF THE DEBT

Note Holder may declare the entire unpaid principal balance and accrued interest due and payable under the terms of the Note, as amended by this Addendum if any payment of interest is not made when due during the Construction Period or if default should occur under any covenant, condition or agreement contained in the Loan Documents. The definition of Loan Documents includes the Note, as amended by this Addendum, Security Instrument securing the Note as amended and the Residential Construction Loan Agreement.

## 6. CONFLICTS

If any term or provision of this Addendum shall be in conflict with any term or provision of the Note, the term or provision of this Addendum shall control. This Addendum shall be interpreted under the laws of                    District of Columbia              . Any provisions of this Addendum adjudged to be invalid shall be deemed amended from it, with the remainder of the provisions to be in full force and effect. Any remedies or rights of Note Holder expressed in this Addendum are cumulative of, and not exclusive of any other remedies and rights. Except as amended or supplemented hereby, the terms and provisions of the above referenced Note shall remain unchanged and in full force and effect.

## 7. TERMINATION

After the advance of all funds as necessary to complete the improvements, completion of the improvements, and the satisfaction of all conditions as described in the Residential Construction Loan Agreement, this Addendum will be null and void and no longer in effect, and any funds remaining in any construction account will be refunded to the Borrower or credited to the principal balance.

HCL 910

DDS-CRI

## 8. NOTICE OF NO ORAL AGREEMENT

The written Loan Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Addendum.

EXECUTED this 22 day of September, 2006.

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| _9/22/06_ | | _9/22/06_ | |
| Lemarcos A Irving | | Nina Q Irving | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

*[Sign Original Only]*

Return To:
INDYMAC BANK, F.S.B.
3465 EAST FOOTHILL BLVD./ATTN: DOCUMENT MANAGEMENT
PASADENA, CA 91107

*Return to:*
SOUTHSHORE TITLE & ESCROW, INC.
7019 BACKLICK COURT
SPRINGFIELD, VA 22151
*1570 VA = DC*

———————— [Space Above This Line For Recording Data] ————————

# DEED OF TRUST

Loan Number: 124039788-PERM

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated          September 22, 2006          , together with all Riders to this document.

**(B) "Borrower"** is
LEMARCOS A IRVING AND NINA Q IRVING, HUSBAND AND WIFE

Borrower's address is  5755 Oak Forest Court

Indian Head, MD  20640                              . Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is
INDYMAC BANK, F.S.B.

Lender is a a federally chartered savings bank
organized and existing under the laws of          THE UNITED STATES OF AMERICA
Lender's address is  155 NORTH LAKE AVENUE
PASADENA, CA  91101

Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is
Southshore Title & Escrow, Inc.
Trustee's address is    7019 Backlick Ct
Springfield, VA  22151

DISTRICT OF COLUMBIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3009

**VMP** ®-6(DC) (0205).02          1/01 (rev. 5/02)
Page 1 of 15          Initials: *LAI  NQI*
VMP Mortgage Solutions, Inc.

DDS-DCJ

EXHIBIT
ALL-STATE LEGAL®
C

(E) "Note" means the promissory note signed by Borrower and dated          September 22, 2006
The Note states that Borrower owes Lender
One Million Two Hundred Thousand and 00/100
                                                                                                              Dollars
(U.S. $ 1,200,000.00                                    ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than          April 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note,
and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be
executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Construction Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are
imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar
paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to
order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-
sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated
clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party
(other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the
Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any
amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor
legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all
requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify
as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of

Parcel ID Number:                                                                      [Street]
7336 14th Street Northwest
Washington, District of Columbia        20010        [Zip Code] ("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency.

However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.

Initials: _____

Form 3009 1/01 (rev. 5/02)

VMP®-6(DC) (0205).02
DDS-DCJ

Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.

Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

VMP®-6(DC) (0205).02
DDS-DCJ

Form 3009 1/01 (rev. 5/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.

If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of                     **N/A**  % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
                                                  -Borrower

Lemarcos A Irving
5755 Oak Forest Court
Indian Head, MD 20640

_____

_____ (Address)

_____ (Seal)
                                                  -Borrower

Nina Q Irving
5755 Oak Forest Court
Indian Head, MD 20640

_____ (Address)

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Address)        _____ (Address)

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Address)        _____ (Address)

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Address)        _____ (Address)

VMP®-6(DC) (0205).02                              Page 14 of 15                              Form 3009 1/01 (rev. 5/02)
DDS-DCJ

State of Maryland
DISTRICT OF COLUMBIA, ss:

State of Maryland
a Notary Public in and for the District

I,
of Columbia, do hereby certify that

Le Marcos A. Irving and  Nina Q. Irving

personally known to me as the person(s) who executed the foregoing instrument bearing date of          22nd
day of    September, 2006          , personally appeared before me in said District and acknowledged said
instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes therein contained .

Witness my hand and official seal this      22nd    day of    September, 2006 .

Patrice X. [signature]      (Seal)
Notary Public, D.C.
MD

TO BE RECORDED WITH THE SECURITY INSTRUMENT

Loan #: 124039788-PERM                         Date: September 22, 2006

## RESIDENTIAL CONSTRUCTION LOAN RIDER WITH SECURITY AGREEMENT AND FINANCING STATEMENT (Multistate)

Words used in this Rider are defined below. Words in the singular mean and include the plural and vice versa.

"Agreement" means the Residential Construction Loan Agreement.

"Borrower" is  Lemarcos A Irving, Nina Q Irving

"Borrower's Funds Account" means any and all construction loan accounts established pursuant to the Agreement and held by Lender and used to deposit additional funds provided by Borrower.

"Contractor" is  DP CUSTOM HOUSE

and its successors or assigns.

"Improvements" are the improvements made to a single family residence *or* new construction of a single family residence.

"Lender" is  INDYMAC BANK, F.S.B.,

a federally chartered savings bank

and its successors or assigns.

"Note" means the promissory note of even date signed by Borrower in favor of Lender.

"Property" means the property commonly known as

7336 14th Street Northwest
Washington, DC  20010

"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument of even date signed by Borrower in favor of Lender.

THIS RESIDENTIAL CONSTRUCTION LOAN RIDER shall be deemed to amend and supplement the Security Instrument of the same date given by the Borrower to secure Borrower's Note to Lender of the same date and covering the Property described in the Security Instrument.

IndyMac Bank, F.S.B.
Residential Construction Loan Rider to Security Instrument - Multistate

8480334 (0311)                    VMP Mortgage Solutions, Inc. (800)521-7291                    12/03
DDS-CR2

**AMENDED AND ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1.   **Residential Construction Loan Agreement.** Borrower agrees to comply with the covenants and conditions of the Agreement between Borrower, Lender and Contractor, which is incorporated herein by this reference and made a part of this Security Instrument. The Agreement provides for the construction of certain Improvements on the Property. All advances made by Lender pursuant to the Agreement shall be an indebtedness of Borrower secured by this Security Instrument as amended, and such advances may be obligatory under the terms of the Agreement. The Security Instrument secures the payment of all sums and the performance of all covenants required by Lender in the Agreement. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Agreement, the principal sum and all interest and other charges provided for in the loan documents and secured hereby shall, at the option of the Lender, become due and payable.

2.   **Security Instrument.** This Security Instrument is a "construction mortgage" securing an obligation incurred for the construction of Improvements on the Property including the acquisition cost of the Property, if any, and any notes issued in extension, renewal, or substitution thereof. Borrower affirms, acknowledges and warrants that prior to the recordation of this Security Instrument, as amended, in the appropriate Real Property Records of the State of _____ District of Columbia _____ , no Improvements contemplated by the Loan Agreement have been constructed, no work has been performed, and no materials have been ordered or delivered.

3.   **Future Advances.** This Security Instrument shall secure in addition to the sum evidenced by the Note all funds hereafter advanced by Lender to or for the benefit of Borrower, as contained in the Contract and/or the Agreement for the construction of Improvements on the mortgaged property or for any other purpose. All future advances shall be made within the time limit authorized by the laws of this state. To the extent that moneys advanced by Lender are used to pay for the costs of acquiring the Property, this mortgage shall be a purchase money security interest.

4.   **Disbursements to Protect Security.** All sums disbursed by Lender prior to completion of the Improvements to protect the security of this Security Instrument, up to the principal amount of the Note and any future advances, shall be treated as disbursements pursuant to the Agreement. All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless the collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefore.

5.   **Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

6.  **Breach by Borrower.** In case of breach by Borrower of the covenants and conditions of the Agreement, Lender, at Lender's option, with or without entry upon the Property, (a) may invoke any of the rights or remedies provided in the Agreement, or (b) may accelerate the sums secured by this Security Instrument.

7.  **Termination of Agreement upon Amortization.** After the commencement of amortization of the Note, the terms of the Agreement (except to the extent Lender is indemnified therein) shall be null and void, and there shall be no claim or defense arising out of or in connection with the Agreement against the obligations of the Note and this Security Instrument.

8.  **Property.** The property covered by this Security Instrument includes the property described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property described below which constitutes real property is sometimes referred to as the "Real Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal Property," listed as follows:

Any and all buildings, improvements (provided in the Agreement or otherwise), and tenements now or hereafter erected on the Property; any and all heretofore and hereafter vacated alleys and streets abutting the Property, easements, rights, appurtenances, rents (subject however to any assignment of rents to Lender), leases, royalties, mineral, oil and gas rights and profits, water, water rights and water stock appurtenant to the Property (to the extent they are included in Borrower's fee simple title); any and all fixtures, machinery, equipment, building materials, appliances, and goods of every nature whatsoever now or hereafter located in, or on, or used, or intended to be used in connection with the Property and all replacements and accessions of them, including, but not limited to those for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air and light; security and access control apparatus; plumbing and plumbing fixtures; refrigerating, cooking and laundry equipment; carpet, floor coverings and interior and exterior window treatments; furniture and cabinets; interior and exterior sprinkler plant and lawn maintenance equipment; fire prevention and extinguishing apparatus and equipment, water tanks, swimming pool, compressor, vacuum cleaning system, disposal, dishwasher, range, and oven, any shrubbery and landscaping; any and all plans and specifications for development of or construction of Improvements upon the Property; any and all contracts and subcontracts relating to the Property; any and all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions related to the Property; any and all permits, licenses, franchises, certifications, and other rights and privileges obtained in connection with the Property; any and all products and proceeds arising from or by virtue of the sale, lease, or other disposition of any of the Property; any and all proceeds payable or to be payable under each policy of insurance relating to the Property; any and all proceeds arising from the taking of all or part of the Property for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof; all building permits, certificates of occupancy, certificates of compliance, any right to use utilities of any kind including water, sewage, drainage and any other utility rights, however arising whether private or public,

present or future, including any reservation, permit, letter, certificate, license, order, contract or otherwise and any other permit, letter, certificate, license, order, contract or other document or approval received from or issued by any governmental entity, quasi-governmental entity common carrier, or public utility in any way relating to any part of the Property or the Improvements, fixtures and equipment thereon; all other interests of every kind and character which Borrower now has or at any time hereafter acquires in and to the Property, including all other items of property and rights described elsewhere in this Security Instrument.

The Personal Property also includes the Borrower's Funds Account, together with any interest accruing thereon and proceeds thereof.

9.   **Security Agreement and Financing Statement.** This Security Instrument shall be a security agreement granting Lender a first and prior security interest in all of Borrower's right, title and interest in, to and under the Personal Property, under and within the meaning of applicable statutes of this state, as well as a Mortgage and/or a Deed of Trust granting a lien upon and against the Real Property. In the event of any foreclosure sale all of the Real and Personal Property may, at the option of Lender, be sold as a whole or in any part. It shall not be necessary to have present at the place of such sale the Personal Property or any part thereof. Lender shall have all the rights, remedies and recourses with respect to the Personal Property afforded to a "Secured Party" by the applicable statutes of this state in addition to and not in limitation of the other rights and recourse afforded Lender under this Security Instrument. Borrower shall, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon any property, real and/or personal, described in this Security Instrument; (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; or (iv) the failure by Borrower to perform or observe any of the provisions or covenants in this Security Instrument; or (v) any actions taken by Lender for any reason whatsoever in any case or proceeding under Chapter 7, 11, or 13 of the Bankruptcy Code or any successor statute thereto, including, but not limited to, action taken with respect to issues particular to federal bankruptcy law.

Lender may, at its election, at any time after the delivery of this Security Instrument, sign one or more copies of this Security Instrument in order that such copies may be used as a financing statement under the statutes of this state. Lender's signature need not be acknowledged, and is not necessary to the effectiveness hereof as a mortgage, a security agreement, or (unless otherwise required by applicable law) a financing statement.

10.   **Completion.** Lender shall not be responsible for the completion of the Improvements, and shall not in any way be considered a guarantor or surety of performance by Borrower. In the event the Improvements are not completed according to the plans and specifications approved by Lender, and it is determined for whatever reason the Lender does not have a lien arising by or through Borrower, then Lender shall have a valid lien for its loan amount, less the amount reasonably necessary to complete the Improvements, or in such event Lender, at its option, shall have the right to complete the Improvements, and the lien shall be valid for the loan amount.

11.   **Invalid Provisions.** If any provision of this Security Instrument is declared invalid, illegal, or unenforceable by a court of competent jurisdiction, then such invalid, illegal or unenforceable provision shall be severed from this Security Instrument and the remainder enforced as if such invalid, illegal or unenforceable provision is not a part of this Security Instrument.

12.   **Address.**

The name and address of the Borrower/Debtor during construction of the Improvements is:

Lemarcos A Irving, Nina Q Irving

5755 Oak Forest-Court
Indian Head, MD  20640

The name and address of the Lender/Secured Party is:

INDYMAC BANK, F.S.B.,
a federally chartered savings bank
155 NORTH LAKE AVENUE
PASADENA, CA  91101

13.   **Other Provisions.** The following notice is required by law:

IMPORTANT NOTICE: YOU ARE HEREBY NOTIFIED THAT ANY PERSON PERFORMING LABOR ON YOUR PROPERTY OR FURNISHING MATERIALS FOR THE CONSTRUCTION, REPAIR, OR IMPROVEMENT OF YOUR PROPERTY WILL BE ENTITLED TO A LIEN AGAINST YOUR PROPERTY IF HE IS NOT PAID IN FULL, EVEN THOUGH YOU MAY HAVE PAID THE FULL CONTRACT PRICE TO YOUR CONTRACTOR. THIS COULD RESULT IN YOUR PAYING FOR LABOR AND MATERIALS TWICE. THIS LIEN CAN BE ENFORCED BY THE SALE OF YOUR PROPERTY. TO AVOID THIS RESULT, YOU MAY DEMAND FROM YOUR CONTRACTOR LIEN WAIVERS FROM ALL PERSONS PERFORMING LABOR OR FURNISHING MATERIALS FOR THE WORK ON YOUR PROPERTY. YOU MAY WITHHOLD PAYMENT TO THE CONTRACTOR IN THE AMOUNT OF ANY UNPAID CLAIMS FOR LABOR OR MATERIALS. YOU ALSO HAVE THE RIGHT TO DEMAND FROM YOUR CONTRACTOR A COMPLETE LIST OF ALL LABORERS AND MATERIAL SUPPLIERS UNDER YOUR CONTRACT, AND THE RIGHT TO DETERMINE FROM THEM IF THEY HAVE BEEN PAID FOR LABOR PERFORMED AND MATERIALS FURNISHED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Residential Construction Loan Rider.

_____ (Seal)
                         -Borrower

Lemarcos A Irving

_____ (Seal)
                         -Borrower

Nina Q Irving

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

**ATTENTION OFFICIAL RECORDER OF INSTRUMENTS:** This instrument covers goods that are or are to become fixtures on the described Property herein and is to be filed for record in the District Recorder's records where mortgages on real estate are recorded. Additionally, this instrument should be appropriately indexed, not only as a mortgage but as a financing statement covering goods that are or are to become fixtures on the described Property herein. The mailing address of the Borrower (Debtor) and Lender (Secured Party) are set forth in this instrument.

[Please See Attached Acknowledgment(s)]

HCL 911

8480334 (0311)                    Page 5 of 6                    12/03
DDS-CR2

## FIXED/ADJUSTABLE RATE RIDER
### (1 Year Libor Index - Rate Caps)

Loan #: 124039788-PERM

THIS ADJUSTABLE RATE RIDER is made this    22nd  day of        September, 2006      ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust,
or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
INDYMAC BANK, F.S.B.,
a federally chartered savings bank
(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

7336 14th Street Northwest
Washington, DC 20010

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note contains the following provisions: This Note, as amended by the attached Residential
Construction Loan Addendum Amending Note (the "Addendum"), represents both a
construction/home improvement loan and a permanent mortgage loan. During the Construction
Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction
Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note
and ending on the first day of the month preceding the due date of the first monthly payment of
principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as
defined in the Residential Construction Loan Agreement) has occurred before that date in accordance
with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will
be in default under the Addendum and under this Note. If Completion has occurred prior to the
Permanent Loan Commencement Date, then the loan evidenced by this Note will automatically
become a permanent mortgage loan on the Permanent Loan Commencement Date, and the
provisions of the Addendum will cease to be in effect and all terms and conditions of the loan will be as
set forth in this Note on the Permanent Loan Commencement Date.

IndyMac Bank
Construction-to-Perm Adjustable Rate Rider
Intermediate Libor ARMs - Multistate
8480827 (0506)                         Page 1 of 5                         HCL 1013
                     VMP Mortgage Solutions, Inc. (800)521-7291                06/05

DDS-9FI

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    8.250    %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the        1st    day of            April, 2012            , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("Libor"), as published in The Wall Street Journal.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three and One Quarter        percentage points (  3.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    13.250 % or less than        3.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than            Two            percentage points (    2.000  %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than  13.250 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
                        -Borrower
Lemarcos A Irving

_____ (Seal)
                        -Borrower
Nina Q Irving

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

8480827 (0506)                Page 5 of 5                HCL 1013
                                                          06/05

DDS-9FI

# Exhibit A

All that certain lot or parcel of land situate in the **District of Columbia** and being more particularly described as follows:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16th STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

BEING the same lot of ground which by Deed dated 02/11/2005 and recorded 03/04/2005 among the Land Records of District of Columbia in Instrument No. 31077 was granted and conveyed by 7336, LLC, a body corporate of the DISTRICT OF COLUMBIA unto CORPORATE MANAGEMENT SERVICES, LLC the Grantors (or Borrowers) herein.

# SECURITY AFFIDAVIT

## CLASS 1 AND CLASS 2

File No. 1510VA-DC

We, LEMARCOS A. IRVING and NINA Q. IRVING, the owners of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to Section 412a of district of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-813), with 5 or fewer units.

_____
LEMARCOS A. IRVING

_____
NINA Q. IRVING

Subscribed and sworn to before me this 22nd day of September, 2006.

_____
Notary Public

My commission expires: ___9/1/09___

File No. **1510VA-DC**
DEED-SHORT FORM D.C.

**This Deed**, made this the 22nd day of September, 2006, by and between **CORPORATE MANAGEMENT SERVICES, INC, a body corporate of the State of Maryland,** erroneously known of record as CORPORATE MANAGEMENT SERVICES, LLC, party of the first part, and **LEMARCOS A. IRVING and NINA Q. IRVING,** parties of the second part.

**Witnesseth,** that in consideration of the sum of **ONE MILLION EIGHTY ONE THOUSAND AND 00/100 DOLLARS ($1,081,000.00),** the party of the first part does hereby grant unto the parties of the second part, in fee simple, as tenants by the entirety, their assigns and unto the survivor of them, and the survivor's personal representatives and assigns, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, being more fully described as follows, to wit:

Lot numbered Nineteen (19) in Square numbered Twenty-Seven Hundred Thirty-Seven (2737) in the subdivision made by Lynchburg Investment Corporation of part of the tract of land called "GIRL'S PORTION" now known as "16th STREET HEIGHTS", as per plat recorded in Liber 42 at Folio 8 of the Land Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 19 in Square 2737.

BEING the same lot of ground which by Deed dated 02/11/2005 and recorded 03/04/2005 among the Land Records of District of Columbia in Instrument No. 31077 was granted and conveyed by 7336, LLC, a body corporate of the DISTRICT OF COLUMBIA unto CORPORATE MANAGEMENT SERVICES, LLC the Grantors (or Borrowers) herein.

Which has a mailing address of:  **7336 14TH STREET, NW
WASHINGTON, DC  20010**

Title Insurer: **First American Title Insurance Company**

**And** the said party of the first part covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.



**EXHIBIT**

4

ALL-STATE LEGAL

In Testimony Whereof, CORPORATE MANAGEMENT SERVICES, INC, has caused these presents to be signed by , its , and its corporate seal to be affixed hereto; and does hereby constitute and appoint , its , as its true and lawful attorney in fact for it and in its name to acknowledge and deliver these presents as its act and deed.

IN PRESENCE OF:

CORPORATE MANAGEMENT SERVICES, INC

By: Alan R. Davis, President

State Of VIRGINIA
County Of FAIRFAX, To Wit:

I, EKATERINA ANANIEVA, a Notary Public in and for the aforesaid jurisdiction do hereby certify that ALAN R. DAVIS, President, who is named as attorney-in-fact as aforesaid by virtue of the authority vested in him/her by said Corporation, and acknowledged said instrument to be the act and deed of said Corporation and the he executed the aforegoing and annexed deed, bearing the date of the 22nd day of September, 2006, personally appeared before me in the said jurisdiction and acknowledged the same to be his act and deed.

Witness my hand and seal this the 22nd day of September, 2006.

EKATERINA ANANIEVA, Notary Public

My Commission Expires:

AFTER RECORDING RETURN TO:
Southshore Title & Escrow, Inc.
7019 Backlick Court
Springfield, VA 22151
File No. 1510VA-DC



Ekaterina Ananieva
NOTARY PUBLIC
Commonwealth of Virginia
My Commission Expires
April 30, 2009

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B. | * | |
| Plaintiff | * | |
| v. | * | Case No.: 1-07-cv 01678 |
| LEMARCOS A. IRVING, et al. | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER OF JUDGMENT BY DEFAULT AGAINST DEFENDANTS ALBERT SMITH, ALAN DAVIS, JUBILEE REALTY & ASSOCIATES, LLC AND CORPORATE MANAGEMENT SERVICES, INC.

Upon consideration of a Motion for Entry of Default Judgment against Defendants Albert Smith, Corporate Management Services, Inc., Alan R. Davis filed by Plaintiff IndyMac Bank, F.S.B. and Federal Deposit Insurance Corporation as receiver for IndyMac Bank, F.S.B. ("FDIC-R"), and any responses thereto, having been read and considered, and this Court having determined that judgment by default is appropriate, it this _____ day of _____, 2008, hereby

**ORDERED**, that the Motion for Entry of Default Judgment against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. is hereby **GRANTED**, and it is further

**ORDERED**, that default judgment is entered in favor of Plaintiff FDIC-R as receiver for IndyMac Bank, F.S.B. and against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. in the amount of $1,164,655.92, plus post-judgment interest, and in favor of Plaintiffs, and it is further

1

**ORDERED**, that any punitive damages, costs and attorneys fees entered against Defendants Albert Smith, Alan Davis, Jubilee Realty & Associates, LLC and Corporate Management Services, Inc. will be deferred until this Court renders a final judgment as to all remaining Defendants in the above captioned action.

_____
JUDGE, United States District Court
for the District of Columbia

Copies to:

Michael N. Russo, Jr.
Michael S. Steadman, Jr.
Council, Baradel, Kosmerl & Nolan, PA
125 West Street, 4th Floor
P.O. Box 2289
Annapolis, MD  21404

Douglas Richard Taylor, Esq.
P.O. Box 4566
Rockville, MD  20850

Jan E. Simonson, Esq.
CARR MALONEY PC
1615 L St., N.W., Ste. 500
Washington, D.C.  20036

Larry E. Becker, Esq.
Becker, Kellogg & Berry, P.C.
5501 Backlick Rd., Ste. 200
Springfield, VA  22151

Sean M. Hanifin, Esq.
ROSS, DIXON & BELL
2001 K Street, N. W.
Washington, D.C.  20006

Matthew W. Carlson, Esq.
Thompson & O'Donnell, LLP
1212 New York Ave., N.W., Ste. 1000
Washington, D.C. 20005

Michael Thomas Hamilton, Esquire
Michelle Marzullo, Esquire
Marks, O'Neill, O'Brien & Courtney, P.C.
600 Baltimore Avenue, Suite 305
Towson, MD 21204

Mr. Lemarcos A. Irving
5755 Oak Forest Court
Indian Head, MD 20640

Ms. Nina Q. Irving
5755 Oak Forest Court
Indian Head, MD 20640

Mr. Albert Smith
4140 Ferry Landing Rd.
Dunkirk, MD 20754

Corporate Management Services, Inc.
Resident Agent: Alan R. Davis
1400 Spring St., Ste. 415
Silver Spring, MD 20910

Mr. Alan R. Davis
1400 Spring St., Ste. 415
Silver Spring, MD 20910

Jubilee Realty & Associates, LLC
4140 Ferry Landing Road
Dunkirk, Maryland 20754